**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ENVIRONMENTAL DEFENSE CENTER, CENTER FOR BIOLOGICAL DIVERSITY, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SANTA BARBARA CHANNELKEEPER, and WISHTOYO FOUNDATION

*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, in his official capacity as the Secretary of the Department of Transportation, PIPELINE AND HAZAROUDS MATERIALS SAFETY ADMINISTRATION, and PAUL ROBERTI, in his official capacity as the Administration of the Pipeline and Hazardous Materials Safety Administration, DOUG BURGUM, in his official capacity as the Secretary of the U.S. Department of the Interior, and U.S. FISH AND WILIDLIFE SERVICE

*Respondents*,

---

**PETITION FOR REVIEW**

---

Linda Krop
Margaret M. Hall
Jeremy M. Frankel
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622

*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Babara Channelkeeper*

Julie Teel Simmonds
Talia Nimmer
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Local Rule 15-1, the Environmental Defense Center, Center for Biological Diversity, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation (collectively, "Petitioners") hereby petition this Court for review of an order (or orders) issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

Petitioners also petition for review of the concurrence of the United States Fish and Wildlife Service (FWS), an agency within the United States Department of the Interior, with PHMSA's determination that its order(s) will not likely adversely affect species listed, or proposed for listing, under the Endangered Species Act (ESA), or their critical habitat.

This Petition challenges, under the standard set forth in 49 U.S.C. § 60119(a), PHMSA's June 25, 2026, order granting a "Special Permit" (the "Special Permit") to Sable Offshore Corp., designated Docket Number PHMSA-2026-0464. The Special Permit applies to two defective onshore oil pipelines, designated as Lines CA-324 and CA-325, which, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at Pentland

Station in Kern County, California (the "Pipelines"). The Special Permit purports to, *inter alia*, authorize operation of the Pipelines without effective cathodic protection—the absence of which caused, in 2015, Line CA-324 to corrode to the point of rupture, resulting in the catastrophic Refugio Oil Spill. A copy of the Special Permit is attached to this Petition as **Exhibit A**.

The Special Permit was accompanied by other documents entitled Analysis and Findings, Jurisdictional Determination, Environmental Assessment, and Finding of No Significant Impact (collectively, the "Related Documents"). The Related Documents were all prepared in support of the Special Permit and all issued the same date (June 25, 2026). To the extent that any or all of the Related Documents constitute separate orders or actions by PHMSA, Petitioner challenges them as well. The Related Documents are attached to this Petition as **Exhibits B-E**.

Pursuant to 49 U.S.C. § 60119(a), an order issued by PHMSA may be challenged by filing a Petition for Review directly in the court of appeals for the circuit in which the petitioner resides or has its principal place of business, and the petition must be filed within 89 days after the order is issued. Petitioners, each of whom are non-profit organizations who reside and/or have its principal place of business within the Ninth Circuit, filed this Petition on September 22, 2026—89 days after PHMSA issued the Special Permit and Related Documents. Thus,

Petitioners have timely and properly sought review of PHMSA's order(s) directly in this Court.

Petitioners claims include, but are not limited to, the following: the Special Permit and Related Documents were issued in excess of PHMSA's statutory jurisdiction and authority; the Special Permit and Related Documents were issued unlawfully, including, but not limited to, in violation of the Hazardous Liquid Pipeline Safety Act (PSA), the National Environmental Policy Act, and the ESA[1]; and the Special Permit and Related Documents, inclusive of the findings and conclusions therein, are arbitrary, capricious, and an abuse of discretion.

Petitioners also challenge FWS's concurrence with PHMSA's determination that its order(s) will not likely adversely affect ESA-listed species, species proposed for listing, or their critical habitat as arbitrary, capricious, and not in accordance with the ESA, in violation of the Administrative Procedure Act. Because this challenge is directed at, and intertwined with, the validity of PHMSA's order(s), and the PSA provides exclusive jurisdiction for the Court of Appeals to review such orders, this challenge too is properly brought directly in

[1] Because Petitioners' ESA claims "challenge[] an agency order issued pursuant to a substantive statute with a 'more specific' judicial review scheme than the ESA"—i.e., the PSA—they "must [be] evaluated . . . under the jurisdictional provisions of that substantive statute." *Ctr. for Bio. Diversity v. E.P.A.*, 847 F.3d 1075, 1089 (9th Cir. 2017) (quoting *Am. Bird Conservancy v. F.C.C.*, 545 F.3d 11909, 1194 (9th Cir. 2008)). Thus, they are appropriately brought directly in this Court. *See id.*; 49 U.S.C. § 60119(a).

this Court. *See, e.g., California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911-12 (9th Cir. 1989); *see also Ctr. for Bio. Diversity v. Bernhardt*, 982 F.3d 724, 733 (9th Cir. 2020). FWS's concurrence is attached as **Exhibit F**.

On July 23, 2026, Petitioners served on all Respondents a 60-day notice of intent to sue for violating the Endangered Species Act. A copy of Petitioners' 60-day notice is attached as **Exhibit G**.

Petitioners' members use and enjoy the areas and wildlife affected by PHMSA's order(s) and FWS's concurrence for cultural, recreational, aesthetic, and scientific purposes and are adversely affected and aggrieved by PHMSA and FWS's decisions. Petitioners respectfully ask this Court to hold unlawful, set aside, and/or vacate PHMSA's order(s) and FWS's concurrence, and for any other relief that this Court deems proper.

Respectfully submitted this 22nd day of September, 2026.

*/s/ Linda Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*/s/ Julie Teel Simmonds*

Julie Teel Simmonds
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**STATEMENT OF RELATED CASES**

The following related cases are pending: *Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.,* Ninth Circuit Court of Appeals Case No. 25-8059; *State of California v. Pipeline and Hazardous Materials Safety Administration, et al.*, Ninth Circuit Court of Appeals Case No. 26-508; and *State of California v. Pipeline and Hazardous Materials Safety Administration, et al.,* Ninth Circuit Court of Appeals Case No. 26-4629.

Respectfully submitted this 22nd day of September, 2026.

*/s/ Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and this Court's Rule 26.1, Petitioners Environmental Defense Center (EDC), Get Oil Out! (GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, by and though the Santa Barbara-Ventura Chapter ("Sierra Club"), Santa Barbara Channelkeeper (SBCK), the Center for Biological Diversity (CBD), and Wishtoyo Foundation state as follows:

These Petitioners are non-profit organizations and do not have any parent corporations or any publicly held corporations owning 10% or more of their stock.

Respectfully submitted this 22nd day of September, 2026.

*/s/ Linda J. Krop*
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds
Talia Nimmer
CENTER FOR BIOLOGICAL DIVERSITY
*Counsel for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

# EXHIBIT A

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Effective Dates:** | June 25, 2026, to June 25, 2036 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

**Grant of Special Permit:**

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS)[1] grants this special permit to Sable Offshore Corp. (Sable). This special permit applies to two segments of the Santa Ynez Pipeline System (SYPS), an interstate hazardous liquid pipeline facility that transports crude oil produced on the Outer Continental Shelf (OCS) through an onshore processing facility located in Santa Barbara County, California, to a terminal located in Kern County, California. The two segments that are subject to the special permit are known as Lines CA-324 and CA-325 (CA-325A and CA-325B). The regulation waived is 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H), which requires hazardous liquid pipeline operators to remediate certain longitudinal seam weld corrosion within 180 days of discovery.

**I. Purpose and Need:**

Lines CA-324 and CA-325 were originally installed with polyurethane foam and an overlying polyethylene wrap tape to provide thermal insulation. The use of these materials is known to cause shielding, a condition that interferes with the proper functioning of cathodic protection and increases the risk of corrosion in pipeline systems. Sable requested a special permit authorizing an alternative approach for managing the increased corrosion risk on Lines CA-324 and CA-325

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California. The Consent Decree includes provisions to address a rupture that occurred on the SYPS in Santa Barbara County, California, in May 2015.

As relevant here, the Consent Decree required the prior operator of the SYPS to obtain a waiver before restarting Lines CA-324 and CA-325 to ensure that effective measures were in place to mitigate the risk of corrosion. The Consent Decree also incorporated the outstanding requirements from a corrective action order that PHMSA issued following the rupture (CPF No. 5-2015-5011H). The CAO required the restart plan for Lines CA-324 and CA-325 to include a long-term plan for managing corrosion under insulation (CUI). The Consent Decree provided multiple options for satisfying this requirement. One of the options was obtaining a special permit that requires: 1) accelerated reassessments; 2) use of appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating in-line inspection (ILI) technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.[2]

The conditions in this special permit address the requirements in the Consent Decree. Specifically, the conditions require substantially more frequent integrity assessments as compared to the pipeline safety regulations at 49 CFR Part 195. Each integrity assessment must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking), The conditions also establish more stringent anomaly repair criteria as compared to Part 195; require enhanced data integration from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks; and require the performance of a corrosion growth rate analysis to better inform the analysis of integrity assessment data. PHMSA notes that it previously issued an emergency special permit to Sable for Lines CA-324 and CA-325 imposing substantially similar conditions on December 23, 2025 (Docket no. PHMSA-2025-1502),[3] and that the California Office of State Fire Marshal (OSFM) issued waivers to Sable containing essentially the same conditions on December 17, 2024.[4]

PHMSA further notes that the jurisdictional status of Lines CA-324 and CA-325 has changed since the District Court entered the Consent Decree. At that time, CA-324 and CA-325 were

---

[2] *See also* PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).

[3] The emergency special permit included several conditions which Sable indicated it had completed prior to the effective date of the emergency special permit but that it had not provided to PHMSA for review. Sable provided additional records to PHMSA following the issuance of the emergency special permit, rendering those conditions no longer necessary for inclusion in this special permit. In addition, on February 13, 2026, Sable requested that its application be considered in accordance with the Notice of Limited Enforcement Discretion and Statement of Policy issued by PHMSA on January 12, 2026. As part of that request, Sable agreed to follow the terms and conditions in the emergency special permit until PHMSA issued its decision on this application.

[4] OSFM submitted a comment on the docket for this special permit request stating that the proposed special permit conditions removed the state waiver requirement that Sable account for tool tolerance in its evaluation of corrosion anomalies needing remediation prior to restart of the SYPS. As discussed in the SPAF, that requirement was not clearly stated in the state waiver itself, and PHMSA determined that the margin of error afforded by that tool tolerance allowance was not necessary for the conditions to be consistent with pipeline safety.

considered part of an intrastate hazardous liquid pipeline facility subject to regulation by OSFM.[5] However, as discussed more fully in the Jurisdictional Determination, PHMSA has since determined that Lines CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility. Accordingly, PHMSA has the sole and exclusive authority to issue the special permit for Lines CA-324 and CA-325 that Sable has requested in this proceeding.[6]

## II. Special Permit Segments

This permit pertains to the specified special permit segments defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR § 195.452(h)(4)(iii)(H).

**General Conditions:**

**1)** The special permit segments may only be used to transport crude oil.

**2)** Prior to transporting crude oil in the special permit segments, Sable must develop and implement procedures for the conditions and requirements described in the special permit.

**3)** Sable shall not exceed maximum operating pressure (MOP) limits for the special permit segments, as follows:

- **a)** The MOP of Line CA-324 cannot exceed 1,003 pounds per square inch gauge (psig).
- **b)** The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1,000 psig.

---

[5] *See* 49 U.S.C. §§ 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility"); 60105 (establishing requirements for State pipeline safety program certifications).

[6] 49 U.S.C. §§ 60104(c), 60118(c).

   **c)** The MOP of Line CA-325B cannot exceed 1,292 psig between Sisquoc and Check Valve 37, and 1,170 psig between Check Valve 37 and Pentland Station.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the special permit segments, as follows:

   **a)** The maximum operating temperature of the crude oil transported in Line CA-324 must not exceed 140 degrees Fahrenheit (°F) for more than 12 consecutive hours.

   **b)** The maximum operating temperature of the crude oil transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

   **c)** The maximum operating temperature of the crude oil transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

**6)** This special permit does not relieve Sable from any applicable requirements contained in the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** ILIs performed pursuant to this special permit must include

   **a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

      **i.** Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

      **ii.** General corrosion means uniform or gradually varying loss of wall thickness over an area.

   **b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

   **c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24-inch pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All test specimens must be from the predominant existing 24-inch pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344 inches that was manufactured by Nippon Steel Corp. in the 1980s. At least three separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ),[7] and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e., three samples for pipe body,

---

[7] The HAZ, as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

three samples for HAZ, and three samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

**9)** Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30-inch pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All test specimens must be from both of the two following predominant existing 30-inch pipe specifications:

**a)** API 5L X70 pipe with a nominal thickness of 0.281 inches that was manufactured by the various pipe mills in the 1980s.

**b)** API 5L X65 pipe with a nominal thickness of 0.344 inches that was manufactured by the various pipe mills in the 1980s.

At least three separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, HAZ, and the double submerged arc weld (DSAW) long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e., three samples for pipe body, three samples for HAZ, and three samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

**10)** All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-324 and CA-325A/B.[10] Upon restart Sable must utilize ultrasonic thickness wall measurement (UTWM) and ultrasonic shear wave crack detection (USCD) ILI tools within 7 days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must use the UTWM and USCD ILI results to identify, to evaluate, and to remediate any immediate and 180-day repair conditions listed in this special permit.

**11)** Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with section 1.2 and exclusions in accordance with section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within 1 inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

**12)** Sable must use cleaning pigs at regular intervals not to exceed a biweekly basis to

---

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing.

[9] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all relevant records to PHMSA.

maintain adequate cleanliness on the internal pipe wall of the special permit segments.

**13)** Pressure testing:[11]

**a)** Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100 percent specified minimum yield strength for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)** Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)** Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)** Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)** Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

---

[11] Sable completed all of the testing required in this Condition, but the condition is included for completeness.

**f)** Sable must obtain approval for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

**i)** Section(s) of the special permit segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the special permit segments cannot be safely operated.

**14)** ILI assessment and frequency:

**a)** Prior to performing ILIs of the special permit segment, Sable shall provide PHMSA with a written notification describing its assessment plan with the following information:

**i.** Dates for integrity assessment.

**ii.** ILI tool(s) selected, in accordance with API Standard 1163, section 5, and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications.

**iii.** ILI tool vendor(s).

**iv.** Required tool specifications, including operational specifications and tool validation methodology.

**v.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications.

**vi.** Criteria used to identify locations for excavation and field verification.

**vii.** Non-destructive examination.

**b)** Within 7 days prior to any anticipated ILI tool run, Sable must use extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal loss tool(s):

**i.** Initial ILI tool runs – Each year, during the first 2 years of operating the

---

[12] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address, Dustin.Hubbard@dot.gov, or his designee.

[13] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR § 195.3 unless another edition is explicitly specified in this special permit.

special permit segments, Sable shall conduct at least two ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every 6 months not to exceed 9 months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

**ii.** Subsequent ILI tool runs – After the first 2 years of operating the special permit segments, Sable shall conduct at least one UTWM each calendar year, not to exceed 15 months, or the ILI assessment must be assessed at more frequent intervals if the remaining failure pressure ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the special permit segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an IMU.

**d)** Crack detection tools – Sable shall conduct at least one USCD tool each calendar year, not to exceed 15 months,[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

**i.** These crack tool runs must use an IMU and must be able to detect and size axial and circumferential cracks.

**ii.** USCD performance specification requirements:

**1.** The USCD tools must have a probability of detection that is greater than or equal to 90 percent for axial and circumferential cracks.

**2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks located in the base material.

**3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks located in the weld.

**4.** The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5 percent or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed outside the range of the tool velocity listed in the

[14] Sable may petition PHMSA to revise the reassessment interval for crack detection tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

tool specification for 2 percent or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the special permit segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10 percent or greater, based on raw data, prior to adding in any correction for tool tolerance.

**h)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition, and includes that tolerance in determining the size of each indication reported to Sable.

**i)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10 percent accuracy for 80 percent of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**j)** Prior to the ILI final report being received, Sable must perform at least four separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**15)** Discovery of condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**16)** Immediate repair conditions:[16]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

**i.** Crack or crack-like anomaly that is equal to or greater than 50 percent of pipe wall thickness.

**ii.** Crack or crack-like anomaly that has a predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion located where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the

---

[15] A minimum of four independent direct examination excavations must be used for unity plots.

[16] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

MOP.[17]

**17)** 180-day repair conditions:[18]

**a)** A crack or crack-like anomaly that has a predicted failure pressure of less than 1.5 times the MOP.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

**c)** All internal or external metal loss anomalies that have an ILI reported depth of 40 percent or greater wall loss, including tool sizing tolerance for depth.[19]

**d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within 1 inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion growth rate analysis (CGRA):

**a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILIs (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the special permit segments is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

**b)** The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILIs, methodologies for growth rate calculations and errors from comparing ILI data.

**c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss.

**d)** When determining the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

**e)** All metal loss indications that are projected to reach a depth of 70 percent or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

---

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(iii), except for those associated with 49 CFR § 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31 percent metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41 percent metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

**19)** Pressure reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for 2 months prior to the date of inspection, until the anomaly is repaired.

**20)** In field direct examination of pipe:

**a)** Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking, such as magnetic particle inspection, shear wave technology, or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

**b)** Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40 percent in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions apply if Sable chooses repair method 5 for metal loss anomalies:

**i.** Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

**ii.** Sable must increase the metal loss anomaly's depth by 20 percent when it inputs it into the formula for calculating the number of wraps needed for repair method 5.

**iii.** After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15 percent of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

**c)** Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

**d)** Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.

**e)** Sable must recoat in accordance with its coating repair procedure.

**f)** All external polyurethane foam and the polyethylene tape wrap on buried pipe exposed during the field evaluation must not be replaced with new insulation or

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

polyethylene tape wrap.

**21)** Integrity management:

**a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

**i.** Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

**ii.** Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

**b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10 percent and 40 percent for validation. The sample size shall be at least ten, unless fewer than ten indications are reported within that range, in which case Sable would examine the number of indications called.

**c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

**d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

**e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the special permit segments. The review must be conducted within 6 months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

**f)** Within 1 year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[25]

**22)** Data requirements for predicted failure analysis:

**a)** Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results, including—but not limited to—tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

---

[25] Sable completed the evaluation required in this condition, but the condition is included for completeness.

**b)** The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

**23)** Recordkeeping:

**a)** Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the special permit segments and must be submitted to the PHMSA in the manner requested (electronic, hardcopy, or other format) within 30 days.

**b)** Sable must maintain the following records:

**i.** Technical approach used for the analysis.

**ii.** All data used and analyzed.

**iii.** Pipe and longitudinal weld seam properties.

**iv.** Procedures used to implement special permit conditions.

**v.** Evaluation methodology used.

**vi.** Models used.

**vii.** Direct in situ examination data.

**viii.** All ILI tool assessments information evaluated.

**ix.** Pressure test data and results.

**x.** All in-the-ditch assessments performed on the special permit segments.

**xi.** All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results.

**xii.** All finite element analysis results.

**xiii.** The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology.

**xiv.** The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods.

**xv.** Safety factors used for fatigue life and/or predicted failure pressure calculations.

**xvi.** Reassessment time interval and safety factors.

**xvii.** The date of the review.

**xviii.** Confirmation of the results by qualified technical subject matter expert(s).

**xix.** Approval by responsible Sable management personnel.

**xx.** Records of additional preventive and mitigative measures performed.

**xxi.** Reports required by this special permit.

**24)** Reporting:

**a)** Any release on the special permit segments shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the

time of discovery.[26]

**b)** An email notification shall be made to PHMSA at least 3 days prior to a special permit segment being exposed for non-emergency purposes of field evaluation and repair. The email notification shall include, if applicable:

- **i.** Tool type and run date.
- **ii.** Unique identifier (e.g., dig number, joint number, flaw ID, condition type).
- **iii.** Dig sheets.
- **iv.** Field contact information for Sable.
- **v.** Time and location of the field evaluation and repair.

**c)** Sable shall provide a summary of conditions report within 210 days of the last date of an ILI run to PHMSA and include:

- **i.** Tool type.
- **ii.** Run date.
- **iii.** Summary of conditions report.[27]
- **iv.** Final vendor report and pipe tally.

**d)** Sable shall provide a report to PHMSA by June 15 of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

- **i.** A closure report for the previous calendar year (CY), which contains:
  - **1.** Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs.
  - **2.** Identify features that remain to be assessed.
  - **3.** Unity plots for previous ILI runs.
- **ii.** Fracture mechanics and pressure cycling analyses in accordance with condition 21(a).
- **iii.** The third-party ILI expert reviews in accordance with condition 21(e).
- **iv.** AC and DC interference surveys that are due in accordance with condition 21(f).
- **v.** A copy of the CGRA for prior year, including:
  - **1.** Mean corrosion growth rate for the special permit segments.
  - **2.** Distribution graph of the corrosion growth rate for the special permit segments (e.g., occurrences (#) versus corrosion rate (mpy)).

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, State, or Federal regulations.

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA) to be included in the summary of conditions reports, closure report, and annual reports if information provided is not deemed sufficient.

**25)** Limitations:

**a)** PHMSA grants this special permit for a period of ten years from the date of issuance.

**b)** PHMSA may order the special permit segments to be shut down, if appropriate, pursuant to its authority under 49 U.S.C. § 60112.

**c)** PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

**d)** In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

**e)** If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide PHMSA with written notice of the change within 30 days of the consummation date.

Issued in Washington, D.C. on June 25, 2026.

PAUL ROBERTI

Digitally signed by PAUL ROBERTI
Date: 2026.06.25 18:22:33 -04'00'

Paul Roberti,

Administrator, Pipeline and Hazardous Materials Safety Administration

# EXHIBIT B

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Special Permit Analysis and Findings
## Sable Special Permit

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Purpose:

The Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS),[1] provides this information to describe the facts of the subject special permit application submitted by Sable Offshore Corp. PPC (Sable), to discuss significant public comments received with respect to the application, to present the engineering and safety analysis of the special permit application, and to make findings regarding whether the requested special permit should be granted and, if so, under what conditions.

## Pipeline System Affected:

On January 22, 2026, Sable applied for a special permit seeking to waive the applicability of the requirements in 49 CFR § 195.452(h)(4)(iii)(H) to approximately 124.42 miles of 24- and 30-inch diameter pipe in the Santa Ynez Pipeline System (SYPS). The pipe is part of two SYPS segments, known as Lines CA-324 and CA-325 (CA-325A and CA-325B), that continue the transportation of crude oil produced on the Outer Continental Shelf (OCS) from an onshore processing facility to a terminal in Kern County, California. Additional information about Sable's special permit application is provided below.

## Special Permit Request:

Sable, in its special permit application, requested a waiver of 49 CFR § 195.452(h)(4)(iii)(H) as applied to Lines CA-324 and CA-325. Without this special permit, 49 CFR § 195.452(h)(4)(iii)(H) would

[1] Throughout this special permit the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

require corrosion of or along a longitudinal seam weld to be scheduled for evaluation and remediation within 180 days of discovering the condition.[2]

Description and definition of the special permits segments and the pipeline specifications are detailed in Sable's application letter with attachments in Docket No. PHMSA-2026-0464, including a map of the special permit segments in Attachment A.

## Public Notice:

On February 24, 2026, PHMSA posted a notice of this special permit request in the Federal Register (91 FR 8949) with a closing date of March 26, 2026. On March 20, 2026, PHMSA posted a notice extending the comment period to April 3, 2026, to give the public additional time for review following the issuance of the Defense Production Act (DPA) Order by the Secretary of Energy on March 13, 2026. Sable's special permit application letter with attachments, the Federal Register notices, environmental assessment, and all other pertinent documents are available for review in Docket No. PHMSA-2026-0464 in the Federal Docket Management System (FDMS) located at www.regulations.gov.

PHMSA reviewed all public comments received for Docket Number PHMSA-2026-0464 through April 3, 2026. PHMSA received 58 public comments submitted by both identified and anonymous members of the public concerning this special permit request.[3] Significant comments are addressed below. Some comments, which specifically referenced possible environmental effects of the proposed special permit or the environmental assessment prepared by PHMSA, are addressed in the Finding of No Significant Impact (FONSI), also available on Docket Number PHMSA-2026-0464 at www.regulations.gov.

## Public Comments:

### Jurisdictional Comments

Several commenters questioned whether CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. One commenter argued that the system should be classified as an interstate pipeline because it connects offshore Federal waters to a system terminating at international ports, thereby falling under federal rather than strictly state oversight. PHMSA addresses these comments in a separate document, titled Jurisdictional Determination in Support of Special Permit, that is available for review in the docket.

### General Comments

Many commenters supported the issuance of the special permit, noting that the operation of the SYPS is essential for California's energy security, economic health, and national interests. Supportive commenters believed the SYPS is ready for a safe restart and referenced the numerous tests, repairs, and system enhancements completed in recent years as demonstrating that the pipeline meets safety

[2] OPS published a revision of Hazardous Liquid Integrity Management Frequently Asked Question 7.16 on September 12, 2025 clarifying that corrosion coincident with a longitudinal seam does not need to be mitigated per 49 CFR § 195.452(h)(4)(iii)(H).

[3] PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments.

requirements. Supportive commenters explained that increasing domestic oil production will stabilize or lower gas prices, and that the operation of the SYPS is expected to support high wage jobs and generate state and local tax revenues to fund schools, infrastructure, and public services. Supporters pointed out that California imports a large percentage of its oil, that domestic production may protect the state from global supply disruptions, and that oil transported by pipeline has a lower carbon footprint than oil shipped by oceangoing tankers. Some commenters stated that the SYPS is critical infrastructure and argued that the Secretary of Energy's DPA Order demonstrates the strategic importance of the pipeline system for national energy reliability.

Thirty-one comments, submitted by anonymous and identified individuals as well as several organizations, opposed the issuance of the special permit. The opposing commenters stated that granting the special permit would prioritize corporate profit over the safety of the environment, wildlife, and local communities. Some commenters referenced the 2015 failure of Line CA-324 and resulting release of crude oil. Commenters pointed out that corrosion caused the 2015 spill, and stated that the special permit does not address the underlying cause of the incident – an inadequate coating and insulation system that shields the steel from effective cathodic protection – and would waive a regulatory provision involving corrosion repair deadlines.

In response to these comments, PHMSA notes that the special permit conditions address the risks of corrosion occurring underneath insulation on the SYPS. Corrosion-driven metal loss is detectable using ILI tools and can be remediated using more stringent repair criteria, including the use of corrosion growth rate assessments. PHMSA further notes that the special permit only waives the requirement that Sable remediate certain longitudinal seam weld corrosion within 180 days, and that the waiver is subject to additional and more stringent conditions, including anomaly detection and repair deadlines calibrated to address corrosion that could threaten the pipeline integrity. In addition, PHMSA notes that the pipe in segments CA-324 and CA 325 is not particularly susceptible to longitudinal seam weld corrosion, meaning that the waiver and conditions, in combination, enhance the safety of the pipeline. The limited effectiveness of cathodic protection beneath insulation does not mean that corrosion on the pipeline cannot be adequately addressed to maintain the safety of the pipeline, particularly in light of the additional and more stringent conditions included in the special permit.

**Comments Regarding the National Energy Emergency and the DPA Order**

PHMSA received several comments addressing the potential impact that the DPA order might have on issuing the special permit, including whether the special permit remains necessary. Sable submitted a comment asserting that the special permit is necessary to fulfill the DPA Order and to resume hydrocarbon transportation during a national energy emergency, while implementing safety measures that exceed standard Federal pipeline safety requirements. Sable's submission included an extensive expert declaration from Michael J. Rosenfeld, P.E., who explained that the use of state-of-the-art, multi-tool in-line inspections (ILIs) performed much more frequently than the industry standard—coupled with more stringent anomaly repair criteria—effectively mitigates risks related to cathodic protection shielding and elevated operating temperatures. Other commenters stated that issuing the special permit is consistent with the DPA, and that the Secretary of Energy directed Sable to re-start the pipeline on March 13, 2026, under the authority of the DPA, so issuing the special permit is justified. Other commenters disagreed and stated that the DPA has no bearing on the special permit. These commenters stated that the DPA Order itself is unlawful and does not supersede safety requirements

under the Pipeline Safety Act. In response to these comments, PHMSA notes that the Secretary of Energy issued the DPA Order separately from PHMSA's consideration of Sable's special permit request, and that PHMSA does not have authority to ignore, override, or otherwise nullify the DPA Order. PHMSA has determined that it remains appropriate to consider and to issue the special permit with conditions that are consistent with pipeline safety.

Opposing commenters stated that the operation of the SYPS is not needed to address a national energy emergency, pointing to data and economic models indicating that restarting the pipeline would have limited impact on statewide or national energy markets. They also claimed the local economic benefit would be negligible compared to the risk, stating the local economy relies on tourism, recreation, and fishing, which were negatively impacted following the 2015 spill. One commenter claimed that many workers are brought in from Gulf states and live on the offshore platforms, meaning the pipeline restart would result in no benefits to local jobs or businesses.

In response to these comments, PHMSA notes that Sable's application included multiple reports (Attachments C, D, E, and F) describing the economic and energy impact of the SYPS on Kern County and California. The possible negative impacts of a spill do not outweigh these benefits because PHMSA has determined that the special permit maintains pipeline safety, meaning there is no increased risk of spills occurring compared to operation of the SYPS absent the special permit. PHMSA also notes that while special permit applications must provide a description of impacts on affected stakeholders, the decision of whether to grant the application turns on whether the special permit would be consistent with pipeline safety. While PHMSA believes that operation of the SYPS will be economically beneficial, that determination is not necessary to issue this special permit. Instead, PHMSA issues this permit because it has determined that the pipeline's operation is consistent with pipeline safety.

Commenters also stated that PHMSA does not have the authority to issue the emergency special permit (ESP) or the special permit. Specifically, commenters stated that issuing the special permit per E.O. 14156 was improper because the E.O. does not supersede applicable law, statutory protections, or state governance. Commenters also stated that the ESP did not meet the definition of emergency, which should be reserved for incidents like hurricanes or spills. Another commenter stated that PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency is an inappropriate application of PHMSA's enforcement responsibilities, and that PHMSA did not adequately justify how issuing the ESP and the special permit would meet the purpose and need and address the energy emergency.

In response to these comments, PHMSA notes that it is authorized to grant special permits on an emergency basis under 49 U.S.C. § 60118(c)(2) and 49 CFR 190.341(g), and that the ESP expired on its own terms in February 2026. PHMSA further notes that 49 CFR 190.341(g) defines emergency as an event that may be: local, regional, or national in scope and includes significant fuel supply disruptions and natural or manmade disasters such as hurricanes, floods, earthquakes, terrorist acts, biological outbreaks, releases of dangerous radiological, chemical, or biological materials, war-related activities, or other similar events. Only the President can declare a national energy emergency. PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given

the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implemented the directives in E.O. 14154 and avoided a potential gap in coverage under the waivers issued by OSFM. PHMSA's Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to National Energy Emergency, which is separate from the permit itself, is an application of PHMSA's enforcement discretion. The Notice merely allows operators to request expedited consideration of requests for special permits which implicate the national energy emergency, and exercises PHMSA's discretion to forgo enforcement action while such requests are under PHMSA review. The Notice did not modify PHMSA's jurisdiction, rights of inspection or access, or investigatory authority, and did not prevent PHMSA from "pursuing an enforcement action if it determines that a significant safety issue warrants doing so" or if the request is ultimately denied. Even absent the issuance of the Notice, PHMSA would retain the discretion not to pursue enforcement actions as appropriate.

**Comments Regarding Proposed Special Permit Conditions**

An opposing comment highlighted that past ILIs on this system underestimated corrosion, meaning that ILI data should not continue to be relied upon to assess the pipeline segments. In response to this comment, PHMSA notes that the special permit conditions require ILI assessment of the pipeline segments to a much more exacting level than standard ILI tool runs. To ensure ILIs are an effective tool in assessing the integrity of the pipeline, the special permit conditions require accelerated reassessments, appropriate and complementary tool selection to address all threats, enhanced data analysis practices, more stringent repair criteria, and advanced corrosion growth data analysis techniques. In addition, PHMSA personnel have reviewed records related to actions that Sable has already taken to ensure the pipeline system will be operated safely, including safely completing hydrostatically pressure testing of Lines CA-324, CA-325A, and CA-325B in 2025 to 139-percent or greater of the pipelines' maximum operating pressure.

Other commenters stated that issuing the special permit for a pipeline with a history of incidents is inconsistent with pipeline safety. Commenters referenced previous instances of Sable's noncompliance. Commenters also stated that the terms of the special permit are misrepresented, and it is inaccurate to describe them as substantially the same as those in the State waivers. Other commenters noted that Sable has a positive safety reputation. Overall, PHMSA has determined that granting the special permit would be consistent with requirements under the Pipeline Safety Act and the policy priorities embodied in E.O. 14156 and E.O. 14154. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP, and the conditions imposed are overwhelmingly aligned with the requirements from the prior state waivers. Any future non-compliance by Sable with the special permit conditions may be addressed by PHMSA's inspection program and enforcement actions as necessary.

Some commenters proposed changes to conditions, including limiting the term of the special permit to a fixed number of years, allowing PHMSA to revoke the special permit if Sable does not comply with all conditions, and allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances. In light of these comments, PHMSA is revising the conditions to grant the special permit for a period of ten years from the date of issuance, and removing the prior limitation in Condition 25(a). PHMSA reserves the right to include such a limitation in the future.

**Comments Regarding Sable as an Applicant**

Some opposing commenters questioned whether Sable submitted its application to bypass California state law AB 864, which imposes additional requirements on state-regulated pipelines, including a requirement to analyze the need for additional leak detection systems, shutoff systems, and valves, and to retrofit existing pipelines according to that analysis. In response to these comments, PHMSA notes that the Consent Decree required completion of an analysis to determine the need for emergency flow restricting devices, and that, as a result, Sable installed 27 new safety valves along Lines CA-324, CA-325A and CA-325B, including a safety valve only 1.25 miles downstream of the start of CA-324. The special permit conditions also impose more stringent repair criteria on the pipeline segments. These actions demonstrate that Sable has and will improve the safety of the pipeline segments regardless of the applicability of AB 864.

Other negative commenters questioned the trustworthiness of Sable as an operator due to investigations and enforcement proceedings conducted by other governmental entities. They also stated that restart was rushed due to financial deadlines faced by the operator. PHMSA notes that Sable has provided the agency with extensive records regarding testing and anticipated operations, and that PHMSA performed an on-site inspection of its onshore processing facility as well as its control room. As an interstate pipeline, the SYPS will also be subjected to mandated reporting requirements and PHMSA's inspection program, including enforcement action as appropriate. PHMSA notes that the restart is occurring pursuant to a detailed plan and under the agency's oversight following years of improvements to the pipeline. Lastly, due to the issuance of the DPA Order, the restart of the pipeline has already safely occurred, and PHMSA's special permit does not displace or nullify the DPA Order's requirement that Sable operate the SYPS.

**Comments Regarding the Prior State Waivers**

OSFM submitted a comment recommending PHMSA deny the special permit request. OSFM stated that the prior state-issued waivers and the proposed special permit are different in that the state waivers required Sable to repair all anomalies, plus tool tolerances, before the pipeline segments were restarted. OSFM also stated that PHMSA previously reviewed and did not object to the state waivers in February 2025.

In response to these comments, PHMSA notes that the tool tolerance requirement described by OSFM represents an allowance of a 10% margin of error for ILI measurements of anomalies detected on CA-324 and CA-325. Notwithstanding OSFM's assertion, PHMSA finds the prior state waivers did not clearly require this allowance for tool tolerance for *pre-restart* ILI runs. The prior state waivers only discussed tool tolerance adjustment for *post-restart* ILI runs, a requirement that is also in the special permit conditions. Even if the state waivers had included the requirement to remediate anomalies accounting for tool tolerance prior to restart, PHMSA has determined that the extra margin of error created by the tool tolerance allowance was not necessary for the special permit to be consistent with pipeline safety, and PHMSA's prior no objection would not mean that an otherwise substantially identical waiver is not also consistent with pipeline safety. In addition, due to the DPA Order, the pipeline has already restarted operation, and the special permit conditions will require Sable to remediate the same anomalies, plus tool tolerances, following the performance of initial ILI runs once the SYPS reaches steady-state operation.

One commenter was neutral, acknowledging special permits can be beneficial to pipeline safety by allowing flexibility in pipeline safety regulations, but urged PHMSA to complete a thoughtful evaluation of the safety benefits and to give careful consideration to the public's comments. PHMSA appreciates the need to conduct a thoughtful review and has done so.

The finalized special permit conditions include minor adjustments for clarity after PHMSA review of Sable records. Condition 3(c) includes a specific MOP for two subsections of Line CA-325B. Condition 13(f) clarifies that Sable must obtain PHMSA approval rather than a specific identification number for applicable hydrostatic testing, and similar language which appeared at Condition 14(g) in the proposed conditions was removed.

## Analysis:

**Background**

Special permits may be granted upon request if unique circumstances make the applicability of a regulation or standard unnecessary or inappropriate for an applicant's pipeline facility. Special permits will only be granted when pipe conditions, integrity management (IM), and the proposed special permit conditions will provide a level of safety greater than or equal to the code requirements. The operator's Federal pipeline safety regulation compliance and incident history are also evaluated prior to issuance of a special permit.

PHMSA reviewed this special permit request to understand the known type of integrity threats that are in the special permit segments. This integrity information informed the special permit conditions which ensure that the operator has an ongoing program to locate and remediate safety threats.

**Enforcement History**

The special permit segments were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). As discussed in the Jurisdictional Determination, the special permit segments are now considered part of an interstate hazardous liquid pipeline facility. PHMSA reviewed OSFM's inspection history of the special permit segments in the time since Sable became the operator of Lines CA-324 and CA-325 in 2024.[4] OFSM conducted 16 inspections of Sable's SYPS in 2024 and 2025, with no concerning or unsatisfactory findings or enforcement actions resulting from the inspections. Therefore, Sable's inspection and enforcement history does not indicate that granting the special permit would be inconsistent with pipeline safety.

**Incident History**

PHMSA typically reviews the previous 5 years of incident history to assess the quantity and severity[5] of reported incidents on proposed special permit segments. Lines CA-324 and CA-325 remained

[4] In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and CA-325 from Plains. In 2024 Sable acquired PPC and became the designated operator of CA-324 and CA-325.

[5] "Significant Incidents" are those including any of the following conditions: (1) Fatality or injury requiring in-patient hospitalization; (2) $50,000 or more in total costs, measured in 1984 dollars; (3) Highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more; and (4) Liquid releases resulting in an unintentional fire or explosion. Gas distribution incidents caused by a nearby fire or explosion that impacted the pipeline system are excluded from this definition.

"active" pursuant to PHMSA's Part 195 regulations but did not transport crude oil from May 19, 2015,[6] until March 14, 2026. Including the time since the restart of the SYPS, no incidents have occurred in the last five years. Even taking a longer view of the special permit segment's incident history to include the May 2015 spill, actions taken by Sable in implementing safety requirements reflected in the Consent Decree and prior state waivers, as well as adherence to the special permit conditions, ensure that issues reflected in the incident history of the pipeline have been and will be addressed. Therefore, the incident history does not indicate that the granting of the special permit would be inconsistent with pipeline safety.

## Findings:

Based on the information submitted by Sable and PHMSA's review of the documentation, PHMSA finds that granting this special permit with conditions that waives the requirements of 49 CFR § 195.452(h)(4)(iii)(H) for Sable's Lines CA-324 and CA-325 is in the public interest and is not inconsistent with pipeline safety. This special permit requires Sable to implement the special permit conditions that include applying IM practices to the special permit segments**.**

**Completed in Washington D.C. on**: June 25, 2026

[6] In May 2015 Lines CA-324 and CA-325 were owned and operated by Plains Pipeline, L.P., and known as Lines 901 and 903, respectively.

# EXHIBIT C

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
## Jurisdictional Determination in Support of Special Permit

### Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | June 25, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

The Pipeline and Hazardous Materials Safety Administration (PHMSA) is authorized under the Pipeline Safety Act[1] to issue special permits waiving compliance with the requirements in 49 CFR Part 195.[2] A special permit may be issued on either an emergency or non-emergency basis. An emergency special permit may be issued for a period of up to 60 days "without prior notice and comment if [PHMSA] determines that (i) it is in the public interest to grant the waiver; (ii) the waiver is not inconsistent with pipeline safety; and (iii) the waiver is necessary to address an actual or impending emergency involving pipeline transportation, including an emergency caused by a natural or manmade disaster."[3] A non-emergency special permit may be issued after providing notice and the opportunity for a hearing "on terms [PHMSA] considers appropriate if [PHMSA] determines that the waiver is not inconsistent with pipeline safety."[4]

---

[1] The Pipeline Safety Act refers generally to the series of laws enacted by Congress to regulate the safety of gas and hazardous liquid pipeline facilities. *See e.g.*, Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720; Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989; Pipeline Safety Reauthorization Act of 1988, Pub. L. 100-561, 102 Stat. 2805; Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289; Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3794; Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985; Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, Pub. L. No. 109-468, 120 Stat. 3490; Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904; Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat. 514; Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), 134 Stat. 2210. These laws are currently codified at 49 U.S.C. § 60101 *et seq.*

[2] 49 U.S.C. § 60118(c); 49 CFR 190.341.

[3] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g)-(i).

[4] 49 U.S.C. § 60118(c)(1); 49 CFR 190.341(a)-(f).

On December 23, 2025, PHMSA issued an emergency special permit to Sable Offshore Corp. PPC (Sable). The emergency special permit waived the applicability of certain requirements in 49 CFR Part 195 to two onshore pipeline segments, previously known as Lines 901 and 903 and currently known as CA-324 and CA-325, in the Santa Ynez Pipeline System (SYPS). In issuing the emergency special permit, PHMSA found that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.[5]

The emergency special permit expired on February 21, 2026, and Sable is now asking PHMSA to issue a non-emergency special permit for CA-324 and CA-325. As in the prior proceeding, Sable contends that CA-324 and CA-325 are part of an interstate hazardous liquid pipeline facility. Commenters in this proceeding have questioned that contention and urged PHMSA to conclude that CA-324 and CA-325 are part of an intrastate hazardous liquid pipeline facility.[6] Intrastate hazardous liquid pipeline facilities in California are subject to the jurisdiction of a State authority, the California Office of the State Fire Marshall (OSFM).[7]

As explained in more detail below, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility. The SYPS transports crude oil from offshore production platforms on the Outer Continental Shelf (OCS) through state waters to an onshore processing facility in Santa Barbara County, California, and onto a terminal in Kern County, California. By moving crude oil from a place outside of California to a place inside of California, the SYPS is "used to transport hazardous liquid in interstate or foreign commerce."[8] Accordingly, the SYPS is an interstate hazardous liquid pipeline facility subject to PHMSA's jurisdiction under the Pipeline Safety Act. This jurisdictional determination confirms and supersedes the jurisdictional determination issued on December 17, 2025. PHMSA concludes that CA-324 and CA-325 are used or intended to be used to transport hazardous liquid in interstate commerce.

**Background**

From 1921 until 1960, the Interstate Commerce Commission (ICC) had the authority under the Transportation of Explosives Act (TOEA) to regulate the safety of pipelines transporting flammable liquids (including crude oil) by "common carriers engaged in interstate or foreign commerce."[9] But the ICC did not use that authority during this four-decade period, having concluded after studying the safety record of the oil pipeline industry in the 1930s and early 1940s that there was no "pressing" need to do so.[10]

---

[5] 49 U.S.C. § 60101(a)(7) (defining "interstate hazardous liquid pipeline facility").

[6] 49 U.S.C. § 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility").

[7] 49 U.S.C. § 60105 (authorizing State authorities to regulate intrastate pipeline facilities by submitting an annual certification to PHMSA and meeting other program requirements); *see City & Cnty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 996-997 (9th Cir. 2015); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878–79 (9th Cir. 2006).

[8] 49 U.S.C. § 60101(a)(7).

[9] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. §§ 831-835.

[10] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 2-3.

In 1960, Congress inadvertently repealed the ICC's authority to regulate the safety of common carrier oil pipelines.[11] According to the legislative history, the repeal occurred when Congress added the phrase "other than pipelines" to the definition of "carrier" in the TOEA.[12] Congress corrected that error five years later, restoring the ICC's safety authority under the TOEA for common carrier oil pipelines.[13] The oil pipeline industry supported the 1965 amendment, primarily on preemption grounds.[14] Citing growing interest in the adoption of state and local safety regulations, the industry argued that, as with other modes of transportation, common carrier pipelines engaged in interstate or foreign commerce should be subject to uniform Federal safety regulations.[15]

From 1965 to 1979, the ICC and its successor agency, the Department of Transportation (DOT),[16] regulated the safety of certain common carrier oil pipelines under the TOEA.[17] Specifically, DOT prescribed safety regulations in 49 CFR Part 195 for common carrier pipelines transporting flammable liquids, including petroleum and petroleum products, "in interstate and foreign commerce."[18] DOT also applied its safety regulations to pipelines on the OCS transporting petroleum and petroleum products in interstate or foreign commerce.[19] In regulating OCS pipelines, DOT relied on the authority in the TOEA and an amendment that Congress enacted in the Deepwater Port Act (DWPA) of 1974.[20]

In 1979, a decade after authorizing DOT to regulate the safety of gas pipeline facilities in the Natural Gas Pipeline Safety Act (NGPSA),[21] Congress authorized DOT to regulate the safety of

---

[11] Pub. L. 86-10, 74 Stat. 808 (Sept. 6, 1960).

[12] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[13] Pub. L. 89-95, 74 Stat. 808 (Jul. 27, 1965); H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3.

[14] H. Rept. 588 to Accompany H.R. 5041, July 2, 1965, at p. 3-4.

[15] *Id.*

[16] Pub. L. 89-670, 81 Stat. 931 (Oct. 15, 1966).

[17] *See e.g.*, 30 Fed. Reg. 13,266 (ICC initiates rulemaking proceeding under TOEA to establish pipeline safety standards); 32 Fed. Reg. 1,098 (ICC proposes pipeline safety reporting requirements under TOEA); 32 Fed. Reg. 9,228 (DOT adopts pipeline safety reporting requirements originally proposed by ICC); 34 Fed. Reg. 15,473 (DOT adopts pipeline safety standards originally proposed by ICC).

[18] 34 Fed. Reg. at 15,476 (codifying scope provision in 49 CFR § 195.1(a)).

[19] 41 Fed. Reg. 34,035 (final rule codifying new safety standards in 49 CFR Part 195 for offshore pipeline facilities).

[20] Pu. L. 93–627, originally codified at 33 U.S.C. §§ 1507(a) ("For the purpose of chapter 39 of title 18, United States Code (18 U.S.C. 831-837), and part I of the Interstate Commerce Act (49 U.S.C. 1-27), a deep water port and storage facilities serviced directly by such deep water port shall be subject to regulation as a common carrier in accordance with the Interstate Commerce Act, as amended."), 1520(a) ("The Secretary [of Transportation], in cooperation with the Secretary of the Interior, shall establish and enforce such standards and regulations as may be necessary to assure the safe construction and operation of oil pipelines on the Outer Continental Shelf.").

[21] Pub. L. 90-481, 82 Stat. 720, originally codified at 49 U.S.C. §§ 1671–1684.

hazardous liquid pipeline facilities in the Hazardous Liquid Pipeline Safety Act (HLPSA).[22] Like the NGPSA, the HLPSA provided DOT with exclusive authority to regulate interstate pipeline facilities[23] and allowed State authorities that satisfied certain requirements to regulate intrastate pipeline facilities.[24] But unlike the NGPSA,[25] the HLPSA defined transportation in terms of the movement by pipeline of hazardous liquids, or storage incidental thereto, "in or affecting interstate or foreign commerce," subject to certain exceptions.[26] The HLPSA defined interstate pipeline facilities as those "used in the transportation of hazardous liquids in interstate or foreign commerce,"[27] and defined interstate or foreign commerce "as commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof."[28] The HLPSA defined "intrastate pipeline facility" by exclusion, *i.e.*, as a pipeline facility that did not meet the definition of interstate pipeline facility.[29]

In 1981, DOT made certain conforming changes to the pipeline safety regulations in 49 CFR Part 195 to align with the HLPSA.[30] In particular, DOT limited the applicability of Part 195 to interstate hazardous liquid pipeline facilities, which DOT defined as (1) hazardous liquid pipeline facilities subject to the economic regulatory jurisdiction of the Federal Energy Commission (FERC) under the Interstate Commerce Act (ICA) over common carriers engaged in the transportation of oil by pipeline and (2) hazardous liquid pipeline facilities originating on the OCS not subject to FERC jurisdiction under the ICA.[31] DOT did not apply Part 195 to

---

[22] Pub. L. 96-129, title II, 93 Stat. 1003, originally codified at 49 U.S.C. §§ 2001-2014; H. Rep. No. 96-182, 267 (May 15, 1979).

[23] Sec. 203(d), originally codified at 49 U.S.C. § 2002(d).

[24] Sec. 205(a), originally codified at 49 U.S.C. § 2004.

[25] Section 2(3) of the NGPSA, originally codified at 49 U.S.C. § 1671(3) and currently codified as amended at 49 U.S.C. § 60101(a)(21), defined transportation as "the gathering, transmission or distribution of gas by pipeline or its storage in or affecting interstate or foreign commerce," subject to an exception for rural gas gathering lines.

[26] Sec. 202(3), originally codified at 49 U.S.C. § 2001(3). As explained below, the "affects interstate commerce" language extends to the full reach of Congress's Commerce Clause power and vests DOT with authority to regulate purely intrastate pipelines that "affect" interstate commerce. *See* 49 U.S.C. § 60102(a)(2). That authority is displaced only if a State authority obtains a certification to regulate intrastate pipelines. 49 U.S.C. § 60105(a). In all events, DOT has exclusive authority to regulate "interstate" hazardous liquid pipeline facilities, meaning pipelines used to transport hazardous liquid "in interstate commerce." *Id.* §§ 60101(7), 60104(c).

[27] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5). Section 2(8) of the NGPSA, originally codified at 49 U.S.C. § 1671(8) and currently codified as amended at 49 U.S.C. § 60101(a)(6), defined an interstate gas pipeline facility based on the jurisdictional status of the facility under the Natural Gas Act of 1938, 15 U.S.C. 717 *et seq.*

[28] Sec. 202(7), originally codified at 49 U.S.C. § 2001(7).

[29] Sec. 202(6), originally codified at 49 U.S.C. § 2001(6).

[30] 46 Fed. Reg. 38,357.

[31] 46 Fed. Reg. 38,357-38,358 (discussing scope and applicability of Part 195); *id.* at 38,361 (codifying scope provision for Part 195 at 49 CFR § 195.1(a)). As explained in *W. Ref. Sw., Inc. v. FERC*, "Congress passed the [ICA] in 1887 to regulate railroads, and simultaneously created the [ICC] to administer the statute. Ch. 104, 24 Stat. 379 (1887). The Hepburn Act of 1906, Pub.L. No. 59–337, § 1, 34 Stat. 584, specifically extended the [ICA] to 'common carriers engaged in ... [t]he transportation of oil ... by pipeline.' 49 U.S.C. app. § 1(1)(b) (1988). In 1977, Congress transferred the [ICC's] authority over oil pipelines to the newly-created [FERC]. Department of Energy Reorganization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 565 (codified at 49 U.S.C. § 60502). The next year,

intrastate pipeline facilities at that time, primarily so State authorities could make the changes needed to fully participate in the Federal pipeline safety program.[32]

In 1985, DOT applied Part 195 to intrastate hazardous liquid pipeline facilities.[33] DOT defined intrastate hazardous liquid pipeline facilities consistent with the HLPSA and adopted a statement of policy for determining the jurisdictional status of hazardous liquid pipeline facilities.[34] The statement of policy generally codified the approach that DOT adopted in 1981 in applying Part 195 to interstate hazardous liquid pipeline facilities. Specifically, the statement of policy indicated that:

> In delineating which liquid pipeline facilities are interstate pipeline facilities within the meaning of the HLPSA, DOT will generally rely on the FERC filings; that is, if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility or if there has been an exemption from the obligation to file tariffs obtained from FERC, then DOT will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the HLPSA. The types of situations in which DOT will ignore the existence or non-existence of a filing with FERC will be limited to those cases in which it appears obvious that a complaint filed with FERC would be successful or in which blind reliance on a FERC filing would result in a situation clearly not intended by the HLPSA such as a pipeline facility not being subject to either State or Federal safety regulation.[35]

To demonstrate the application of these principles, the statement of policy included seven examples of hypothetical hazardous liquid pipeline systems that DOT would consider as either

---

Congress repealed much of the [ICA], but provided that transportation of oil by pipeline companies would be subject to '[t]he laws ... as they existed on October 1, 1977.' Act of Oct. 17, 1978, Pub.L. No. 95–473, § 4c, 92 Stat. 1337, 1470." 636 F.3d 719, 723–24 (5th Cir. 2011). For that reason, "[t]he 1977 version of the [ICA] remains the governing organic statute for FERC's oil pipeline authority, even though the Act is no longer part of the U.S. Code." *Petro Star Inc. v. FERC*, 166 F.4th 161, 166 (D.C. Cir. 2026). Moreover, as explained in *Re Bonito Pipe Line Co.*, FERC has concluded that the language of the ICA prohibits it from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS." 61 FERC ¶ 61,050, 61,221 (1992). The ICA states that it only "appl[ies] to common carriers engaged in . . . [t]he transportation of oil . . . by pipeline . . .from one State or Territory of the United States . . . to any other State or Territory of the United States . . . or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States." 61 FERC ¶ 61,221 (quoting section 1(1) of the ICA). Because "the OCS is not a State or Territory of the United States," FERC has found that it "does not come within the ICA's jurisdictional language." *Id.*

[32] 46 Fed. Reg. 38,359-38,360.

[33] 50 Fed. Reg. 15,895. As explained above, *see supra* note 26, DOT has jurisdiction to regulate intrastate hazardous liquid pipeline facilities under the "affects interstate commerce" language in the definition of transporting hazardous liquid. 49 U.S.C. §§ 60101(a)(22); 60102(a)(2).

[34] 50 Fed. Reg. 15,897-15,898.

[35] 50 Fed. Reg. 15,899-15,900 (codifying 49 CFR Part 195, Appendix A).

interstate or intrastate hazardous liquid pipeline facilities. One of those examples included a pipeline originating on the OCS and transporting hazardous liquid into the interior of an adjoining coastal State. The statement of policy indicated that DOT would consider such a pipeline to be an interstate hazardous liquid pipeline facility, even though the operator had no obligation under the ICA to file a FERC tariff for that system.

DOT has not made any significant changes to the regulations or policy statement in Part 195 that apply in determining interstate or intrastate status of hazardous liquid pipeline facilities since issuing the 1985 final rule. Aside from recodifying the Pipeline Safety Laws in 1994,[36] Congress has not made any substantive changes to the governing statutory provisions either.

**Facts**

The SYPS transports crude oil from the OCS to a terminal in Kern County, California. The SYPS originates at three offshore production platforms, named Heritage, Harmony, and Hondo, located on the OCS approximately 5 to 9 miles from the coastline of California. After passing through a separator, the offshore facilities produce crude oil as part of an emulsion that also contains water and other impurities. The crude oil emulsion moves through the SYPS to an onshore processing facility in Santa Barbara County, California.[37] The onshore processing facility is known as the Las Flores Canyon Facility (LFC Facility).

At the LFC Facility, the crude oil is metered and heated to reduce its viscosity for subsequent movement through the SYPS.[38] A "free water knock out" or "F.W.K.O" process is also performed to remove water and other corrosive constituents.[39] The crude oil is then sweetened by removing hydrogen sulfide and stabilized to reduce vapor pressure to levels suitable for subsequent storage and movement by pipeline.[40]

Following heating, dewatering, sweetening, and stabilization, the crude oil is either sent to a pump station for continued movement in the SYPS or to one of several aboveground tanks. The tanks are directly connected to the SYPS and receive crude oil for temporary storage and

---

[36] Pub. L. 103–272, §§ 1(e), 4(s), July 5, 1994, 108 Stat. 1301.

[37] The offshore platforms also produce raw natural gas. After passing through a separator at the offshore platforms, the raw natural gas is transported in a separate pipeline system to the LFC Facility for processing. The jurisdictional status of this gas pipeline system is not at issue in this proceeding.

[38] Portions of the SYPS downstream from the LFC Facility are insulated to maintain the heated temperature of the crude oil. For additional information on the impact of temperature, viscosity, and pour point on the operation of a crude oil pipeline, *see* Overview of the Design, Construction, and Operation of Interstate Liquid Petroleum Pipelines, Argonne National Laboratory, ANL/EVS/TM/08-1, p. 21-23 (Nov. 2007) (ANL/EVS/TM/08-1).

[39] The presence of water and other impurities in crude oil pipelines can cause internal corrosion. *See e.g., In the Matter of Plains Pipeline, LP*, 2015 WL 9287190, at *2 (PHMSA Nov. 12, 2015); *In the Matter of Kinder Morgan CO2 Company*, L.P., 2010 WL 6539184, at *6 (PHMSA Oct. 12, 2010).

[40] For additional information on the impact of vapor pressure on the operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 23.

reinjection back into the pipeline.[41] In addition to the processing facilities and tanks, the LFC Facility contains other equipment used in the operation of the SYPS, including pumps; valves and appurtenances; rectifiers; corrosion inhibitor injection points; and equipment necessary for performing in-line inspections and hydrostatic pressure testing.[42]

After leaving the LFC Facility, the SYPS transports the crude oil through two onshore pipeline segments, previously known as Line 901 and Line 903 and currently called CA-324 and CA-325, respectively, to a terminal. The terminal, known as Pentland Station, is the location designated as the delivery point in a current purchase agreement for the OCS-produced crude oil transported in the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

**Procedural History**

*May 2016 Letter from PHMSA to OSFM*

On May 18, 2016, PHMSA sent a letter to OSFM addressing the jurisdictional status of the onshore portions of the SYPS. The letter explained that Line 901 ruptured on May 19, 2015, resulting in the release of approximately 2,934 barrels of crude oil. The letter further explained that PHMSA issued a corrective action order (CAO) to the operator of Line 901, Plains Pipeline, LP (Plains), following the rupture, and that the CAO and subsequent amendments required Plains to shut down Line 901 and Line 903.[43]

The letter then explained that Plains operated Lines 901 and 903 as interstate crude oil pipelines subject to the jurisdiction of FERC under the ICA prior to the rupture, and that PHMSA had treated Line 901 and Line 903 as interstate hazardous liquid pipeline facilities on that basis. The letter noted that Plains had canceled the FERC tariffs for Lines 901 and 903 on February 12, 2016, and April 29, 2016, respectively, and that the cancelation made both lines intrastate hazardous pipeline facilities subject to OSFM's jurisdiction. The letter noted that PHMSA was reserving its right to investigate and to initiate enforcement actions for events that occurred prior to the tariff cancelation, and that PHMSA's understanding of the jurisdictional status of Lines 901 and 903 was "subject to change based on any future events or newly-discovered facts."

*November 2025 Letter from Sable to PHMSA*

On November 26, 2025, Sable sent a letter to PHMSA regarding the jurisdictional status of Lines 901 and 903, now called CA-324 and CA-325, respectively. The letter explained that Sable recently determined that Lines 901 and 903 should be reclassified as interstate hazardous liquid

---

[41] For additional information on the use of tanks in operating a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 5-6.

[42] For additional information on the use of these and other components in operation of a crude oil pipeline, *see* ANL/EVS/TM/08-1 at p. 8-11, 29-38, 81-87. The LFC Facility also contains a power plant, a helipad, natural gas processing facilities, and equipment for biologically treating outfall water.

[43] Plains Pipeline, L.P., C.P.F. No. 5-2015-5011H, available at https://primis.phmsa.dot.gov/enforcement-data/case/520155011H.

facilities under the Pipeline Safety Act. The letter noted that Sable had acquired the SYPS from another operator in 2024, and that Sable intended to operate SYPS as part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station.

The letter noted that the SYPS had operated differently prior to October 2022, with ExxonMobil owning and operating the offshore production platforms, the offshore-to-onshore oil emulsion pipeline, and the LFC Facility, and Plains owning and operating Lines 901 and 903. The letter further noted that PHMSA treated Lines 901 and 903 as interstate hazardous liquid pipeline facilities before Plains canceled the FERC ICA tariffs for the lines in early 2016. The letter then acknowledged PHMSA's conclusion in the May 2016 letter to OSFM that the cancelation of the ICA tariffs made the Lines 901 and 903 intrastate hazardous liquid pipeline facilities, "subject to change based on any future events or newly-discovered facts."

Pointing to the latter reservation, the letter explained that "intervening events" had impacted the jurisdictional status of Lines 901 and 903. The letter stated that, unlike the "arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions" of the SYPS, Sable intended to operate the entire SYPS as a part of a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter stated that Sable's intent to use the facilities in this manner made the SYPS an interstate hazardous liquid pipeline facility. The letter further explained that Lines 901 and 903 did not need a FERC tariff to attain that status, noting that the policy statement in Appendix A to Part 195 recognizes that the pipelines that originate on the OCS and transport crude oil to an adjoining coastal State can be classified as interstate hazardous liquid pipeline facilities even without a FERC tariff.

*December 2025 Letter from PHMSA to Sable*

On December 17, 2025, PHMSA responded to Sable's letter. In its letter, PHMSA began by acknowledging that Lines 901 and 903 had historically been treated as interstate hazardous liquid pipeline facilities but explained that both lines became intrastate hazardous liquid pipeline facilities when Plains canceled the ICA tariffs in 2016. The letter further acknowledged that Sable had acquired the SYPS in 2024 and intended to operate the entire SYPS as a single pipeline system transporting crude oil from the OCS through the LFC Facility to Pentland Station. The letter then explained that PHMSA had initiated a three-day, onsite jurisdictional audit of the SYPS after receiving Sable's letter, and that the audit included a review of written procedures and records and physical inspections of the offshore and onshore facilities. The letter noted that OSFM representatives had participated in the audit.

After providing that background information, the letter explained that determining the jurisdictional status of a hazardous liquid pipeline facility is a factual inquiry, and that Appendix A to Part 195 includes a statement of policy and interpretation to assist in making those determinations. The letter noted that Appendix A sets forth a general policy of deferring to the filing of an ICA FERC tariff in determining whether a hazardous liquid pipeline facility is interstate or intrastate. If the operator has a FERC tariff on file, PHMSA will generally consider

the hazardous liquid pipeline facility to be interstate. If the operator does not have a FERC tariff on file, PHMSA will generally consider the hazardous liquid pipeline facility to be intrastate. But the letter noted that Appendix A identifies several scenarios where a hazardous liquid pipeline facility will be treated as interstate without a FERC tariff. One of those scenarios is a pipeline that originates on the OCS and transports crude oil to an adjoining coastal State.

Citing the scenario in Appendix A for OCS pipelines and the results of its multi-day jurisdictional audit, letter stated that PHMSA agreed with Sable's determination that the entire SYPS is an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. Because Lines 901 and 903 had previously been classified as intrastate hazardous liquid pipeline facilities, the letter stated that PHMSA would notify OSFM of the change in jurisdictional status.

**Analysis**

*Interstate Hazardous Liquid Pipeline Facilities*

Congress defined an "interstate hazardous liquid pipeline facility" in the Pipeline Safety Act as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[44] Congress further defined "interstate or foreign commerce," in relevant part, as "commerce between—(i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State."[45]

The key phrase in the definition of "interstate hazardous liquid pipeline facility"—"in interstate or foreign commerce"—has been used in Federal legislation for more than a century, including in the TOEA.[46] While construed more narrowly than the broader phrase "affecting interstate or foreign commerce,"[47] the U.S. Supreme Court has articulated certain basic principles that apply in determining whether something is "in interstate or foreign commerce."[48] Specifically, the Supreme Court has said that "[t]he question whether commerce is interstate or intrastate must be

[44] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[45] 49 U.S.C. § 60101(a)(8)(B). Transportation is a particular type of commerce. Black's Law Dictionary 244 (5th ed. 1979) (defining commerce as "[i]ntercourse by way of trade and traffic between different peoples or states and the citizens or inhabitants thereof, including not only the purchase, sale, and exchange of commodities, but also the instrumentalities and agencies by which it is promoted and the means and appliances by which it is carried on, and transportation of persons as well as of goods, both by land and sea"); *id.* at 1344 (defining "transport" as "[t]o carry or convey from one place to another" and "transportation" as "[t]he movement of goods or persons from one place to another, by a carrier").

[46] Act of March 4, 1909, as amended by 41 Stat. 1445 (Mar. 4, 1921) and previously codified at 18 U.S.C. § 831-835; *see also* Federal Arbitration Act of 1925, codified at 9 U.S.C. § 1.

[47] *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-118 (2001); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022); *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358, 1365 (2026).

[48] *Kelley v. Rhoads*, 188 U.S. 1, 5-10 (1903); *Illinois Cent. R. Co. v. De Fuentes*, 236 U.S. 157, 163 (1915); *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376 (1922); *Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268-269 (1927); *U.S. v. Erie R. Co.*, 280 U.S. 98, 101-102 (1929); *Maryland v. Louisiana*, 451 U.S. 725, 753-756 (1981); *Flowers Foods Inc.,* 146 S. Ct. at 1364-1365.

determined by the essential character of the commerce," and that "the determination of the character of the commerce is a matter of weighing the whole group of facts in respect to it."[49] The Supreme Court has also said that once something "actually starts in the course of transportation" and "becomes a part of interstate commerce[,] . . . generally . . . this interstate character . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[50] Finally, the Supreme Court has said that an interruption on the way to an intended destination, such as a stop at a warehouse or processing facility, does not change the essential character of an interstate movement.[51] An interruption, for example, "to promote . . . safe or convenient transit" does not break the continuity of an interstate journey.[52]

Several Supreme Court cases addressing the effect of interruptions on the flow of interstate commerce are instructive. In *Kelley v. Rhoads*, for example, the Court held that a shepherd driving of a flock of sheep from Utah to Nebraska was engaged in interstate commerce throughout his journey and not subject to local taxation in Wyoming, even though he allowed his sheep to stop at various points along the way to graze.[53] The Court observed that the sheep were being driven through Wyoming for the purpose of shipment to another state, not for the purpose of grazing, that "they required sustenance on the journey, and could obtain it only by grazing," and "that they could hardly have been driven more rapidly without a loss of flesh during the transit."[54] Similarly, in *Flowers Foods*, a company transported baked goods across state lines to a warehouse in Colorado. A separate delivery driver then picked up the good from the warehouse and delivered them to stores in Colorado. The Court held that the delivery driver was engaged "in interstate commerce" because he performed "an intrastate leg of an interstate journey."[55] The Court rejected the argument that the interruption at the warehouse terminated the flow of interstate commerce. In *Maryland v. Louisiana*, the Court held that gas transported by pipeline from federal waters in the Gulf of America through an onshore processing facility in Louisiana and then onto consumers in over 30 states remained in interstate commerce throughout the journey.[56] The Court rejected an argument that the interruption at the processing facility terminated the flow of interstate commerce. The Court held that "[g]as crossing a state line at

---

[49] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102; *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 907 (9th Cir. 1990) ("The characterization of transportation between two points within the same state as a continuation of an interstate shipment or as a distinct intrastate shipment depends upon the 'essential character' of the shipment.").

[50] *Illinois Cent. R. Co.*, 236 U.S. at 163; *see also Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020).

[51] *Flowers Foods*, 146 S. Ct. at 1364-1365; *Maryland v. Louisiana*, 451 U.S. at 754-756.

[52] *Champlain Realty Co.*, 260 U.S. at 376.

[53] *Kelley*, 188 U.S. 1.

[54] 188 U.S. at 8.

[55] *Flowers Foods*, 146 S. Ct. at 1363.

[56] *Maryland v. Louisiana*, 451 U.S. at 753-756.

any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey."[57]

The pre-enactment history of the Pipeline Safety Act supports the conclusion that Congress intended to incorporate these basic principles in defining an "interstate hazardous liquid pipeline facility." As previously noted, Congress originally used the phrase "in interstate or foreign commerce" in the TOEA, the statute that the ICC and DOT used to regulate the safety of common carrier pipelines before the HLPSA. DOT clearly recognized the significance of that statutory language in determining the extent of its jurisdiction over oil pipelines under the TOEA,[58] and Congress retained the same language in defining an "interstate hazardous liquid pipeline facility" in the HLPSA.[59] As the Supreme Court has long held, "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"[60] And as the Supreme Court recently reiterated in addressing analogous statutory language in the Federal Arbitration Act (FAA) of 1925, "we can hardly blind ourselves to what this Court's cases said, both before and around the time of the FAA's adoption, about what it means to be 'engaged in commerce between the States.'"[61]

The contemporaneous, post-enactment history confirms that Congress incorporated the traditional understanding of "in interstate or foreign commerce" into the Pipeline Safety Act as well.[62] As already noted, DOT issued a final rule in July 1981 amending Part 195 to conform to the new terminology in the HLPSA.[63] In so doing, DOT decided to "[r]estrict[] the application of Part 195" to interstate hazardous liquid pipeline facilities, *i.e.*, "to pipelines used for moving petroleum, petroleum products, or anhydrous ammonia *in interstate or foreign commerce*."[64] DOT also acknowledged in the July 1981 final rule that the HLSPA's "in interstate or foreign commerce" standard dated back to the TOEA and was comparable to the standard that FERC used in regulating pipelines under the ICA.[65] Lastly, DOT acknowledged that hazardous liquid pipeline facilities originating on the OCS, while not subject to FERC jurisdiction under the ICA, qualified as "interstate hazardous liquid pipeline facilities" for purposes of the DWPA and HLPSA.[66]

---

[57] 451 U.S. at 755-756.

[58] Interpretation Response #PI-72-055, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-72-055.

[59] Sec. 202(5), originally codified at 49 U.S.C. § 2001(5).

[60] *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019))

[61] *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[62] 46 Fed. Reg. at 38,357, 38,357-38,373; *Flowers Foods, Inc.*, 146 S. Ct. at 1365.

[63] 46 Fed. Reg. at 38,357.

[64] *Id.* (emphasis added).

[65] 46 Fed. Reg. at 38,359.

[66] *Id.*

*Intrastate Hazardous Liquid Pipeline Facilities*

Congress intended to go beyond the pre-HLPSA understanding of "interstate or foreign commerce" in regulating intrastate hazardous liquid pipeline facilities under the Pipeline Safety Act. The Pipeline Safety Act defines "transporting hazardous liquid" as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, *in or affecting* interstate or foreign commerce."[67] By adding the phrase "or affecting" to the definition of "transporting hazardous liquid," Congress invoked the full reach of its authority under the Commerce Clause.[68] And by excluding interstate hazardous liquid pipeline facilities from the definition of "intrastate hazardous liquid pipeline facility,"[69] Congress used that authority to assert jurisdiction over purely the local commerce that had not been previously subject to regulation under the TOEA and DWPA.[70] In other words, Congress defined "transporting hazardous liquid" and "intrastate hazardous liquid pipeline facility" to expressly authorize the regulation of movements of hazardous liquid by pipeline "affecting interstate or foreign commerce."

The contemporaneous, post-enactment history confirms that conclusion. In the April 1985 final rule that originally extended the applicability of Part 195 to intrastate hazardous liquid pipeline facilities,[71] DOT specifically noted that the HLPSA "requires the Secretary of Transportation to establish minimum Federal safety standards for the transportation of hazardous liquids by pipeline *in or affecting interstate or foreign commerce*," and that "[o]nce the Federal standards are established, . . . the HLPSA provides for state adoption and enforcement of the Federal standards with respect to *'intrastate pipelines,' or pipelines to which the HLPSA applies which are not used in interstate or foreign commerce*."[72]

DOT reiterated that principle in adopting the statement of agency policy and interpretation in Appendix A as part of the April 1985 final rule:

> In 1979, Congress enacted comprehensive safety legislation governing the transportation of hazardous liquids by pipeline, the Hazardous Liquids Pipeline

[67] 49 U.S.C. § 60101(a)(22)(A).

[68] *Circuit City*, 532 U.S. at 115–116, 118; *see also* Black's Law Dictionary 53 (5th ed. 1979) (defining "affecting commerce" as "[a]ny activity which touches or concerns business or industry, favorably or burdensomely; . . . in commerce, or burdening or obstructing commerce or the free flow of commerce").

[69] 49 U.S.C. § 60101(a)(10); *see also* 49 CFR § 195.2 (defining "intrastate pipeline" as "a pipeline or that part of a pipeline to which this part applies that is not an interstate pipeline").

[70] *Gonzales v. Raich*, 545 U.S. 1, 22 (2005); *see also* Black's Law Dictionary 244 (5th ed. 1979) (intrastate commerce is "[s]uch as is begun, carried on, and completed wholly within the limits of a single state").

[71] 50 Fed. Reg. at 15,895 ("The existing Federal safety standards for pipelines transporting hazardous liquids apply to pipelines operating in interstate or foreign commerce. This final rule extends the applicability of these standards to include pipelines transporting hazardous liquids that *affect interstate or foreign commerce, sometimes called intrastate pipelines*.") (emphasis added).

[72] 50 Fed. Reg. at 15,895 (emphasis added).

> Safety Act of 1979, 49 U.S.C. 2001 et seq. (HLPSA). The HLPSA expanded the existing statutory authority for safety regulation, which was limited to transportation by common carriers in interstate and foreign commerce, to transportation through facilities used in or affecting interstate or foreign commerce. . . . The HLPSA leaves to exclusive Federal regulation and enforcement the "interstate pipeline facilities," those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce. For the remainder of the pipeline facilities, denominated "intrastate pipeline facilities," the HLPSA provides that the same Federal regulation and enforcement will apply unless a State certifies that it will assume those responsibilities.[73]

*Storage of Hazardous Liquid*

Congress defined "transporting hazardous liquid" in the Pipeline Safety Act to authorize the regulation of "the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline."[74] Consistent with that authority, DOT issued a final rule in July 1981 applying Part 195 to "breakout tanks."[75] DOT defined a "breakout tank" as "a tank used to (a) relieve surges in a hazardous liquid pipeline system or (b) receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline."[76] In adopting that definition, DOT explained that "[s]ince its issuance in 1969, Part 195 has applied to storage called 'breakout tankage' by virtue of the inclusion of that term in the definition of 'pipeline system' or 'pipeline.'"[77] DOT further explained that it "believe[d] that it should try to make Part 195 more precise regarding the kinds of storage to which that Part applies and at the same time not extend its application to any storage not previously covered."[78]

To provide that precision, DOT defined a breakout tank to limit the "applicability of Part 195" to:

> two kinds of storage functions. First, tanks used to relieve surges in a hazardous liquid pipeline. This is sometimes called working tankage or a form of operating tankage. Second, tanks used to receive hazardous liquid from a pipeline and store it temporarily for reinjection into a pipeline for continued transportation. This type of storage aids in the dispatching of different types and grades of hazardous liquids through a pipeline system.[79]

[73] 50 Fed. Reg. at 15,899.

[74] 49 U.S.C. § 60101(a)(22)(A).

[75] 46 Fed. Reg. at 38,357.

[76] 46 Fed. Reg. at 38,362 (codified at 49 CFR § 195.2).

[77] 46 Fed. Reg. at 38,358.

[78] *Id.*

[79] *Id.*

The breakout tank definition adopted in the July 1981 final rule remains codified in Part 195.

*Exception for Onshore Production, Refining, or Manufacturing Facilities*

The Pipeline Safety Act contains an exception in the definition of "transporting hazardous liquid" for the movement of hazardous liquids "through onshore production, refining, or manufacturing facilities" and "storage or in-plant piping systems associated with onshore production, refining, or manufacturing facilities."[80] For purposes of that exception, a "hazardous liquid" includes, in relevant part, "petroleum or a petroleum product."[81]

When Congress originally enacted the exception for production, refining, or manufacturing facilities in the HLPSA, contemporaneous dictionaries provided definitions for the following key terms:

- Production was commonly understood as the "[p]rocess or act of producing" and "[t]hat which is produced or made; i.e. goods."[82]

- Manufacture was commonly understood as "[t]he process or operation of making goods or any material produced by hand, by machinery or by other agency; anything made from raw materials by the hand, by machinery, or by art. The production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties or combinations, whether by hand labor or machine."[83] Manufacture was also commonly understood as "something made from raw materials."[84]

- Refine was commonly understood as, among other things, "to reduce to a pure state."[85] A refinery was also commonly understood as "a building and equipment for refining or purifying metals, oil, or sugar."[86]

- Petroleum was commonly understood as "an oily flammable bituminous liquid that may vary from almost colorless to black, occurs in many places in the upper strata of the earth, is a complex mixture of hydrocarbons with small

[80] 49 U.S.C. § 60101(a)(22)(B)(ii)-(iii); *see also* 49 CFR 195.1(b)(8).

[81] 49 U.S.C. § 60101(a)(4)(A).

[82] Production, Black's Law Dictionary 1089 (5th ed. 1979).

[83] Manufacture, Black's Law Dictionary 870 (5th ed. 1979).

[84] Manufacture, Webster's New Collegiate Dictionary (1977).

[85] Refine, Webster's New Collegiate Dictionary (1977).

[86] Refinery, Webster's New Collegiate Dictionary (1977).

amounts of other substances, and is prepared for use as gasoline, naptha, or other products by various refining processes."[87]

- Product was commonly understood as "something produced."[88]

Taken together, these definitions suggest that the exception for "onshore production, refining, or manufacturing facilities" should be given a particular meaning when applied to the movement of petroleum and petroleum products.[89] Specifically, the exception should be applied with the understanding that petroleum is a raw material produced from the earth, and that petroleum products are manufactured from the process of refining that raw material.

The definitions in Part 195 support that understanding of the exception. The term "petroleum" is defined as "crude oil, condensate, natural gasoline, natural gas liquids, and liquefied petroleum gas," and the phrase "production facility" is defined as "piping or equipment used in the production, extraction, recovery, lifting, stabilization, separation or treating of petroleum or associated storage or measurement."[90] The Part 195 definition further states that "[t]o be a production facility . . ., piping or equipment must be used in the process of extracting petroleum from the ground and preparing it for transportation by pipeline."[91]

A "petroleum product," on the other hand, is defined as "flammable, toxic, or corrosive products obtained from distilling and processing of crude oil, unfinished oils, natural gas liquids, blend stocks and other miscellaneous hydrocarbon compounds."[92] Relying on the industry standard that formed the original basis for the Part 195 regulations, DOT has long recognized that the distilling and processing necessary to create a petroleum product from liquid petroleum "typically occurs at oil refineries . . . and gasoline plants."[93]

As important, DOT has further recognized that the exception for onshore production, refining, or manufacturing facilities "does not apply to any facilities that are used directly in the

---

[87] Petroleum, Webster's New Collegiate Dictionary (1977); *see also Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (1989) (quoting a similar definition from Webster's Third New International Dictionary Unabridged (1981) in interpreting the term "petroleum" for purposes of the Comprehensive Environmental Response, Compensation, and Liability Act).

[88] Product, Webster's New Collegiate Dictionary (1977).

[89] *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) ("statutory construction" requires "reviewing text in context").

[90] 49 CFR § 195.2.

[91] *Id.*

[92] *Id.*; *see also* Notice of Interpretation and Partial Stay of Enforcement: Petroleum Products and Low-stress Pipelines, 61 Fed. Reg. 24, 244 (May 14, 1996); Interpretation Response #PI-24-0007 (Dec. 10, 2024), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0007.

[93] 61 Fed. Reg. at 24,245. Certain petroleum products are also extracted from natural gas that is delivered by pipeline to gas processing plants. *See Mobil Oil Corp. v. Fed. Energy Admin.*, 566 F.2d 87, 89 (Temp. Emer. Ct. App. 1977) (discussing similarities and differences in the extraction and recovery of natural gas liquids from gas processing plants and crude oil refineries).

transportation of hazardous liquids by pipeline."[94] DOT has applied that principle in exercising jurisdiction over midstream processing facilities that perform pipeline-transportation-related functions.[95] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, for example, PHMSA found that the exception for production, manufacturing, or refining facilities did not apply to a natural gas liquids (NGL) fractionation plant.[96] In reaching that conclusion, PHMSA was "guided by testimony presented by [the agency] that refining is a term commonly used in the industry to refer to the conversion of crude petroleum into new products, not the separation of a mixture," and "that common usage in the industry would never refer to an NGL fractionation facility as a refinery."[97]

*The Santa Ynez Pipeline System is an Interstate Hazardous Liquid Pipeline Facility*

The Pipeline Safety Act defines an "interstate hazardous liquid pipeline facility" as "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce."[98] In determining whether a hazardous liquid pipeline facility satisfies this definition, "the essential character of the commerce" must be considered in light of "the whole group of facts in respect to it."[99] Moreover, once the transportation of a hazardous liquid by pipeline in interstate or foreign commerce begins, it "generally . . . continues, at least, until . . . the point where the parties originally intended that the movement should finally end."[100] Finally, the continuity of a movement of a hazardous liquid in interstate or foreign commerce is not broken by an interruption "to promote the safe or convenient transit" by pipeline.[101]

Applying these basic principles to the facts at hand demonstrates that the SYPS is an interstate hazardous liquid pipeline facility. As previously discussed, the SYPS moves crude oil produced at offshore platforms on the OCS to the LFC Facility, where it is subject to certain processing, *i.e.*, heating, removal of water and other contaminants, sweetening, and stabilization, to facilitate further movement by pipeline.[102] After this processing is complete, the crude oil is either sent

---

[94] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[95] *See* 85 Fed. Reg. 70,125 (Nov. 4, 2020) (draft guidance).

[96] *In the Matter of ONEOK NGL Pipeline, L.P., et al.*, 2016 WL 8315623 (PHMSA Oct. 12, 2016) appealed and resolved by consent agreement at 2018 WL 8058072 (PHMSA Oct. 23, 2018).

[97] 2016 WL 8315623, at *8.

[98] 49 U.S.C. § 60101(a)(7); *see also* 49 CFR § 195.2 (defining "interstate pipeline" as "a pipeline or that part of a pipeline that is used in the transportation of hazardous liquids or carbon dioxide in interstate or foreign commerce").

[99] *Atlantic Coast Line R. Co.*, 275 U.S. at 268-269; *see also U.S. v. Erie R. Co.*, 280 U.S. at 101-102.

[100] *Illinois Cent. R. Co.*, 236 U.S. at 163.

[101] *Champlain Realty Co.*, 260 U.S. at 376.

[102] Memorandum from Dustin Hubbard, Western Region Director, OPS to File, PHMSA-2026-0464, Document Review for Jurisdictional Determination in Support of Special Permit (June 25, 2026) (on file with PHMSA).

directly to a pump station for delivery to Pentland Station or to aboveground storage tanks at the LFC Facility. The tanks at the LFC Facility temporarily store the crude oil, which is later reinjected into the SYPS for shipment to Pentland Station, the location designated in a current purchase agreement as the delivery point for the OCS-produced crude oil transported through the SYPS. The crude oil is delivered from Pentland Station in another pipeline system to refineries in California.

The "essential character" of this commerce is interstate. First, the movement of a hazardous liquid by pipeline through the SYPS begins on the OCS. The offshore platforms produce an emulsion that contains crude oil, a hazardous liquid subject to regulation under the Pipeline Safety Act.[103] While the ICA prohibits FERC from exercising jurisdiction over "pipelines transporting oil solely on or across the OCS,"[104] the Pipeline Safety Act and DWPA clearly provide PHMSA with jurisdiction to regulate such pipelines.

Second, the movement of crude oil through the SYPS is also part of an interstate journey from the start. The Pipeline Safety Act defines "interstate or foreign commerce," in relevant part, as "commerce between . . . a place in a State and a place outside that State."[105] The SYPS transports crude oil from the OCS, "a place outside" of California, through state waters to inland points located within California. Once the crude oil produced at the offshore platforms enters the SYPS, it has begun an interstate journey.[106]

Third, the crude oil remains in interstate commerce at least until it reaches Pentland Station. A current purchase agreement identifies Pentland Station as the intended destination of the crude oil that begins its movement by pipeline on the OCS, and nothing breaks the interstate character of that movement during its transit through the SYPS. The heating, dewatering, sweetening, stabilization, and other processing functions performed at the LFC facility ensure that the crude oil can be safely transported by pipeline.[107] Such processing "to promote the safe or convenient transit" of crude oil by pipeline does not break the continuity of an interstate movement.[108] The aboveground storage tanks at the LFC Facility also provide storage incidental to pipeline

[103] 49 U.S.C. § 60101(a)(4)(A) (defining "hazardous liquid" to include "petroleum"); 49 CFR 195.2 (defining "hazardous liquid" to include "petroleum" and defining "petroleum" to include "crude oil"). The fact that the emulsion also contains water and other contaminants not subject to regulation as a hazardous liquid does not render the Pipeline Safety Act inapplicable to the offshore portions of the SYPS. PHMSA Letter of Interpretation, PI-20-0008 (June 15, 2020), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-20-0008.

[104] *Re Bonito Pipe Line Co.*, 61 FERC ¶ 61,221.

[105] 49 U.S.C. § 60101(a)(8)(B).

[106] A different analysis would be required if the SYPS originated at offshore platforms located in California state waters. In that scenario, the movement of crude oil through the SYPS would not begin at a place outside of California, and that, in turn, would need to be considered in assessing the jurisdictional status of the pipeline under the Pipeline Safety Act. *See Southern Pacific Pipe Lines Inc. v. U.S. Dept. of Transp.*, 796 F.2d 539 (D.C. Cir. 1986).

[107] *See supra* notes 38-40.

[108] *Champlain Realty Co.*, 260 U.S. at 376.

transportation. The tanks, which qualify as PHMSA-regulated breakout tanks under Part 195, receive crude oil for reinjection and continued transportation in interstate commerce in the SYPS.[109]

In other words, Sable's onshore pipeline segments are just like the delivery driver and his truck in *Flowers Foods*. They are used to transport crude oil on an intrastate leg of an interstate journey. And just like the warehouse in *Flowers Foods* that repackaged the Butterscotch Krimpets from wholesale to retail packaging, and just like the onshore processing facility in *Maryland v. Louisiana*, the processing at the LFC Facility does not stop the flow of interstate commerce because the crude oil remains in interstate commerce until it reaches its final intended destination in Pentland.

Fourth, the exception for onshore production, refining, and manufacturing facilities does not apply to the LFC Facility. The crude oil that moves through the LFC facility is only subject to transportation-related processing[110] and remains a raw material until it reaches the California refineries downstream from the Pentland Station, where it is refined into petroleum products.[111] The fact that the transportation-related processing performed at the LFC Facility results in the removal of water, certain NGLs, and contaminants does not mean that the exception applies. Such phenomena are a regular feature of the transportation-related processing that occurs throughout the nation's hazardous liquid and natural gas pipeline network.[112]

---

[109] PHMSA Interpretation Response #PI-24-0009 (Jul. 28, 2025), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-24-0009. Sable acknowledged in a letter submitted after the filing of the application for the non-emergency special permit that the tanks at the LFC Facility are breakout tanks under Part 195.

[110] Interpretation Response #PI-17-0003, available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-17-0003; Interpretation Response #PI-96-015 (Jul. 22, 1996), available at https://www.phmsa.dot.gov/regulations/title49/interp/pi-96-015 (the exception for manufacturing facilities does not apply to "facilities . . . operated primarily to further . . . transportation . . . by pipeline").

[111] Nor would the applicability of the exception for onshore production, refining, and manufacturing facilities to certain movements of hazardous liquid through the LFC facility break the continuity of the interstate journey. The legislative history indicates that Congress added this exception to the HLPSA for policy reasons, *i.e.*, "because such lines present insufficient risk to life and property to require regulation." Senate Report No. 96-182 to Accompany S. 411, May 15, 1979, p. 18. The applicability of such a policy-based exception to a particular movement of hazardous liquid is not enough to change the "essential character" of the interstate commerce at issue in this case. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. & Teamsters Joint Council No. 7 v. I.C.C.*, 921 F.2d 904, 910 (9th Cir. 1990) (holding "that goods shipped from a point in one state to a point in the same state may remain in interstate commerce even where an exempt movement of the goods precedes the single-state movement").

[112] *Oneok*, 2016 WL 8315623 at *7 ("Were the [Pipeline Safety Act] interpreted to exempt any facility used in removing unwanted substances, it would result in significant and unintended gaps in safety oversight. For example, every natural gas pipeline facility that removes unwanted moisture from its gas stream to aid in pipeline transportation could potentially fall under such concepts of refining and be excluded from the Act. PHMSA does not assume Congress intended to enact an exception so expansive that it would defeat much of the purpose of the legislation.").

Fifth, even if contrary to PHMSA's consistent interpretation going back many decades,[113] transportation-related processing facilities were outside the statutory definition of transporting hazardous liquid, PHMSA would still conclude that lines CA-324 and CA325 are used to transport hazardous liquid in interstate commerce under 49 U.S.C. § 60101(a)(7). Sable transports crude oil across state lines before it reaches the Las Flores Canyon facility and, after that crude oil exits the Las Flores Canyon facility, the crude oil continues its interstate journey through CA-324 and CA-325 until it reaches Pentland Station. Lines CA-324 and CA-325 are thus used to transport crude oil in interstate commerce because they perform an intrastate leg of an interstate journey. Based on our inspection and analysis, the processing that occurs at Las Flores does not change the essential character of the crude oil in any way that would terminate the flow of interstate commerce.

Finally, PHMSA's May 2016 letter to OSFM addressing the jurisdictional status of the SYPS does not change the essential character of the commerce today. PHMSA issued that letter shortly after Plains submitted filings with FERC canceling the ICA tariffs for CA-324 and CA-325. In those filings, Plains represented that the pipelines had been taken out of service and were no longer available to provide transportation in interstate commerce.[114] PHMSA had no reason to question the representations made in Plains' filings at that time, and there was no indication that Plains canceled the tariffs simply to avoid jurisdiction. To the contrary, PHMSA had mandated in the CAOs that CA-324 and CA-325 be shutdown following the May 2015 rupture, and the lines subsequently remained out of service for more than 10 years. The offshore platforms that produced crude oil for delivery into CA-324 and CA-325, then owned and operated by ExxonMobil, were also shut down at that time and remained in idle status for the next 10 years.[115]

PHMSA's conclusion in the May 2016 letter that Plains did not intend to use CA-324 and CA-325 in interstate commerce was reasonable under such circumstances. CA-324 and CA-325 were not operational and could not transport crude oil in interstate commerce, both because of the CAO and as a result of ExxonMobil's decision to idle the offshore platforms and eliminate the sole source of supply for the lines. And PHMSA relied, as it routinely does under Appendix A to Part 195, on the absence of a FERC tariff as a general proxy for jurisdiction under the HLPSA when there is no disputed issue as to jurisdiction.

But as PHMSA noted at the conclusion of the May 2016 letter, its views on the jurisdictional status of the SYPS were "subject to change based on any future events or newly-discovered

---

[113] *Id.*

[114] Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.3.0, Document Accession No. 20160212-5032 (Feb. 12, 2016); Plains Pipeline, L.P. Tariff Filing -- FERC Tariff No. 114.4.0, Document Accession No. 20160429-5326 (Apr. 29, 2016), available at https://elibrary.ferc.gov/eLibrary/search

[115] U.S. Dep't of the Interior, Bur. of Safety and Envtl. Enf't, Finding of No Significant Impact: ExxonMobil/Sable Offshore Corp. Lease Extension of the Santa Ynez Unit at 2 (May 2025), https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/2025_0528_SableEA_FONSI_508c.pdf.

facts," a condition that is certainly met here. The SYPS is now under common ownership and control, production has resumed at the offshore platforms, and the pipeline is once again transporting crude oil from the OCS through the LFC Facility to Pentland Station. The movement of crude oil is consistent with the circumstances that existed prior to the May 2015 failure of Line 901, when PHMSA considered that pipeline and Line 903 to be part of an interstate hazardous liquid pipeline facility under the Pipeline Safety Act. For these reasons, the May 2016 letter does not undermine the determination that the SYPS is an interstate hazardous liquid pipeline facility.

**Conclusion**

As stated above, PHMSA finds that the SYPS is an interstate hazardous liquid pipeline facility subject to its jurisdiction under the Pipeline Safety Act.

# EXHIBIT D

**U.S. DEPARTMENT OF TRANSPORTATION**

**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**

**ENVIRONMENTAL ASSESSMENT**

**Special Permit Information:**

| | |
|---|---|
| **Docket Number:** | PHMSA-2025-1502 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID#:** | 40881 |
| **Original Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |

## I. INTRODUCTION

The National Environmental Policy Act (NEPA), 42 United States Code (USC) §§ 4321 – 4375 *et seq*., and U.S. Department of Transportation (DOT) Order No. 5610.1D, require the Pipeline and Hazardous Materials Safety Administration (PHMSA) to analyze a proposed action to determine whether such action would have a significant impact on the human and natural environment. PHMSA analyzes special permit requests for potential risks to public safety and the environment that could result from the decision to grant, grant with additional conditions, or deny the request. As part of this analysis, PHMSA evaluates whether granting a special permit would provide an equal or greater level of safety compared to the operation of the pipeline in regular compliance with the federal pipeline safety regulations. PHMSA's environmental review associated with a special permit is limited only to impacts that would result from granting or denying the special permit.

Pipeline special permits are authorized by statute in 49 USC § 60118(c) and the regulatory requirements, including the application process, are set forth in 49 CFR 190.341. PHMSA is also authorized to grant special permits on an emergency basis under 49 U.S.C. § 60118(c)(2) and 49 CFR 190.341(g). When the expected environmental impacts of a proposed emergency action are

not considered significant, PHMSA prepares an environmental assessment to the extent practicable.[1]

This Environmental Assessment (EA) is being developed to assess the environmental impacts associated with the Emergency Special Permit issued to Sable Offshore Corp. (Sable) on December 23, 2025, in addition to the proposed non-emergency Special Permit (SP) currently under review by PHMSA. The Emergency Special Permit (ESP) granted Sable's request to waive compliance with the requirements of 49 CFR § 195.452(h)(4)(iii)(H) for two segments of the Santa Ynez Pipeline System (SYPS). The proposed non-emergency SP requests to waive the same regulatory requirement.

## II. PROJECT DESCRIPTION

### 1) Description of Location

The SYPS is a Part 195-regulated interstate pipeline facility that originates at offshore oil production platforms located on the Outer Continental Shelf (OCS). The SYPS transports the oil produced at the platforms through Federal and State waters and an onshore processing facility in Santa Barbara County, California, known as the Las Flores Canyon Processing Facility (LFC), before transporting the oil through two downstream pipeline segments, CA-324 and CA-325 (formerly known as "Line 901" and "Line 903", respectively), that traverse portions of Santa Barbara, San Luis Obispo, and Kern Counties.[2] A map depicting the location of segments CA-324 and CA-325 within the SYPS is provided below:

[1] USDOT Order 5610.1D: DOT's Procedures for Including Environmental Impacts, Sec. 23(b).

[2] Crude oil has been transported from offshore oil production platforms through the SYPS up to LFC since May 2025. Petroleum flowed through the entire SYPS, including segments CA-324 and CA-325, until May 19, 2015, when a rupture occurred along segment CA-324 approximately 100 yards north of Highway 101 and 0.25 miles west of Refugio State Beach in Santa Barbara County, California. The SYPS has remained in an active state, but petroleum did not flow through it, from the time that 2015 rupture occurred until May 2025.




Segment CA-324 is approximately 10.86 miles in length. It generally runs parallels to the north of U.S. Highway 101 along the southern coast between the LFC consolidated oil and gas processing facility and Gaviota Pump Station. The pipeline segment ends at Las Flores Canyon. This pipeline segment is located north of U.S. Highway 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons. Segment CA-325 is split into two portions – CA-325A and 325B. The CA-325A segment is approximately 38.72 miles in length. This pipeline segment extends west from Gaviota Pump Station to a motor operated valve (MOV) located east of Gaviota Creek and U.S. Highway 101. It then enters Gaviota State Park approximately 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area. From there, the segment crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area. The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park. The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, before crossing back into the Park and descending toward the west fork of Gaviota Creek (Betty Creek). The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101. The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains. It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed. North of Moonshine Creek, the route crosses ridges with rock outcroppings. The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills. It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley. The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley. It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Pump Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approximately 74.84 miles in length. The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Pump Station. It then extends northeast towards Tepusquet Road. The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains, where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon. The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest. The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon. At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approximately 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

High Consequence Areas (HCAs)[3] along segments CA-324 and 325 are provided below:

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple counties as well as State and federal land. Approximate mileage is included below:

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction *(Note 1)*** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |

[3] See 49 CFR § 195.450 (defining high consequence area for purposes of the integrity management requirements in 49 CFR § 195.452).

| | | | | |
|---|---|---|---|---|
| Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| City of Buellton | 0 | 1.1 | 0 | 1.1 |
| Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction.*

**2) Description of Action**

PHMSA developed this EA to assist in analyzing the environmental impacts associated with the ESP issued to Sable on December 23, 2025 and proposed non-emergency SP currently under PHMSA consideration. Sable sought the ESP to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California ("Consent Decree"). The Consent Decree, entered in response to a failure that occurred near Refugio State Beach in May 2015, imposed certain conditions on the resumption of petroleum transportation through CA-324 and CA-325. Specifically, the Consent Decree required the prior operator to obtain certain waivers to address "the limited effectiveness of cathodic protection" for CA-324 and CA-325.[4]

At the time of entry of the Consent Decree, CA-324 and CA-325 were considered intrastate pipeline facilities subject to regulation by the California Office of the State Fire Marshall (OSFM) pursuant to the terms of its State certification with PHMSA under 49 U.S.C. § 60105(a). Section 60118(d) of the Pipeline Safety Act (PSA) authorizes certified state authorities to issue waivers of the safety standards that would otherwise apply to an intrastate pipeline facility, subject to review by PHMSA under a 60-day prior notice and objection process. For several decades prior to the entry of the Consent Decree, however, CA-324 and CA-325 were considered interstate

[4] Consent Decree at Appx. B, Article I, Section 1.A and B. The Consent Decree did not require the prior operator to obtain these waivers from OSFM if it replaced CA-324 and CA-325. Id. at Appx. B, Article I, Section 2. Appendix D of the Consent Decree also provides for the submission and approval of a "Restart Plan" prior to resuming petroleum transportation through the segments.

pipeline facilities subject to regulation by PHMSA under the PSA.[5] Indeed, PHMSA issued a Corrective Action Order (CAO) to the operator of CA-324 and CA-325 at the time of the failure, Plains All American Pipeline, LP (Plains), pursuant to its sole and exclusive regulatory authority, and the terms and conditions of that CAO provided the basis for many of the provisions subsequently included in the Consent Decree.[6]

The interstate status of CA-324 and CA-325 changed in 2016, when Plains canceled the tariffs filed with the Federal Energy Regulatory Commission (FERC) for providing interstate oil transportation service on both pipeline segments under the Interstate Commerce Act. Pursuant to a longstanding and well-established Statement of Agency Policy and Interpretation codified in Appendix A to part 195, PHMSA "generally rel[ies] on the FERC filings; that is, if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility or if there has been an exemption from the obligation to file tariffs obtained from FERC," in determining whether to "consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." *Id.* Accordingly, Plains decision to cancel the FERC tariffs had the effect of transforming CA-324 and CA-325 into intrastate pipeline facilities, a status that both pipeline segments retained when the District Court approved the Consent Decree.

In 2024, Sable acquired the SYPS from another operator and sought to obtain the waivers required under the Consent Decree for CA-324 and CA-325 from OFSM. On December 17, 2024, OFSM issued those waivers, and on February 11, 2025, PHMSA notified OSFM that it had no objection to the same under the 60-day notification provision in the PSA.

Several months later, on November 26, 2025, Sable notified PHMSA that it had recently determined that CA-324 and CA-325 were once again part of an interstate pipeline facility under the PSA. Citing the definitions in the PSA and policy statement in Appendix A to part 195, Sable

---

[5] Except for purposes of enforcing the requirements in State one-call damage prevention programs, State authorities are prohibited from regulating the safety of interstate pipeline facilities under the PSA. 49 U.S.C. § 60104(c). Interstate pipeline facilities are subject to PHMSA's sole and exclusive regulatory authority for safety purposes.

[6] Plains Pipeline, LP, CPF No. 5-2015-5011H, Corrective Action Order (May 21, 2015), subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016.

explained that its acquisition and intention to operate the entire SYPS as a single pipeline system transporting oil produced on the OCS into and through the State of California supported the conclusion that the SYPS was an interstate pipeline facility. On December 17, 2025, PHMSA sent a response concurring with Sable's November 26, 2025 determination that the SYPS, including segments CA-324 and CA-325, is an interstate pipeline facility under the PSA. PHMSA further stated that it had sole and exclusive authority to regulate the safety of that interstate pipeline facility, including for purposes of issuing and administering any waivers that might be required for CA-324 and CA-325.

After receiving PHMSA's response, on December 19, 2025, Sable applied for an ESP for segments CA-324 and CA-325. In its application, Sable asked PHMSA to adopt "substantially the same measures" in the ESP as those "that have already been reviewed and approved by [OSFM] through issuance of [the] State Waivers." Specifically, Sable's application sought (1) regulatory relief from 49 C.F.R. § 195.452(h)(4)(iii)(H) and (2) "a special permit from PHMSA for [the] limited effectiveness of cathodic protection" as provided under the Consent Decree.

On December 23, 2025, PHMSA granted the application and issued the ESP to Sable. The ESP included substantially the same conditions as those contained in the two State Waivers previously issued by OFSM, which are summarized further below. Sable's application for the non-emergency SP includes substantially the same conditions as the ESP and the State Waivers.

## III. PURPOSE AND NEED

Issuance of a special permit is necessary to resume transportation of petroleum through CA-324 and CA-325 under the terms of the Consent Decree. The Consent Decree required the prior operator, Plains, to obtain waivers from OFSM as an alternative to completely replacing the line pipe in both segments. Sable subsequently acquired CA-324 and CA-325 from another operator and obtained the waivers required from OFSM under the Consent Decree. Having recently decided to begin using the SYPS once again as an interstate pipeline facility, Sable appropriately sought to obtain the waivers required under the Consent Decree from PHMSA.

Moreover, Sable asked PHMSA to grant those waivers on an emergency basis to address an actual or impending emergency involving pipeline transportation pursuant to Executive Order

14156.[7] Issued in accordance with the authority provided in the National Emergencies Act (50 U.S.C. § 1601 et seq.), the President declared a national energy emergency in Executive Order 14156 based on his finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[8] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[9] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[10]

PHMSA determined that granting the ESP was consistent with the requirements in the PSA given the national energy emergency declared by the President in Executive Order 14156. Specifically, the ESP would enable and facilitate the ***special permit segments*** to meet regional energy demands, reduce refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United States dependency on imported oil and the associated energy security risks of such imports. As described in Executive Order 14156, the national energy emergency requires the expeditious deployment of domestic "unrealized energy resources" and the United States' "current inadequate development of domestic energy resources leaves us vulnerable to hostile foreign actors and poses an imminent and growing threat to the United States' prosperity and national security."[11] As an executive agency, PHMSA must "exercise any

---

[7] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g).

[8] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[9] Id. at Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[10] Id. at Sec. 3(b).

[11] Id. at Sec. 1.

lawful emergency authorities" and "all other lawful authorities" to facilitate the transportation of "domestic energy resources."[12]

In addition, the current crude oil supply conditions in California create the additional risk of a statewide motor fuel supply emergency. The reduction in regional sources of crude caused by declining onshore production, and the current inability to move oil out of the Santa Ynez Unit due to the lack of adequate pipeline transportation into California, has increased the state's reliance on imported crude oil from countries such as Iraq, Ecuador, and Brazil. Oil from these locations must be shipped significant distances to California by ocean-going tankers at greater expense and a potentially greater environmental impact than oil produced in-state. California's reliance on foreign crude creates significant risk of disruptions given current geopolitical conditions. Issuance of ESP will facilitate the prompt and safe restart of CA-324 and CA-325, which would immediately and significantly improve energy security by offsetting the need for imported crude. For these reasons, the President's declaration of a national energy emergency in Executive Order 14156 supports the issuance of the ESP and the subsequent non-emergency SP.

PHMSA's decision to grant the ESP also implements the directives in Executive Order 14154 (January 20, 2025) ("Unleashing American Energy"), in which the President identified that "high energy costs devastate American consumers by driving up the cost of transportation, heating, utilities, farming and manufacturing, while weakening our national security."[13] Executive Order 14154 establishes a policy to "encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future," as well as to "protect the United States'[] economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation."[14] Executive Order 14154 further directs multiple agencies, including the Department of Transportation, to "undertake all available efforts to eliminate all delays within

---

[12] Id. at Sec. 2(a).

[13] Exec. Order 14154: Unleashing American Energy (Jan. 20, 2025), Sec. 1.

[14] Id. at Sec. 2.

their respective permitting processes," and to use "all possible authorities, including emergency authorities, to expedite the adjudication of Federal permit" for projects deemed "essential for the Nation's economy or national security."[15] As with Executive Order 14156, grant of the ESP implements Executive Order 14154 by facilitating the transportation of petroleum through CA-324 and CA-325 in an expedient fashion and allowing for the realization of the above-described energy supply and security benefits.

Finally, PHMSA's decision to grant the ESP avoided a potential gap in coverage under the waivers issued by OSFM. Because CA-324 and 325 were reconfigured as an interstate pipeline, the ESP was necessary to replace those waivers, which no longer have any legal effect due to the operation of the preemption provision in 49 U.S.C. § 60104(c). Sable's recent invocation of the *Notice of Limited Enforcement Discretion and Statement of Policy for Issuing Special Permits in Response to the National Energy Emergency* (*National Energy Emergency Enforcement Discretion*) that PHMSA issued on January 12, 2026, in applying for a non-emergency special permit provides further assurance that any gap in coverage will be avoided.[16] Consistent with the *National Energy Emergency Enforcement Discretion*, Sable has committed to following the conditions in the ESP after it expires on February 21, 2026 pending a final determination from PHMSA on its application for a non-emergency SP.

## IV. BACKGROUND AND REGULATORY REQUIREMENTS

### 1) Existing Part 195 Requirement

Section 195.452(h)(4)(iii)(H) provides that certain corrosion of or along a longitudinal seam weld must be mitigated within 180 days of discovery. On September 12, 2025, PHMSA published a revised interpretation clarifying the applicability of the requirements in § 195.452(h)(4)(iii)(H). Specifically, PHMSA clarified that corrosion that coincidentally occurs

---

[15] Id. at Sec. 5.

[16] A copy of the *National Energy Emergency Enforcement Discretion* is available on the PHMSA website at https://www.phmsa.dot.gov/news/notice-limited-enforcement-discretion-and-statement-policy-issuing-special-permits-response.

along a longitudinal seam but which is not otherwise preferential to the seam does not need to be mitigated per section 195.452(h)(4)(iii)(H).[17]

**2) <u>Consent Decree Requirements</u>**

Appendix B of the Consent Decree provides that, as a condition of resuming petroleum transportation through segments CA-324 and CA-325, the operator must either (1) obtain a waiver for both segments from OSFM "for the limited effectiveness of cathodic protection," or (2) completely replace the line pipe in both segments. As noted above, Sable obtained the waivers required from OSFM, but those waivers are no longer effective due to the change in the jurisdictional status of CA-324 and CA-325, which are now interstate pipeline facilities subject to the sole and exclusive regulatory authority of PHMSA under the PSA.

Consistent with the terms of the Consent Decree and the requirements in the PSA, PHMSA issued the ESP for segments CA-324 and CA-325 to replace the OSFM waivers. The ESP included conditions that are substantially the same as those included in the prior waivers.

**3) <u>Existing Environmental Review</u>**

*<u>Initial EIS</u>:* On July 18, 1984, the US Department of the Interior (DOI) and the California State Lands Commission (CSLC) prepared a draft joint Environmental Impact Report/Environmental Impact Statement ("Draft EIS"), pursuant to the requirements in NEPA and the California Environmental Quality Act (CEQA), analyzing the construction, operation, and ongoing repair and maintenance of segments CA-324 and CA-325.[18]

Following public comment, in January 1985, the DOI and CSLC prepared a Final Environmental Impact Report/Environmental Impact Statement ("Final EIS"). Both the Draft EIS

---

[17] PHMSA, Hazardous Liquid Integrity Management Frequently Asked Question 7.16 (September 12, 2025).

[18] The Draft EIS analyzed the "Celeron / All American Pipeline Proposal," which consisted of the construction, operation, and ongoing repair and maintenance of an approximately 1,200-mile pipeline to transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins to McCamey, Texas. Segments CA-324 and CA-325 were analyzed in the Draft EIS as part of the "Celeron segment" of the proposal. The operational life of these segments were assumed to continue until "the availability of crude oil" for use in the segments was exhausted. (*See* Draft EIS, p. 2-35.)

and Final EIS also analyzed the environmental effects of identified routing alternatives to determine the significance of these potential impacts, the avoidability of these impacts, and potential mitigative measures. Collectively, this EA refers to the Draft EIS and Final EIS as the "Initial EIS."[19] The Initial EIS serves to characterize impacts associated with the construction of CA-324 and CA-325, as well as routine maintenance and repair activities as part of ongoing operation.

*Replacement EIR/EA.* In 2022, Santa Barbara County and the DOI's Bureau of Land Management prepared a joint Revised Notice of Preparation of a Draft Environmental Impact Report/Environmental Impact Assessment ("Replacement EIR/EA") for the proposed Plains Replacement Pipeline Project (Project). The notice assessed the significance of potential environmental impacts associated with the replacement of CA-324 and CA-325 to determine which issue areas to cover in an environmental impact statement.[20] The Replacement EIR/EA determined potentially significant impacts could result to biological resources, cultural resources, and hydrological resources. In October 2023, the pipeline operator withdrew its application for the proposed project, stating that potential environmental impacts associated with the proposed project would be unnecessary and avoidable given that the existing pipeline could be responsibly restarted.[21] The Replacement EIR/EA now characterizes impacts associated with the No Action Alternative, discussed further below.

*IM Rule EA*. In 2000, PHMSA conducted an environmental assessment in conjunction with the Integrity Management Rule (IM Rule) at 49 CFR 195.452, which governs the frequency of integrity assessments and prescribes a schedule of anomaly repairs for covered pipelines not

---

[19] The Draft EIS and Final EIS can be accessed at http://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672 and https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt, respectively, and are incorporated into this EA.

[20] The Revised Notice of Preparation of a Draft Environmental Impact Report/Environmental Impact Assessment can be accessed at https://cosantabarbara.app.box.com/s/xs3savjcx9rkdsrmobc2eedzec8cn78k and is incorporated into this EA.

[21] The Withdrawal Letter can be accessed here: https://cosantabarbara.app.box.com/s/3gvdwbzta1l19ss9r7cpkuvinte1byuv/file/1343281220509

otherwise subject to a special permit (see Appendix A). PHMSA's EA associated with that rulemaking determined that hydrostatic testing could be associated with minor environmental impacts, including:

- slight disturbance of the right-of-way to uncover short segments of the line;
- potential for leaks of water and oil residue mixture; and
- disposition of the spent water test medium that mixes with residue oil.

PHMSA's EA also determined that internal inspections may have minor environmental impacts, including:

- possible need to install pig launchers and receivers and valves or other appurtenances to accommodate inspection tools; and
- possibility of additional localized disturbances along the right-of-way for excavations to examine and repair identified anomalies.[22]

PHMSA determined that these impacts would be limited to small areas on the applicable pipeline segment's right-of-way and would not involve additional vegetation or environmental disturbances beyond the equipment site. PHMSA concluded that these adverse impacts would not be significant, and determined that:

> the combined impacts of the initial baseline assessment (pressure testing or internal inspection), the subsequent periodic assessments, and additional preventive and mitigative measures that may be implemented to protect high consequence areas will result in positive environmental impacts. The number of incidents and the environmental damage from failures in and near high consequence areas are likely to be reduced. However, from a national perspective, the impact is not expected to be significant for the pipeline operators covered by the final rule.[23]

[22] Appx. A at 23.

[23] 65 Fed. Reg. at 75405.

The IM rule EA also determined that acceleration of integrity assessments of affected segments would "only shift[] the improved integrity assurance forward for a few years for most high consequence areas."[24]

The IM Rule EA serves to establish the environmental insignificance of integrity assessments and anomaly repair activities that are required under the ESP, including in-line inspections and excavations and repair of pipe anomalies. The focus of the IM EA is generalized impacts of the mitigations resulting from the rulemaking. It does not assess location-specific impacts related to this pipeline itself. However, PHMSA reviewed the IM EA and determined that the environmental resource areas analyses are applicable to site specific actions, such as this emergency special permit.

## V. PHMSA NEPA REVIEW

PHMSA's EA for the ESP and non-emergency SP is limited to an evaluation of the significance of impacts associated with the Action Alternative, compared to those that would result under the No Action Alternative. These alternatives are discussed in more detail below.

### 1) Alternatives

*Alternative 1: No Action Alternative*. This Alternative involves the failure to issue a regulatory waiver and the construction of approximately 123 miles of new pipe at or near segments CA-324 and CA-325's existing right-of-way, pursuant to Appendix B, Article I, Section 2 of the Consent Decree. This Alternative would involve substantially greater earth disturbances compared to the Action Alternative, based on the need to excavate the entire pipeline route, install

---

[24] *Id*. Apart from these previous NEPA reviews, the US Department of Interior Bureau of Safety and Environmental Enforcement ("BSEE") also recently determined that BSEE's decision to approve an extension of time to resume operations on the 16 federal offshore leases comprising Sable's Santa Ynez Unit will not significantly affect the quality of the human environment under NEPA. See US Dept. of Interior Bureau of Ocean Energy Management, Bureau of Safety and Environmental Enforcement, "Finding of No Significant Impact, ExxonMobil/Sable Offshore Corporation Lease Extension of the Santa Ynez Unit – Environmental Assessment," May 2025 (available at https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/2025_0528_SableEA_FONSI_508c.pdf). Santa Ynez Unit production activities send oil through the SYPS for eventual downstream transportation.

line pipe, and backfill. Upon completion of replacement, the new pipeline segments would transport oil and continue to comply with the existing requirements of Part 195. This includes performance of integrity assessments, such as ILIs, on an operator-determined schedule not to exceed once every five years, and the potential repair of anomalies identified from assessments according to the requirements in 49 CFR 195.452, generally through excavation and localized replacement of affected pipe.

*Alternative 2: Action Alternative.* The Action Alternative is the grant of the waiver sought in the ESP and non-emergency SP. This would address the energy emergency conditions identified above, including regional fuel shortages and resultant economic and national security issues, through facilitating the transportation of petroleum through CA-324 and CA-325 within the framework of the Consent Decree and at an equivalent or greater level of safety as provided under the Consent Decree and Part 195. No large-scale earth disturbances involved with pipeline replacement would be required under the No Action Alternative.[25] Under the Proposed Alternative, additional maintenance, inspection, and localized repair activities ("Special Permit Conditions") would be required as further described below.

PHMSA personnel separately reviewed information regarding the location of segments CA-324 and CA-325 and the conditions in the ESP and non-emergency SP. PHMSA personnel previously determined that the ESP would achieve at least an equivalent level of safety as adhering to the Part 195 regulations in full.

In addition, this EA does not evaluate alternatives beyond PHMSA's mandate. This EA considers only reasonable alternatives, including those which are consistent with the legal framework currently applicable to the special permit segments (i.e., the requirements specified in the Consent Decree and Part 195), and which meet the above-described purpose and need for the

[25] The Action Alternative does not include actions taken by the operator that are not required under the ESP, or which are discrete tasks that had already been completed prior to the issuance of the ESP. These actions include the installation of numerous safety valves and real-time transient model (RTTM) leak detection system to reduce spill volumes, performance of integrity assessments and repairs of identified anomalies pursuant to the Consent Decree's specifications, and spike hydrostatic testing pursuant to the State Waivers, each of which lower the risk of a pipeline failure. Nor does the Action Alternative include initial construction of CA-324 and 325.

ESP.[26] This EA does not consider, nor does NEPA require, consideration of every theoretical alternative. This EA only analyzes reasonable, foreseeable impacts of specifically the Action Alternative (i.e., granting the special permit) and No Action Alternative. Alternatives that require speculation outside of the current legal framework (as may occur in the possibility of prospective termination or modification of the Consent Decree or amendment to Part 195), or which do not meet the purpose and need for the proposed action (such as permanent abandonment of the special permit segments without replacement) are not considered in this EA.

## VI. OVERVIEW OF SPECIAL PERMIT CONDITIONS

The ESP and non-emergency SP conditions require maintenance, inspection, and repair activities that are more stringent than required under Part 195. In particular, the conditions require fracture toughness testing, spike hydrotesting, more frequent integrity assessments and direct examinations, and more stringent anomaly repair criteria. The conditions do not provide for or allow any expansion in capacity or new or expanded physical infrastructure along segments CA-324 or CA-325.

A summary of conditions imposing the above requirements is provided below.

- *Condition 14(c):* Requires two Ultrasonic Wall Measurement (UTWM) ILI assessments per year for the first two years following restart, then, at minimum, annual ILI assessments thereafter, to assess metal loss, including due to corrosion. Part 195 only requires such integrity assessments on a once-per-five-year schedule, and the Special Permit Segments were previously only assessed on a once-per-three-year schedule. The higher assessment frequency established in the ESP will facilitate the timely detection and repair of such anomalies before they pose integrity risks.
- *Condition 14(d):* Requires, at minimum, annual Ultrasonic Shear Wave Crack Detection (USCD) ILI assessments. Part 195 only requires such assessments on a once-per-five-year schedule. The higher assessment frequency established in the ESP will facilitate the timely detection and repair of such anomalies before they pose integrity risks.

[26] USDOT Order 5610.1D.

- *Condition 14(e):* Requires running high-resolution deformation ILI tool along with each UTWM ILI assessments.
- *Condition 14(i)-(k):* Requires ILI tool vendor to determine tool tolerance per API 1163 2nd Ed. and include that tolerance in determining the size of each indication reported to Sable. Sable must account for this tool tolerance and anomaly growth rates in scheduling repairs and future reassessment intervals and must demonstrate ILI tool accuracy for each run by using calibration, excavations, and unity plots demonstrating tool accuracy meets the vendor's specifications (typical for depth within 10% accuracy for 80% of the time). Sable must perform at least four validation digs in accordance with Level 2 of API 1163.
- *Conditions 16-17:* Requires immediate repair of crack or crack-like anomalies equal to or greater than 50% of wall thickness (vs 80% threshold in § 195.452(h)(4)(i)). Requires 180-day repair of all internal or external metal loss anomalies with an ILI-reported depth of 40% wall loss or more, including tool tolerance (vs 50% wall loss threshold in § 195.452(h)(4)(iii)(F)).
- *Condition 18:* Requires Sable to develop a corrosion growth rate procedure to annually calculate corrosion growth rates between successive ILI assessments, including the most accurate signal matching between ILI data sets.
- *Condition 21(b)-(f):* Requires Sable to field-analyze a sample of assessment-identified anomalies to compare, and to apply 6t by 6t interaction criteria, and to use an approved third-party to review all ILI reports, verification dig results, unity plots, field findings, and any other finding that could affect the integrity of the Special Permit Segments within 6 months of each ILI assessment.

Some of the activities specified in the conditions already have been completed prior to the grant of the ESP, namely fracture toughness testing and spike hydrotesting. Moreover, multiple integrity assessments and substantial anomaly repairs have also been performed by Sable along segments CA-324 and CA-325 prior to the grant of the ESP. These discrete, previously-completed activities are not considered for purposes of characterizing impacts associated with the Action Alternative.

## VII. AFFECTED RESOURCES AND ENVIRONMENTAL CONSEQUENCES

**1) Land Use, Agriculture, and Recreation**

The right-of-way for segments CA-324 and CA-325 runs parallel to US Highway 101 along Santa Barbara County's southern coast, until CA-325 turns north toward the Sisquoc Pump Station and then continues east toward the Pentland Station terminal in Kern County, California. The route primarily crosses grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, and coastal and eastern foothill areas. Portions of these areas have experienced forest and range fires, particularly during dry years and under strong easterly wind conditions. Recreational facilities surrounding or in proximity to segments CA-324 and CA-325 include Refugio and Gaviota State Parks, which include beaches and campgrounds. Beyond Gaviota Pass, the segments enter the Los Padres National Forest, in which various recreational activities occur, ranging from hunting, camping, and off-roading.

The No Action Alternative would require construction of new pipeline and would potentially be subject to Santa Barbara County's Inland and Coastal Zoning Ordinance standards as well as Santa Barbara County's Comprehensive Plan, including its Coastal Land Use Plan, as well as similar standards within San Luis Obispo and Kern Counties. The No Action Alternative could result in significant land use impacts, which would be determined upon review by local agencies pursuant to these authorities.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on the results of the integrity assessments. As no land use conversion is proposed, no significant impacts to land use, agriculture, or recreational resources will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis than is otherwise required under Part 195, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (according to the more stringent repair criteria in the permit conditions), these activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. The degree of excavation under the Action Alternative would be substantially less as

compared to the No Action Alternative, which would entail large-scale excavation for the entire length of the special permit segments.

Moreover, the Action Alternative will not alter the segments' existing oil transmission capacity, route, or facilities so as to introduce new impacts related to land use and recreation, such as agricultural land conversions, providing uncontrolled access to previously inaccessible areas, or affecting forest fire or wildfire risks. Nor would the Action Alternative produce any new impacts related to conflicts with land use policies limiting pipeline crossings at environmentally sensitive habitat areas or recreational areas beyond what was already determined in the Initial EIS. As such, other land use impacts (other than impacts related to potential oil spill impacts, as described below) associated with the Action Alternative would not be significant.[27]

The Action Alternative would not present significant impacts to agricultural or recreational resources due to potential oil spills, as PHMSA will not issue the special permit if it does not achieve an equivalent level of safety to the regulations. Specifically, the Action Alternative's heightened inspection, monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to Part 195 requirements. Compliance with the permit conditions provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

**2) <u>Cultural and Historic Resources</u>**

The Initial EIS identified the presence of cultural resource sites within segments CA-324 and CA-325's right of way, including lithic scatters, bedrock millingstones, rock shelters, campsites, habitations, quarries, pit houses, and burial sites, among others, and as part of construction of these segments, imposed Mitigation Measure 30, which required the pipeline

[27] Sable has also installed 27 new safety valves along CA-324 and 325 that serve to limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume pursuant to California AB 864.

operator to comply with a cultural resources inventory and treatment plan to be finalized by federal and state land management agencies, including the State Historic Preservation Office, before construction commenced. (Draft EIS, p. 4-159, Final EIS, p. 3-7.) The Initial EIS required that the plan would include an intensive cultural resource survey, site-specific mitigation measures, data recovery programs, archaeological monitoring, and cooperation with appropriate Native American groups. (Draft EIS, pp. 4-159 through 4-160; Final EIS, pp. 4-13 through 4-14.) Mitigation Measure 30 has already been implemented as part of the initial construction of the segments.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. The Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions). These excavations will take place within disturbed soil within the existing rights-of-way for segments CA-324 and CA-325. Because of these prior mitigations it is unlikely that eligible cultural resources exist.

Continued operation of the already-constructed pipeline is a non-invasive activity which has no potential to impact historic properties under NHPA. Although future maintenance and anomaly repairs may involve ground disturbance in discrete areas, such work would occur within the existing, previously disturbed right-of-way, where additional NRHP-eligible resources are not expected. Because survey and mitigation occurred prior to the construction of the pipeline, it is believed that no additional resources remain. However, full review of the initial EIS and subsequent EIR was not possible due to the emergency nature of this special permit request. Emergency consultation with CA State Historic Preservation Officer (SHPO), Santa Ynez Band of Chumash Indians Tribal Historic Preservation Officer (THPO), and the Advisory Council on Historic Preservation (ACHP) is ongoing due to the possibility that some ground disturbance could be required to repair anomalies which could otherwise pose a hazard to health and human safety, within the disturbed pipeline ROW. PHMSA has requested comment on our finding that the current action will have no adverse effect on historic properties, with the conditions that the operator follow the mitigation requirements of the initial EIS, an Unanticipated Discovery

Protocol is implemented, and any additional mitigations determined following consultation with SHPO/THPOs should potentially eligible historic properties be discovered.

On the other hand, the No Action Alternative could potentially result in significant impacts to cultural resources, as determined in the 2020 EIA (EIA, pp. 13-14), due to the substantially greater degree of subsurface disturbance associated with the wholesale replacement of the existing pipe along CA-324 and 325.

**3) <u>Biological Resources</u>**

As noted above, Segments CA-324 and CA-325's rights-of-way are primarily alongside grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, as well as coastal and eastern foothill areas. The Initial EIS determined that no significant adverse impacts to aquatic biology would occur during construction due to the limited and temporary nature of construction activities. (Draft EIS, p. 4-42.) The Initial EIS nonetheless imposed Mitigation Measure 8 to further limit potential impacts, which restricted the amount of construction equipment fuel and lubrication that could be located near sensitive streams and where construction equipment fueling and lubrication activities could occur. (Draft EIS, p. 4-153; Final EIS, p. 4-6.) Mitigation Measure 8 continues to be implemented by Sable when conducting any applicable repair and maintenance activities along segments CA-324 and CA-325, independent of the grant of the ESP.

The Initial EIS further determined that construction of segments CA-324 and CA-325 would result in significant adverse impacts to sensitive plant and wildlife species (Draft EIS, pp. 4-45 through 4-46.), and imposed several mitigation measures to address these impacts. Based on a review of the U.S. Fish and Wildlife Service (USFWS) Information for Planning and Consultation (IPaC) tool, PHMSA identified 31 federally listed or proposed species and critical habitat with the potential to occur in the Action Area. Due to the ongoing performance of such repair and maintenance activities since segments CA-324 and CA-325 were constructed, their rights-of-way have remained relatively clear of mature vegetation. However, PHMSA

acknowledges some areas within and immediately adjacent to the project area may contain suitable habitat for these species.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to terrestrial or aquatic biological resources are expected to occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions), these activities were already addressed and determined to be insignificant in the IM rule EA, and are otherwise of a limited scope that no significant impacts to biological resources would be expected. Moreover, these excavations are not expected to affect biological resources because they are within the existing rights-of-way for segments CA-324 and CA-325, where such resources are not expected to be found.

The Action Alternative would not present significant impacts to biological resources due to potential oil spills. Specifically, the Action Alternative's heightened inspection, monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to Part 195 requirements that are applicable to other pipelines, including replacement of CA-324 and 325. Compliance with the permit conditions provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

To address the uncertainty of future repair locations, PHMSA is consulting with the USFWS. PHMSA completed emergency consultation with USFWS. PHMSA is in the process of initiating non-emergency consultation with USFWS. Sable should consult the "Official Species List for General Project Design Guidelines," which provides recommendations to help avoid or minimize adverse effects to listed species and designated critical habitat. Through its non-emergency consultation with USFWS, PHMSA and USFWS may determine different mitigation measures are needed. Based on the limited scope of the potential ground disturbance

activities, duration, and confinement of work to the existing ROW, PHMSA anticipates that the proposed action may affect, but is not likely to adversely affect listed species or designated critical habitat under Section 7 of the Endangered Species Act. Future consultation is needed.

The No Action Alternative could potentially result in significant impacts to biological resources, as determined in the Replacement EIR/EIA (Replacement EIR/EIA, pp. 11-12), due to the substantially greater degree of subsurface disturbance associated with wholesale replacement of CA-324 and 325. This includes some 123 new trenched stream crossings (requiring a Section 404 Clean Water Act permit from the US Army Corps of Engineers) and potential vegetation trimming and clearing that would result in removal or trimming of habitats for threatened and endangered species listed in the California Natural Diversity Database (Replacement EIR/EIA, p. 12).

**1) <u>Air Quality</u>**

Segments CA-324 and CA-325 pass through the South Central Coast and San Joaquin Valley Air Basins of California and are located within Santa Barbara, Kern, and San Luis Obispo Counties. Currently, Santa Barbara County and the portion of San Luis Obispo County in which the segments pass through are in attainment with all National Ambient Air Quality Standards.[28] The San Joaquin Valley Air Basin in Kern County is currently designated as nonattainment for the following pollutants: 8-hour ozone (2008 and 2015 National Ambient Air Quality Standard (NAAQS)), PM2.5 (1997, 2006, 2001 NAAQS), and in maintenance for 8 hour ozone (1997 NAAQS) and PM10. .[29]

The Initial EIS determined that construction-related emissions (primarily resulting from heavy-duty vehicle traffic) would not result in any significant air quality impacts because such emissions would account for a small portion of the background ambient emissions in the

---

[28] EPA, "California Nonattainment/Maintenance Status for Each County by Year for all Criteria Pollutants", available at https://www3.epa.gov/airquality/greenbook/anayo_ca.html. These two Counties are listed as in nonattainment or "nonattainment-transitional" pursuant to the 2023 area designations for the California Ambient Air Quality Standards for ozone. See https://ww2.arb.ca.gov/sites/default/files/2024-10/State_2023_O3.pdf.

[29] EPA, "California Nonattainment/Maintenance Status for Each County by Year for all Criteria Pollutants", available at https://www3.epa.gov/airquality/greenbook/anayo_ca.html.

surrounding area and any such emissions would be temporary and transient. (Draft EIS, pp. 4-3, 4-5.) The Initial EIS also concluded that operation of segments CA-324 and CA-325 and associated pump stations would result in a minor incremental increase in ambient background concentrations of nitrogen oxides, carbon monoxide, hydrocarbons, and sulfur dioxide. As such, no significant impacts related to air quality were anticipated to occur. (Draft EIS, p. 4-5.) The air quality impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

The air quality impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA and are not otherwise associated with significant emissions. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. Moreover, the Action Alternative would not increase these segments' oil transmission capacity beyond that contemplated in the Initial EIS, and therefore will not directly or indirectly increase operational emissions at any pump stations or other final delivery points.

Future routine repair and maintenance work conducted under the Action Alternative would require substantially less excavation activities than initial construction of segments CA-324 and CA-325 (whose air quality impacts were already deemed insignificant in the Initial EIS) and as compared to the No Action Alternative (involving wholesale replacement of CA-324 and CA-325). Therefore, the Proposed Action is not associated with significant air quality impacts.

**4) <u>Hydrological Resources</u>**

Segments CA-324 and CA-325 cross three bodies of water, as noted in the table below.

| Name | USGS QUAD | Longitude (DD) | Latitude (DD) |
|---|---|---|---|
| Santa Ynez River | Solvang | -120.2124695 | 34.6143644 |
| Sisquoc River | Foxen Canyon | -120.2207732 | 34.8471759 |
| Cuyama River | Miranda Pine Mtn | -120.0690660 | 35.0982197 |

The Initial EIS determined that construction and operation of CA-324 and CA-325 would not result in any significant adverse impacts to surface water resources due to the limited and temporary nature of construction activities. (Draft EIS, p. 4-31 through 4-33, S-5, 4-163.) The Initial EIS further determined that the initial construction or operation of segments CA-324 and CA-325 would not result in any significant impacts to groundwater resources. (Draft EIS, pp. 4-34 - 35.). The hydrological resource impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to hydrological resources will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments (under the more stringent repair criteria in the permit conditions), inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. Moreover, these excavations are not expected to affect hydrological resources because they are within the existing rights-of-way for segments CA-324 and CA-325. In fact, the extent of excavation associated with these repair activities is considerably less than the degree of excavation associated with initial construction of these segments (which was deemed to present insignificant impacts to hydrological resources) or complete replacement under the No Action Alternative.

The Action Alternative would also not present significant impacts to hydrological resources due to potential oil spills. Specifically, the Action Alternative's heightened inspection,

monitoring, testing, maintenance, and repair requirements collectively will minimize the risk of an oil spill and minimize the magnitude of any such spill should it occur relative to the initial construction, operation, and ongoing repair and maintenance of segments CA-324 and 325, to a degree equivalent or superior to part 195 requirements that are applicable to other pipelines, including replacement of CA-324 and 325. Compliance with the conditions of the ESP provide that segments CA-324 and CA-325 will be operated in accordance with inspection and repair standards that are more stringent than required under Part 195.

On the other hand, the No Action Alternative could potentially result in significant impacts to hydrological resources, as determined in the 2020 EIA (EIA, p. 14), due to the substantially greater degree of excavation and grading activities associated with wholesale replacement of the existing pipe along CA-324 and 325, and the resulting erosion and sedimentation along adjacent areas. The Action Alternative avoids these potentially significant impacts associated with replacement because it does not involve such large-scale construction activities.

**5) <u>Hazardous Waste and Substance Discharge</u>**

Segments CA-324 and CA-325 are not regulated under the Resource Conservation and Recovery Act (RCRA) or the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Segments CA-324 and CA-325 are not expected to generate hazardous waste or non-excluded hazardous substances.[30] The US Environmental Protection Agency (EPA) lists no superfund sites in the vicinity of the Action Alternative.

The Action Alternative will not alter segments CA-324 or CA-325's existing route or facilities so as to introduce new streams of hazardous waste or substance discharges. Given that segments CA-324 and CA-325 do not handle hazardous waste or hazardous substances, nor do the Action Alternative or No Action Alternative involve the introduction of any activities that would involve hazardous waste or hazardous substances, neither alternative will produce any significant environmental impacts associated with the discharge of hazardous waste or hazardous

[30] Petroleum substances, including crude oil, are excluded from the definition of hazardous substances under CERCLA, see 42 U.S.C. Section 9601(10).

substances. Although hydrotesting can generate some small waste streams consisting of a water and oil residue mixture, hydrotesting has already been previously completed in 2025, prior to the grant of the ESP, and is not a new waste stream specific to the Action Alternative.

**6) <u>Geology and Topography</u>**

As noted above, Segments CA-324 and CA-325's rights-of-way are primarily alongside grazing land between side canyons containing riparian vegetation, as well as oak woodland, rangeland, and irrigated cropland. There are also mountainous portions along the segments' route, as well as coastal and eastern foothill areas. The Initial EIS concluded that, although some temporary and permanent changes to topography would occur from the initial construction of CA-324 and 325, the scale of such changes was sufficiently minor such that no significant impacts related to subsidence and physiology would occur. (Draft EIS, p. 4-15.) Potential impacts related to subsidence and impacts related to paleontology, unique geologic features, and mineral/petroleum resources were also not determined to be significant. (Draft EIS, pp. 4-19 through 4-20.)

The Initial EIS imposed several mitigation measures associated with potential impacts associated with seismicity and faulting. Mitigation Measures 1 and 3 required detailed geologic, seismologic, and geotechnical studies to be prepared and recommendations to be incorporated into the segments' final design and route. Mitigation Measure 2 required the pipeline design also to incorporate appropriate ground motion parameters. (Draft EIS, pp. 4-150 through 4-151; Final EIS, pp. 4-2 through 4-4.) With the implementation of these mitigation measures, the Initial EIS determined that all geology-related impacts would be less than significant. (Draft EIS, p. S-4.). Ultimately, these mitigation measures were implemented as part of initial construction of the segments. The impacts to geology and topography described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring

Under the Action Alternative, no new construction or reroutes will occur beyond localized excavations that may be required based on integrity assessments. Therefore, the Action Alternative would have no potential to effect geology or topography. The Action Alternative does

not involve any changes to the segments' existing alignment so as to involve different geologic conditions than those which were implicated by the segments' initial construction. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, these activities will not result in reroutes or design changes that could cause significant topographic impacts or disturb geological resources.

**7) Noise and Visual Environment**

The construction efforts associated with the No Action Alternative are comparable to those undertaken as part of the original construction of CA-324 and CA-325. The Initial EIS determined that the segments' initial construction noise impacts would be significant and unavoidable at sensitive receptors near their rights-of-way, including at schools, parks, residential subdivisions, and individual residences. (Draft EIS, pp. 4-94, 4-100.)[31] Further, the Initial EIS determined that potentially significant visual impacts would result from construction of CA-324 and CA-325 as part of right-of-way clearing through the Los Padres National Forest (LPNF), and from the construction of permanent, aboveground facilities associated with the Sisquoc Pump Station in the Santa Barbara County. (Draft EIS, pp. 4-88 through 4-93; Final EIS, p. 3-6.) The Initial EIS directed implementation of certain Mitigation Measures to reduce these construction-related impacts to a less-than-significant level, each of which have been implemented.[32] Accordingly, replacement of the segments under the No Action Alternative would potentially raise significant

---

[31] Moreover, the Initial EIS directed implementation of Mitigation Measure 34 (which required the Pump Station to be shielded from the school by a noise barrier such as a berm or structural enclosure) to limit to a non-significant level noise impacts to the former location of the Vista del Mar school, near the Gaviota Pump Station. (Draft EIS, pp. 4-162 and S-12; Final EIS, p. 4-16.) However, the Vista del Mar school has since relocated to a location remote from the Gaviota Pump Station, and Mitigation Measure 34 has been implemented.

[32] The Initial EIS imposed Mitigation Measures 31 and 32 in order to mitigate these significant impacts. Measure 31 required screening the Gaviota Pump Station and Sisquoc Pump Station with native shrubs, trees, and/or naturalized masses of evergreen shrubs and trees as appropriate for each site's location and climatic conditions. (Draft EIS, pp 4-160 through 4-161; Final EIS, p. 4-14 through 4-15.) Measure 32 required that the pipeline use a 50-foot construction corridor within the Los Padres National Forest (LPNF), protect existing large diameter trees, feather the edges of the cleared right-of-way, and reseed cleared areas with native species. (Draft EIS, p. 4-161; Final EIS, p. 4-15.) Implementation of these mitigation measures reduced the potentially significant visual resources impacts identified at the Gaviota Pump Station and Sisquoc Pump Station to a less than significant level. (*Id.*, p. 4-165.)

noise and visual impacts, particularly associated with the construction and land-clearing activities of the replacement project.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to noise and the visual environmental will occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in significant environmental impacts. The Action Alternative will not alter segments CA-324 and CA-325's existing route or facilities or any pump stations so as to introduce new noise- or visual environment-related impacts to sensitive receptors. Therefore, the Action Alternative will not result in significant noise or visual impacts.

**8) <u>Socioeconomic Impacts</u>**

The replacement of CA-324 and CA-325 under the No Action Alternative is comparable to the project involving the original construction of CA-324 and CA-325, which was previously assessed by the Initial EIS. The Initial EIS determined that all socioeconomic impacts related to construction and operation of the segments would be insignificant. (Draft EIS, pp. 4-60 through 4-64.) The socioeconomic impacts described in the Initial EIS would be comparable to what would occur under the No Action Alternative given that there would be similar types of construction activities occurring.

Under the Action Alternative, no new construction will occur beyond localized excavations that may be required based on integrity assessments. Therefore, no significant impacts to socioeconomics are anticipated to occur. Although the Action Alternative would involve the performance of integrity assessments on a more frequent basis, which may result in the need to perform localized excavations to repair anomalies discovered from such assessments, inspection-related activities were already addressed and determined to be insignificant in the IM rule EA. There is no evidence to suggest that more frequent integrity assessments would result in

significant environmental impacts. None of the activities associated with the Action Alternative are expected to produce significant socioeconomic impacts in the area.

## VIII. CONCLUSIONS

PHMSA finds that issuance of the ESP and subsequent non-emergency SP does not result in significant environmental impacts. The Action Alternative's scope is narrow and does not involve any new construction in areas not previously disturbed by the initial construction of segments CA-324 and CA-325. The Action Alternative requires routine repair, inspection, and maintenance activities (albeit under a more stringent schedule), which culminate only in, at most, the performance of limited excavations localized within the existing segments' right-of-way. Such activities have already been determined to be insignificant in previous environmental assessment by PHMSA associated with the IM Rule. In comparison, the No Action Alternative (replacement of CA-324 and 325) could raise significant environmental impacts, particularly to land use, hydrological resources, cultural resources, and biological resources.

In accordance with USDOT Order 5610.1D, PHMSA has independently evaluated this EA for its accuracy, scope, and contents. To ensure the integrity of the review, PHMSA provided comprehensive guidance to the operator, specifically outlining the types of data and information essential for the preparation of the environmental document. Furthermore, PHMSA collaborated directly with the applicant to direct the analytical focus toward areas with a higher potential for significant impacts, ensuring a rigorous evaluation of potential environmental effects. The ESP can be found on the Federal Docket Management System located on the Internet at www.regulations.gov under docket no. PHMSA-2025-150.

**Completed by PHMSA in Washington, D.C., on:** February 20, 2026

**Prepared by:**

| Staff | Title |
|---|---|
| Lance Yearwood | Vice President, Pacific Pipeline Company and Sable Offshore Corp. |
| Steve Rusch | Vice President of Regulatory and Environmental Affairs, Sable Offshore Corp. |

| | |
|---|---|
| Nathan Soderberg | Manager, Rights of Way, Sable Offshore Corp. |
| James Thompson | Project Manager, SCS Engineers (Consultant) |
| Sarah Nicchitta | Principal, Vice President, Albion Environmental (Consultant) |
| Chris Dunn, Manager | Biology, Padre Associates, Inc. (Consultant) |

**Reviewed by:**

| **Staff** | **Title** |
|---|---|
| Carolyn Nelson | Director, Environmental Analysis and Compliance Division, PHMSA |
| Amanda Murphy | Federal Preservation Officer/Environmental Protection Specialist, PHMSA |
| Matt Fuller | Senior Environmental Protection Specialist, PHMSA (Contractor) |
| Natisha Joseph | Environmental Protection Specialist, PHMSA (Contractor) |
| Travis Mast | Environmental Protection Specialist, USDOT Volpe Center |
| Leah Epstein | Environmental Protection Specialist, USDOT Volpe Center |

**Appendix A**

**Environmental Assessment for Final Rule: Pipeline Integrity Management in High Consequence Areas, Docket No. RSPA 00-7408**

# EXHIBIT E

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

**FINDING AFTER ENVIRONMENTAL REVIEW**

**RESPONSIBLE AGENCY**: U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration

**ACTION:** Finding of No Significant Impact

**DATE:** June 25, 2026

**PROJECT & PROPONENT:** Issuance of an Emergency Special Permit (ESP) and issuance of a subsequent non-emergency Special Permit (SP), Sable Offshore Corp., PHMSA-2025-1502 and PHMSA-2026-0464

**SUMMARY:**

Pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* the Pipeline and Hazardous Materials Safety Administration (PHMSA) prepared an Environmental Assessment (EA) to assess the environmental impacts associated with the Emergency Special Permit (ESP) issued to Sable Offshore Corp. (Sable) on December 23, 2025, and the proposed non-emergency special permit currently under review by PHMSA. The ESP granted Sable's request to waive compliance with the requirements of 49 CFR 195.452(h)(4)(iii)(H) for two onshore segments of the Santa Ynez Pipeline System (SYPS). PHMSA's decision to grant the ESP avoided a potential lapse in oversight for waivers issued by the state of California. The proposed non-emergency special permit requests to waive the same regulatory requirement as the ESP.

**Purpose and Need:** The terms of a court-approved Consent Decree required the prior operator to obtain a waiver or completely replace the line pipe prior to restarting the two onshore segments. Sable originally obtained the required waivers from California's Office of the State Fire Marshall (OSFM) but subsequently asked PHMSA to issue the waivers on an emergency basis to address an actual or impending emergency involving pipeline transportation[1] pursuant to Executive Order (E.O.) 14156 *Declaring a National Energy Emergency*. PHMSA's decision to grant the ESP avoided a potential lapse in oversight once PHMSA determined that the two onshore pipeline segments were part of an interstate pipeline. PHMSA found that issuing the ESP

[1] 49 U.S.C. § 60118(c)(2); 49 CFR 190.341(g).

was necessary to replace those waivers, which no longer had any legal effect due to the preemption provision in 49 U.S.C. § 60104(c).

**Action Alternative:** PHMSA has selected the Action Alternative, which involves granting the non-emergency special permit following PHMSA's review. This Action Alternative requires Sable to adhere to stringent safety conditions that provide an equal or greater level of safety compared to regular compliance with Federal pipeline safety regulations. Key conditions include:

- Mandatory annual in-line inspections (ILI) for metal loss and crack detection.
- Stringent anomaly repair criteria, such as the immediate repair of cracks at 50% wall thickness, which exceeds the standard regulatory threshold.
- Enhanced monitoring and enhanced integrity management, including but not limited to fracture toughness testing and spike hydrotesting.

**Environmental Impacts:**

A Draft and Final environmental impact statement (EIS) (Initial EIS)[2] was prepared in 1984 which analyzed the construction, operation, and ongoing repair and maintenance of an approximately 1,200-mile pipeline to transport Outer Continental Shelf (OCS) and other locally produced crude oils from the Santa Barbara and Santa Maria Basins in California to McCamey, Texas. Lines CA-324 and CA-325 were analyzed in the Initial EIS as part of that project. In the EA, PHMSA uses the Initial EIS to characterize impacts associated with the construction of CA-324 and CA-325, as well as routine maintenance and repair activities as part of ongoing operation..

Based on the analysis in the current EA and supporting consultations, PHMSA has determined that the Action Alternative will not have a significant impact on the human or natural environment. This section describes the resource areas that were evaluated as part of the EA. Descriptions of how PHMSA complied with other relevant environmental laws and regulations, that were not included in the EA published on February 23, 2026, are also provided in the appropriate sections below. New analyses in the FONSI relate to the following statutory requirements: Section 4(f) of the U.S. Department of Transportation Act of 1966; Coastal Zone Management Act; Section 106 of the National Historic Preservation Act of 1966; and Section 7 of the Endangered Species Act.

- **Land Use, Agriculture & Recreation**: The Action Alternative involves localized inspections and repairs within the existing right of -way (ROW). No new land conversion or significant recreation impacts will occur. Potential impacts from integrity assessments

[2] The Draft EIS and Final EIS can be accessed at http://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672 and https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt, respectively.

have been previously determined insignificant under the EA issued during promulgation of PHMSA's Integrity Management Rule.[3]

- Section 4(f) of the U.S. Department of Transportation Act of 1966: Section 4(f) properties were identified adjacent to the pipeline segments. PHMSA has determined that the Action Alternative does not constitute a use of any protected Section 4(f) properties. The special permit authorizes localized preventative maintenance activities within the existing pipeline ROW. Because no properties are being permanently incorporated or converted into a transportation use, there is no direct use of Section 4(f) properties. Temporary noise or visual disturbance associated with maintenance activities are consistent with existing pipeline operations and will not substantially impair the properties protected activities, features, or attributes.

- Coastal Zone Management Act: The Action Alternative does not implicate the Coastal Zone Management Act (CZMA) because it is not a federal license or permit (15 CFR 930.51), Outer Continental Shelf (OCS) OCS exploration, development or production activity (930.71), or a federal agency activity (930.31). First, the waiver in the special permit is not an "authorization that an applicant is required by law to obtain in order to conduct activities affecting any land or water use or natural resource of the coastal zone and that any Federal agency is empowered to issue to an applicant." 15 CFR 930.51(a). Sable was not required "by law" to acquire the special permit from PHMSA to operate the SYPS. While the Consent Decree required obtaining a waiver, Sable is not a party to the Consent Decree and therefore its obligation to obtain a waiver was contractual as opposed to a statutory or regulatory. The California Coastal Commission's published list of federal licenses and permits subject to consistency certification does not include any PHMSA activities.[4] Second, the special permit is not an OCS exploration, development, or production activity. Existing pipeline segments link the production facilities on the OCS to onshore portions of the SYPS. The special permit does not change that infrastructure in any way and only applies to onshore pipeline segments. Third, the special permit is not a federal agency activity within the meaning of the CZMA. Federal agency activities are "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities. The term 'Federal agency activity' includes a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities when coastal effects are reasonably foreseeable, e.g., a Federal agency's proposal to physically alter coastal resources, a plan that is

[3] 49 CFR 195.452

[4] https://www.coastal.ca.gov/fedcd/listlic_2015.pdf.

used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone." 930.31(a). In general, this applies to activities in "which the federal agency itself is the principal actor," and not "federally approved activities of third parties." *Secretary of the Interior v. California*, 464 U.S. 312, 332 (1984); see also *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 886 (9th Cir. 2022) (contrasting when "the federal agency takes the action itself" and when the agency "instead is approving a proposed plan or is issuing a federal license or permit to an applicant"). Here, PHMSA is not the principal actor for the operation of the SYPS, it is only approving the action by Sable.

- **Cultural & Historic Resources**: Mitigation measures from the Initial EIS have already been implemented, and any subsequent excavations or ground-disturbing activities will occur in previously disturbed areas. Consultation with the State Historic Preservation Office (SHPO) or the Tribal Historic Preservation Office (THPO) is ongoing for unanticipated discoveries, but no adverse effects to historic properties are anticipated. Where a known site exists, further monitoring or treatment would be required. In the event that a new site is found, Sable would coordinate with PHMSA, SHPO, and THPO before work can occur.

    - <u>Section 106 of the National Historic Preservation Act of 1966</u>: PHMSA began consultation with California (CA) SHPO and the one federally recognized Tribe listed on the public-facing California Native American Heritage Commission (NAHC) database (Santa Ynez Chumash) on February 25, 2026. In accordance with 36 CFR 800.4(d)(1), PHMSA determined the Action Alternative will result in No Adverse Effect to Historic Properties with the condition that the existing mitigation measures from the Initial EIS and PHMSA's Unanticipated Discovery Protocol (UDP) are followed. On Friday, March 27, 2026, PHMSA received a response from CA SHPO, requesting additional information. PHMSA requested relevant information from the appropriate California Historic Information Systems (CHRIS) center and NAHC, responding to SHPO's questions and reevaluating their findings. On May 7, 2026, PHMSA sent a continuing consultation to SHPO and to the four federally recognized Tribes that were identified in the process (Morongo Band of Mission Indians, Tejon Indian Tribe, Table Mountain Rancheria, Tule River Indian Tribe). On May 7th, the Morongo Band of Mission Indians responded that they had no specific interest in the project area. The THPO for the Tejon Indian Tribe requested additional information, which was provided by PHMSA on May 11, 2026. No further response from SHPO, the Tule River Indian Tribe, the Santa Ynez Chumash, the Table Mountain Rancheria, or the Tejon Indian Tribe had been received as of June 9, 2026, 30 days from PHMSA's most recent response to the Tejon Indian Tribe, and 34 days

from the initiation of the second consultation period with SHPO and the Tribes. In accordance with 36 CFR 800.3(c)(4), PHMSA therefore will proceed with the finding that there will be No Adverse Effects to Historic Properties with the conditions that PHMSA's UDP is in force and any necessary treatment plans will be developed and followed for the special permit area in coordination with the SHPO and interested Tribes, as specified in the Initial EIS. Should SHPO or any of the Tribes reenter consultation, PHMSA will continue to consult in accordance with 36 CFR 800.3(c)(4).

- **Biological Resources**: Minimal disturbance which is limited to existing ROW. The Action Alternative could result in ground disturbance which may result in temporary and localized effects. However, PHMSA has determined these impacts would not be significant to Federal and state listed species or other biological resources, due to the limited scope of anticipated activities, implementation of mitigation measures, and because ground disturbance would occur in the previously disturbed ROW.
  - Section 7 of the Endangered Species Act: On February 20, 2026, PHMSA submitted a request to consult with the U.S. Fish and Wildlife Service (USFWS), pursuant to the emergency Endangered Species Act (ESA) Section 7 consultation procedures (50 CFR 402.05). PHMSA determined the action is an emergency based upon implementation of E.O. 14156 *Declaring a National Energy Emergency*. The USFWS provided PHMSA with a list of General Project Design Guidelines to help avoid or to minimize adverse effects to listed species and to designated critical habitat. PHMSA then submitted an informal consultation letter to USFWS on February 26, 2026, and found that the Action Alternative *may affect, but is not likely to adversely affect* listed species and designated critical habitat. PHMSA submitted an amended Section 7 consultation request on June 11, 2026, requesting concurrence only for the ILI runs required by the special permit conditions. Localized excavations and repairs will be addressed through site-specific consultation(s) after the exact locations requiring repairs, if any, are identified. PHMSA determined that ILI runs *may affect but is not likely to adversely affect* listed species and designated critical habitat. The USFWS concurred in writing with this determination on June 11, 2026.
  - The Action Alternative does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, therefore, PHMSA has determined the action will have *no effec*t on species or critical habitats under the National Marine Fisheries Service (NMFS) jurisdiction.
- **Air Quality**: The Action Alternative will not result in a significant emissions increase compared to pipeline replacement. Localized work in the ROW is negligible compared to

pipeline replacement. The Action Alternative will not result in capacity expansion of the SYPS, meaning that no changes would occur to operational air quality.

- **Hydrological Resources**: The Action Alternative will not result in significant effects on hydrological resources. None of the special permit segments are offshore, and any inland water resources intersecting the ROW are not expected to be at greater risk of spills compared to operation of the SYPS without the special permit. Inspections and repairs are not expected to have significant effects on hydrological resources above those already required by the pipeline safety regulations. Largescale excavation due to pipe replacement could cause erosion, cause sedimentation in waterways, or other negative impacts to hydrological resources.
- **Hazardous Waste/Substance Discharge**: Neither alternative involves hazardous waste streams. Petroleum is excluded under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Lines CA-324 and CA-325 do not transport hazardous waste or materials regulated by CERCLA.
- **Geology & Topography**: The Action Alternative will not result in significant effects on geology or topography because no large-scale excavations will occur aside from isolated excavation and repair and the pipeline alignment remains fixed.
- **Noise & Visual Environment**: The Action Alternative may result in limited, temporary noise from localized maintenance during specific excavation and repair. The Action Alternative will not result in any new permanent facilities. Pipeline replacement would result in much more extensive noise and visual impacts on the surrounding environment.
- **Socioeconomics**: The Action Alternative would not result in significant socioeconomic disruptions when compared to pipeline replacement.

**RESPONSE TO COMMENTS:**

PHMSA received a total of 12,816 comments on the Sable Offshore Corp. Special Permit request (Docket ID: PHMSA-2026-0464). Over 12,000 of those comments were from the public; seven comments were from industry, non-profits, or other private sector companies; two comments were from a state agency, and one comment was from Sable. One comment from a non-profit included a form campaign with over 12,000 signatories. Aside from the form campaign comments, there were a total of 58 unique comments. The public comment period occurred from February 24, 2026 to March 26, 2026 and was extended to April 3, 2026. A summary of substantive comments related to the environment, and PHMSA's responses, are below.

<u>Comment:</u> Several commenters expressed support for the issuance of the special permit. Commenters stated that resuming operations will generate revenue, will create jobs, and will reduce energy costs by promoting domestic energy, resulting in economic benefits. Other

commenters that supported the issuance of the special permit stated that frequent inspections and other conditions specified in the special permit mitigate the risk corrosion issues and other safety concerns. Commenters also stated that Sable has completed requirements to resume safe operation of the pipeline and that transport of crude oil via pipeline is safer than other modes of transportation.

Response: PHMSA acknowledges the commenters' statements that issuing the special permit will result in economic and safety benefits. PHMSA's environmental analysis is located in Section VII of the EA.

Comment: Three commenters neither opposed nor supported the issuance of the special permit. They stated that PHMSA must evaluate the benefits and impacts of issuing the special permit and that all comments should be considered.

Response: PHMSA conducts a comprehensive technical analysis of each special permit application to ensure that issuing the special permit would be consistent with pipeline safety (49 CFR 190.341). PHMSA reviewed Sable's special permit application and proposed conditions that will provide an equal or greater level of safety than the actions required by the pipeline safety regulations. PHMSA also analyzed the impacts of issuing the special permit in the EA. The EA was published in the Federal Register for review and comment from February 24, 2026 to April 3, 2026. PHMSA reviewed and considered all substantive comments received on the docket. PHMSA evaluates all benefits, impacts, and public comments per the National Environmental Policy Act (NEPA) and DOT Order 5610.1D.

Comment: Commenters proposed timeframes for inspections and other conditions. One commenter recommended regular inspections, and another commenter proposed an inspection frequency of once per day. Commenters also proposed an alert system so Sable can promptly respond to issues, in addition to providing full inspection transparency to inform the public of potential risks. Commenters proposed other conditions, including: limiting the term of the special permit to a fixed number of years; allowing PHMSA to revoke the special permit if Sable does not comply with all conditions; allowing PHMSA to revoke, suspend, or modify the special permit under certain circumstances; and maintaining the pipeline in its current, non-operational status.

Response: The proposed special permit conditions, which outline inspection and repair requirements under the special permit, are provided in the docket under PHMSA-2026-0464-0002. In addition, PHMSA addresses public notification and disclosure of risk through the NEPA and public comment processes. PHMSA utilizes risk-based framework to determine inspection frequency, and the SYPS, as an interstate hazardous liquids pipeline, is subject to numerous inspections and mandatory reporting requirements in accordance with 49 CFR Part 195.

PHMSA notes that, irrespective of the issuance of the special permit, the SYPS is currently operating in accordance with a Defense Production Act Order.

Moreover, the EA does not evaluate alternatives beyond PHMSA's mandate. The EA considers only reasonable alternatives, including those which are consistent with the legal framework currently applicable to the special permit segments (i.e., the requirements specified in the Consent Decree and Part 195), and which meet the purpose and need. The EA does not consider, nor does NEPA require, consideration of every theoretical alternative. The EA only analyzes reasonable, foreseeable impacts of specifically the Action Alternative (i.e., granting the special permit) and No Action Alternative. Alternatives that require speculation outside of the current legal framework (as may occur in the possibility of prospective termination or modification of the Consent Decree or amendment to Part 195), or which do not meet the purpose and need for the proposed action (such as permanent abandonment of the special permit segments without replacement) are not considered in the EA. The alternatives proposed by the commenters do not meet the purpose and need and are outside the scope of the EA.

<u>Comment:</u> Several comments expressed concern about the analysis in the EA and the NEPA process. Commenters stated that the EA did not analyze reasonably foreseeable environmental impacts, such as those that may occur from a spill. Other commenters stated that the resource analysis in the EA was inadequate, that the EA did not consider the negative impacts that may occur from issuing the special permit, especially those related to a spill, and that the analysis in the EA did not support PHMSA's findings and relied upon outdated sources. Other commenters requested a more detailed analysis on state-protected species. One commenter stated that PHMSA bypassed the required public notice and comment period before issuing the ESP, and other commenters stated that a more robust environmental analysis, such as the preparation of an EIS, is needed. A commenter stated that PHMSA should also hold a public meeting in Santa Barbara. Other commenters stated that it was unclear if PHMSA will consult with the National Marine Fisheries Service (NMFS).

<u>Response:</u> Section VII of the EA discusses potential impacts from issuing the special permit, including reasonably foreseeable impacts and impacts that may occur in the event of an incident. Through this analysis, PHMSA subject matter experts, including engineers, determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations. PHMSA determined that existing NEPA documentation described in Section IV of the EA accurately characterizes the impacts associated with the No Action Alternative, and impacts associated with routine maintenance and repair activities as part of the ongoing operation of the pipeline. Section 6 of DOT Order 5610.1D states that Operating Administrations (OAs), including PHMSA, must use available reliable data sources and not undertake new scientific or technical research to inform their analysis unless it is essential. The EA describes the relevance

of these existing environmental reviews, analyses, and data sources in the context of the special permit. The operator is required to coordinate with the state natural resources agencies if they anticipate any impacts to state-protected species as a result of the pipeline maintenance activities. The issuance of the special permit does not excuse Sable from compliance with any other applicable federal, state, or local environmental law or regulation, unless such a law or regulation is preempted by the Pipeline Safety Act in accordance with 49 U.S.C. 60104(c).

Per Section 10 of DOT Order 5610.1D, PHMSA may, but is not required to, release an EA for public comment. PHMSA released an EA for public comment, fulfilling the public comment and notification requirements for an EA per DOT Order 5610.1D. When the expected environmental impacts of a proposed emergency action are not considered significant, PHMSA prepares an EA to the extent practicable. PHMSA subject matter experts determined that expected environmental impacts of issuing the ESP and special permit would not be significant, therefore, an EA was prepared.

PHMSA has determined that consultation with NMFS is not required. The scope of the special permit is strictly limited to the onshore portion of the SYPS. Because the proposed action does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, PHMSA has determined the action will have "no effect" on species or critical habitats under NMFS jurisdiction, therefore consultation is not required.

<u>Comment:</u> Many commenters referenced the pipeline's rupture and associated oil spill that occurred in 2015 due to corrosion and released 450,000 gallons of crude oil along 150 miles of coastline, killing birds and marine life. Commenters stated that Santa Barbara's economy relies on tourism, fisheries, recreation, and access to the coast, and that the Santa Barbara area has high marine biodiversity and waters that provide ecological, economic, and cultural significance, all of which would be negatively impacted in the event of a spill. Several commenters stated that the economic benefits of resuming pipeline operations are not as robust as the scale of potential risk.

<u>Response:</u> Section VII of the EA discusses potential impacts from issuing the special permit, including impacts that may occur in the event of an incident. Through this analysis, PHMSA determined that granting the special permit would provide an equal or greater level of safety compared to the operation of the pipeline in compliance with the existing federal pipeline safety regulations.

<u>Comment:</u> Several commenters referenced the operator's duty to install automatic shut-off valves (ASV) per PHMSA's 2022 Final Rule (87 FR 20940), which establishes that ASVs are the national standard for mitigating catastrophic ruptures, and per California law (AB 864), which requires ASV for pipelines near sensitive coastal areas.

Response: PHMSA requires interstate hazardous liquid pipeline operators to meet specific safety and operational standards under 49 CFR Part 195, including standards for valve placement and inspection. PHMSA's recent Pipeline Safety: Requirement of Valve Installation and Minimum Rupture Detection Standards Final Rule, which went into effect in 2022, amended the regulations regarding installation of rupture-mitigation valves (RMVs). An RMV is an ASV or remote-control valve (RCV). For an "entirely replaced onshore hazardous liquid or carbon dioxide pipeline segment" or an, "entirely replaced onshore gas transmission pipeline segment" replaced after April 10, 2023, operators must install RMVs or alternative equivalent technology whenever a valve must be installed in order to meet valve spacing requirements. Sable installed 27 new safety valves along lines CA-324 and CA-325 in response to an analysis on the need for emergency flow restricting devices (EFRDs). These safety valves limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume. Sable also installed leak detection systems and an automatic shutoff system that shuts down pumps and closes valves in the event of a rupture. Section 2 of Sable's special permit application in Docket no. PHMSA-2026-0426 provides additional information on operating information, leak history, and testing and assessment results.

Comment: The California Attorney General's Office stated that PHMSA improperly invoked the ESA's emergency consultation procedures.

Response: PHMSA determined that granting the ESP was consistent with the requirements in the Pipeline Safety Act given the national energy emergency declared by the President in E.O. 14156. PHMSA's decision to grant the ESP also implements the directives in E.O. 14154, and PHMSA's decision to grant the ESP avoided a potential gap in coverage under the waivers issued by OSFM. Based on the emergency determination, PHMSA proceeded in accordance with 50 CFR 402.05 of the ESA. PHMSA also completed post-emergency informal consultation as part of the non-emergency special permit process, during which the Fish and Wildlife Service (FWS) concurred in PHMSA's judgment that the ILI requirements in the special permit conditions were not likely to affect endangered species, and that post-ILI repair and maintenance could be adequately mitigated using ongoing consultations once repair and maintenance excavation activities were identified.

Comment: The Environmental Defense Center and Center for Biological Diversity commented that the scope of the EA was too narrow, and that PHMSA should have analyzed the impacts resulting from the restart of the SYPS.

Response: In December, PHMSA conducted a review of Sable's restart plan and several related documents and procedures. Based on that review, on December 22, 2025, PHMSA issued a letter approving Sable's restart plan. However, Sable did not restart the pipeline at that time.

Subsequently, on March 13, 2026, the Secretary of Energy issued a Defense Production Act (DPA) Order requiring Sable to restart the pipeline. Sable restarted the pipeline on March 14, 2026. In light of the comments received about the scope of the EA, PHMSA has considered whether its approval of Sable's restart plan has a significant environmental impact. Because the pipeline will be operated in accordance with established pipeline safety standards (with the exception noted in this special permit, which itself has no significant environmental impact), PHMSA finds its approval of the restart plan also has no significant environmental impact. In addition, PHMSA notes that notwithstanding its approval of the restart plan, the pipeline must be operated pursuant to the DPA Order. Finally, as described in the EA, the No-Action Alternative of the special permit was for the segment pipe to be replaced, and the segments subsequently operated. And following the issuance of the DPA Order, failure to issue the special permit will not affect the operating status of the SYPS. At no point has the No Action Alternative been the non-operation of the SYPS.

**DETERMINATION**:

___ CE: No Extraordinary Circumstances Present

_X_ FONSI

___ EIS

In consideration of the factors detailed in the EA and summarized above, PHMSA finds that the Action Alternative would not result in significant impacts to the human environment. PHMSA therefore approves this FONSI pursuant to the National Environmental Policy Act (NEPA), as amended (42 United States Code (U.S.C.) § 4321 et seq.). No EIS is required for this proposal.

| PHMSA Review | Printed Name and Role of Reviewer | Sign and Date |
|---|---|---|
| EACD Environmental Protection Specialist | Dr. Amanda L. Murphy, FPO & Environmental Protection Specialist | AMANDA LAUREN MURPHY Digitally signed by AMANDA LAUREN MURPHY Date: 2026.06.25 23:06:35 +02'00' |
| Agency Environmental Coordinator | Carolyn Nelson, P.E., Agency Environmental Coordinator | CAROLYN LAVONNE NELSON Digitally signed by CAROLYN LAVONNE NELSON Date: 2026.06.25 17:30:45 -04'00' |

**CONTACT:** For further information on this FONSI, please contact Dr. Amanda Murphy, Federal Preservation Officer and Environmental Protection Specialist, at amanda.l.murphy@dot.gov.

# EXHIBIT F

Mast, Travis <travis.mast@dot.gov>

# Sable Section 7 Consultation Response (CA-324 and CA-325) (Project Code 2026-0052036)(Ecosphere 2026-0052879-S7-001)

1 message

**Dellith, Chris** <chris_dellith@fws.gov> Thu, Jun 11, 2026 at 5:25 PM
To: "carolyn.nelson@dot.gov" <carolyn.nelson@dot.gov>
Cc: "Ventura Section 7, FW8" <fw8venturasection7@fws.gov>, "Darst, Cat" <Cat_Darst@fws.gov>, "Johnson, Adam G" <adam_johnson@fws.gov>, "keith.coyle@dot.gov" <keith.coyle@dot.gov>, "whitney.leets@dot.gov" <whitney.leets@dot.gov>, "timothy.o'shea@dot.gov" <timothy.o'shea@dot.gov>, "Benjamin.Fred@dot.gov" <Benjamin.Fred@dot.gov>, "travis.mast@dot.gov" <travis.mast@dot.gov>, "Sloan, Justin" <Justin_Sloan@fws.gov>, "Felch, Josh" <josh_felch@fws.gov>, "Brandt, Joseph" <joseph_brandt@fws.gov>, "Diel, Christopher" <christopher_diel@fws.gov>, "Lee, Alice C" <alice_lee@fws.gov>

2026-0052879-S7-001

Dear Carolyn Nelson,

We are responding to your request, sent via electronic correspondence dated June 11, 2026, for our concurrence with your determination that the Sable Offshore Corporation Special Permit (Segments CA-324 and CA-325) Phase I: In-line Inspections (project; see attached), is not likely to adversely affect the federally endangered federally endangered Buena Vista lake shrew (*Sorex ornatus relictus*), giant kangaroo rat (*Dipodomys ingens*), San Joaquin kit fox (*Vulpes macrotis mutica*), Tipton’s kangaroo rat (*Dipodomys nitratoides nitratoides*), California condor (*Gymnogyps californianus*), California least tern (*Sternula antillarum browni)*, lightfooted ridgway's rail (*Rallus obsoletus obsoletus*), least Bell's vireo (*Vireo bellii pusillus*), southwestern willow flycatcher (*Empidonax traillii extimus*) and its critical habitat, blunt-nosed leopard lizard (*Gambelia silus*), arroyo toad (*Anaxyrus californicus*), California tiger salamander - Santa Barbara Distinct Population Segment (*Ambystoma californiense*), foothill yellow-legged frog (*Rana boylii*), tidewater goby (*Eucyclogobius newberryi*), California jewelflower (*Caulanthus californicus*), Gambel's watercress (*Rorippa gambellii*), Gaviota tarplant (*Deinandra increscens* ssp. *villosa*) and its critical habitat, Kern mallow (*Eremalche kernensis*), marsh sandwort (*Arenaria paludicola*), salt marsh bird's-beak (*Cordylanthus maritimus* ssp. *maritimus*), San Joaquin wooly-threads (*Monolopia congdonii*), the federally threatened western snowy plover (*Charadrius nivosus nivosus*), yellow-billed cuckoo (*Coccyzus americanus*), California red-legged frog (*Rana draytonii*) and its critical habitat, Kern primrose sphinx moth (*Euproserpinus euterpe*), vernal pool fairy shrimp (*Branchinecta lynchi*), and spreading navarretia (*Navarretia fossalis*) in accordance with section 7 of the Endangered Species Act of 1973, as amended (16 U.S.C.1531 et seq.). Furthermore, you have requested our concurrence with your determination that the southwestern pond turtle (*Actinemys pallida*), northwestern pond turtle (*Actinemys marmorata*), western spadefoot (*Spea hammondii*), and the monarch butterfly (*Danaus Plexippus*) and its critical habitat, which are all proposed for federal listing as threatened, is not likely to be adversely affected by project activities.

The U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration proposes to issue a special permit that waives certain compliance requirements of 49 CFR § 195.452(h)(4)(iii)(H) to allow for a more stringent integrity management schedule. The purpose of the action is to facilitate the restart and operation of Sable’s pipeline segments CA-324 and CA-325 by mandating more frequent In-Line Inspections and immediate repair of anomalies that exceed specific safety thresholds. The proposed action does not authorize new pipeline construction. Activities are limited to preventative maintenance (localized excavations to inspect and repair pipeline anomalies) within the existing, previously disturbed Right-of-Way. Pipeline segment CA-324 is approximately 10.86 miles in length. It generally runs parallels to the north of U.S. Highway 101 along the southern coast between the Las Flores Canyon consolidated oil and gas processing facility and Gaviota Pump Station. Pipeline segment CA-325 is split into two portions, CA-325A and 325B. Pipeline segment CA-325A is approximately 38.72 miles in length. Pipeline segment CA-325A extends west from Gaviota Pump Station to a motor operated valve (MOV) located east of Gaviota Creek and U.S. Highway 101 to the Sisquoc Pump Station at the southern end of Santa Maria Canyon. Pipeline segment CA-325B is approximately 74.84 miles in length. Pipeline segment CA-325B continues on from the Sisquoc Pump Station terminating at the Pentland Station in Kern County.

Based on our review of the project description and implementation of all avoidance and minimization measures, as described in the request letter, we concur with your determination that implementation of the project is not likely to result in adverse effects to the aforementioned listed and proposed for listing species, as well as respective critical habitat designations. Further consultation pursuant to section 7(a)(2) of the Act is not required. We recommend you contact us immediately to determine whether additional consultation is required or re-evaluate the proposed action in our Information for Planning and Consultation program (IPaC) if the proposed action changes in any manner that may affect a listed species or critical habitat or if new information becomes available about the listed species or critical habitat that would change your determination.

If you have any questions regarding this matter, please contact our office by electronic mail at fw8venturasection7@fws.gov with the project title and Service's reference number (2026-0052879-S7-001) in the subject line.

Sincerely,

Chris

==========================

Chris Dellith, CWB®

Senior Fish and Wildlife Biologist

Ventura Field Office

U.S. Fish and Wildlife Service

2493 Portola Rd., Suite B

Ventura, CA 93003

Phone: (805) 677-3308

ORCiD ID 0000-0002-4540-1225

·´¯`·.¸¸..><((((º>.·´¯`·.¸¸.·´¯`·.¸><((((º>`·.¸¸.·´¯`·.¸><((((º>`·.¸¸.·

---

**From:** Nelson, Carolyn <carolyn.nelson@dot.gov>
**Sent:** Thursday, June 11, 2026 8:28 AM
**To:** Ventura Section 7, FW8 <fw8venturasection7@fws.gov>
**Cc:** Darst, Cat <Cat_Darst@fws.gov>; Johnson, Adam G <adam_johnson@fws.gov>; Coyle, Keith (PHMSA) <keith.coyle@dot.gov>; Leets, Whitney (OST) <whitney.leets@dot.gov>; O'Shea, Timothy (PHMSA) <timothy.o'shea@dot.gov>; Fred, Benjamin (PHMSA) <Benjamin.Fred@dot.gov>; Travis Mast <travis.mast@dot.gov>
**Subject:** [EXTERNAL] Section 7 Consultation Request (CA-324 and CA-325)

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Hello Stephen,

Please find attached the amended informal Section 7 consultation request for the Sable Offshore Corp. Special Permit (Segments CA-324 and CA-325).

Following our recent coordination, PHMSA has revised our approach to focus specifically on Phase 1: In-Line Inspection (ILI) Runs. Phase 2 (Localized Excavations and Repairs) will be addressed through separate, ongoing, site-specific consultations as repair locations are identified.

We respectfully request your concurrence with our determination that the Phase 1 activity of performing ILI runs may affect, but is not likely to adversely affect, the listed species or designated critical habitat identified in our original February 26, 2026, request.

We appreciate your office's time and technical assistance in reviewing this amended request. Please let us know if you or your staff have any questions.

Thank you

Carolyn Nelson, P.E.

Director, Environmental Analysis & Compliance Division

Office of Chief Counsel

Pipeline and Hazardous Materials Safety Administration

U.S. Department of Transportation

(202) 860-6173 (mobile)

carolyn.nelson@dot.gov

PRIVILEGED & CONFIDENTIAL: This e-mail, including any attachments, is confidential, intended only for the named recipient(s) above and may contain information that is privileged, confidential, attorney work product or otherwise legally protected. If you have received this message in error, or are not the named recipient(s), please immediately notify me and permanently delete this e-mail message and any attachments from your workstation and/or network mail system.

**2 attachments**

**Sable Informal Consultation Request_signed.pdf**
239K

**Sable Section 7 Programmatic NLAA__02.26.2026 final.pdf**
366K

# EXHIBIT G

July 23, 2026

Paul J. Roberti, Administrator
U.S. Department of Transportation
Pipeline and Hazardous Materials
Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590
phmsa.pipelinesafety@dot.gov

Dustin Hubbard, Director
U.S. Department of Transportation
PHMSA Pipeline Safety
Western Region Office
12300 W. Dakota Ave., Ste. 110
Lakewood, CO 80228
dustin.hubbard@dot.gov

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590
OPL@dot.gov

Brian Nesvik, Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240
info@fws.gov

Paul Souza, Regional Director
Fish and Wildlife Service
Pacific Southwest Region
2800 Cottage Way
Sacramento, CA 95825
paul_souza@fws.gov

Joseph Brandt, Field Supervisor
Fish and Wildlife Service
Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003
joseph_brandt@fws.gov

Doug Burgum, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov

Howard Lutnick, Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, D.C. 20230
TheSec@doc.gov

**SENT VIA CERTIFIED AND ELECTRONIC MAIL**

Re: **Notice of Violations of the Endangered Species Act in Relation to the Pipeline and Hazardous Materials Safety Administration's June 25, 2026 Special Permit to Sable Offshore Corp. (Docket No. PHMSA–2026–0464)**

Dear Secretary Duffy, Administrator Roberti, Director Hubbard, Director Nesvik, Director Souza, Supervisor Brandt, Secretary Lutnick, and Secretary Burgum:

On behalf of the Environmental Defense Center, Center for Biological Diversity, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, and

Wishtoyo Foundation (collectively, the "Noticing Parties"), we write to you concerning the Special Permit which the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued to Sable Offshore Corp. ("Sable") on June 25, 2026. The Special Permit waives certain regulations of the Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") that require pipelines to be equipped with an effective cathodic protection system that will minimize the risk of corrosion. The Special Permit waives such requirements with respect to Sable's onshore pipelines (Lines CA-324 and CA-325, together referred to as the "Onshore Pipelines").[1] CA-324 is the same pipeline that caused the devastating 2015 oil spill at Refugio State Beach Park (the "Refugio Oil Spill"). The pipeline rupture was caused by high levels of corrosion resulting from the lack of an effective cathodic protection system. This defect is pervasive throughout the length of the Onshore Pipelines. This letter provides you with notice that PHMSA and the U.S. Fish and Wildlife Service (FWS) are in violation of the Endangered Species Act (ESA) for, *inter alia*, their failure to properly consult under section 7 of the Act under the guise of a fake emergency. The Noticing Parties intend to file a lawsuit over these violations.

The Onshore Pipelines run from Las Flores Canyon, along the Gaviota coast, through Buellton, the Santa Ynez River, Foxen Canyon, the Sisquoc River, the Los Padres National Forest, and the Cuyama River valley to Pentland. This pipeline route traverses the habitat of several species that are protected under the ESA.

The Special Permit includes a number of conditions that require frequent excavations which have the potential to affect numerous listed species. Moreover, as the Refugio Oil Spill demonstrated, the Onshore Pipelines are susceptible to failure which can spill oil both on land and into coastal waters and harm ESA-listed marine species. The Special Permit thus may affect listed species, including: tidewater goby, California red-legged frog, southwestern willow flycatcher, San Joaquin kit fox, blunt-nosed leopard lizard, California least tern, giant kangaroo rat, western snowy plover Pacific DPS, California condor, southern sea otter, least Bell's vireo, vernal pool fairy shrimp, arroyo toad, steelhead Southern California DPS, Steller sea lion Western DPS, Guadalupe fur seal, black abalone, white abalone, blue whale, fin whale, humpback whale Mexico DPS, humpback whale Central America DPS, hawksbill sea turtle, loggerhead sea turtle North Pacific DPS, leatherback sea turtle, and green sea turtle East Pacific DPS. In addition, the Special Permit may affect critical habitat of at least four of these species, namely the California red-legged frog, southwestern willow flycatcher, arroyo toad, and steelhead Southern California DPS.

Although PHMSA appears to acknowledge it must engage in ESA consultation, it has failed to fulfill ESA consultation requirements with the FWS or engage in *any* consultation with the National Marine Fisheries Service (NMFS) (collectively, "the Services"). Instead, PHMSA improperly requested emergency consultation with FWS under the guise of a national energy emergency, which FWS appears to have concurred with. For these reasons, PHMSA and FWS are in violation of their ESA Section 7 duties to engage in consultation prior to issuing the Special Permit. *See Environmental Defense Center v. Bureau of Ocean Energy Management*, 36

[1] Sable and PHMSA unlawfully attempt to conflate two distinct pipeline systems – one offshore and one onshore - into one, which they refer to as the "Santa Ynez Pipeline System." This letter correctly refers to CA-324 and CA-325 as the "Onshore Pipelines."

F.4th 850, 884 (2022). PHMSA is also in violation of its substantive and procedural duties to ensure against jeopardy and avoid destruction or adverse modification of critical habitat, timely complete consultation, and to not make any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures. 16 U.S.C. § 1536(a)(2), (b)(1)(A), (d).

This letter provides formal sixty-day notice of the Noticing Parties' intent to sue PHMSA and FWS for their violations of the ESA insofar as may be required by 16 U.S.C. section 1540(g).[2] Specifically, this letter puts PHMSA and FWS on notice that the Special Permit approval absent standard Section 7 consultation violates the agencies' procedural and substantive ESA duties. If PHMSA and FWS fail to remedy these violations, the Noticing Parties intend to file suit against PHMSA and FWS upon the expiration of sixty days.

## I. <u>Noticing Parties and their Counsel</u>

The Environmental Defense Center (EDC) is a non-profit organization and law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action. The issue of protecting sensitive wildlife directly impacts EDC's mission and organizational priorities, including protecting land and water. EDC has long worked to uphold protections for threatened and endangered species and to prevent harm from oil and gas development.

The Center for Biological Diversity (CBD) is a non-profit conservation organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. CBD works to ensure the long-term health and viability of animal and plant species across the United States and elsewhere, and to protect the habitat these species need to survive. As part of its mission, CBD has for decades worked to combat the negative impacts of oil and gas production and transportation on the environment.

Get Oil Out! (GOO!) is a public interest group dedicated to the protection of the Santa Barbara Channel and coastline from the deleterious impacts of oil development. GOO! was formed in the wake of the Santa Barbara Oil Spill of 1969 and, throughout its existence, has fought to protect California from further oil development and exploitation.

Santa Barbara County Action Network (SBCAN) is a non-profit organization dedicated to promoting social and economic justice; preserving environmental and agricultural resources; and creating sustainable communities. SBCAN focuses its efforts to protect Santa Barbara County's natural resources and community from the risks associated with oil and gas operations.

Sierra Club is a national organization of over one million members, including more than 105,000 members in California and around 5,005 active members in the Santa Barbara-Ventura

---

[2] *See* 49 U.S.C. § 60119(a) (special permits are subject to direct review within the courts of appeal); *see Am. Bird Conservancy v. FCC,* 545 F.3d 1190, 1193–95 (9th Cir. 2008) ("When two jurisdictional statutes draw different routes of appeal, the well-established rule is to apply only the more specific legislation").

Chapter. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. Consistent with its mission, Sierra Club is committed to the transition away from fossil fuels.

Santa Barbara Channelkeeper (SBCK) is a non-profit public benefit corporation founded in 1999. SBCK's mission is to protect and restore the Santa Barbara Channel and its watersheds. SBCK accomplishes its mission through science-based advocacy, education, fieldwork, enforcement, and community engagement. SBCK and its members are committed to protect the Santa Barbara Channel from pollution threats such as coastal and offshore oil development.

Wishtoyo Foundation ("Wishtoyo") was founded in 1995 to preserve and protect Chumash culture; to protect natural and cultural resources essential to Chumash lifeways; and to educate and instill in youth environmental values, awareness, and stewardship. Wishtoyo serves as a "rainbow bridge" linking Chumash and indigenous lifeways with the protection of natural and cultural resources, utilizing traditional ecological knowledge to provide environmental and cultural preservation, justice, education, research, and advocacy. Wishtoyo has a longstanding record of protecting and restoring the coastal watersheds of Chumash homelands, the Santa Barbara Channel, and the Pacific Ocean.

These organizations have members that use the local area affected by operation of the Onshore Pipelines for recreational, aesthetic, spiritual, academic, economic, and/or scientific purposes and who live, work, or visit areas along the pipeline route. Their members regularly use the land and waters along the Onshore Pipelines' route for hiking, bird watching, scientific study, spiritual and cultural connection, swimming, boating, recreation, fishing, and education. PHMSA's ESA violation has impaired and will continue to impair the members' interests, and would be redressed at least in part by a ruling enjoining PHMSA's ongoing ESA violations.

The Noticing Parties have retained legal counsel to represent them in this matter. Please direct all communications to:

Linda Krop
lkrop@environmentaldefensecenter.org
Maggie Hall
mhall@environmentaldefensecenter.org
Jeremy Frankel
jfrankel@environmentaldefensecenter.org
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
(805) 963-1622

Julie Teel-Simmonds
jteelsimmonds@biologicaldiversity.org
Rachel Mathews

rmathews@biologicaldiversity.org
Talia Nimmer
tnimmer@biologicaldiversity.org
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7137

## II. Factual Background

### A. The Onshore Pipelines and Refugio Oil Spill

The Onshore Pipelines that are the subject of PHMSA's Special Permit have a troubling history. The pipelines begin at the Las Flores Canyon processing facilities that process oil and gas from the Santa Ynez Unit (SYU), consisting of three offshore platforms. The Onshore Pipelines run approximately 120 miles from the processing facility on the Gaviota Coast to Pentland Station in Kern County. Along the way, the Onshore Pipelines traverse sensitive coastal habitats; dozens of creeks, wetlands, and riparian areas; major rivers and groundwater basins; and world-renowned parks and ecological reserves. As depicted below, the Onshore Pipelines traverse areas with occurrences of numerous listed species and critical habitats.




**Habitat map for federally and state-listed species (Kara Clauser 2025)[3]**

---

[3] Created in December 2025 using GIS data from the FWS website at https://ecos.fws.gov/ecp/report/table/critical-habitat.html; NMFS website at

On May 19, 2015, CA-324 ruptured at Refugio State Beach Park, releasing as much as 450,000 gallons of heavy crude oil into the surrounding environment.[4] The spill devastated approximately 150 miles of the California coast.[5] Thousands of acres of shoreline and subtidal habitat were destroyed.[6] The spill also forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties.[7]

According to the Refugio Beach Oil Spill Final Damage Assessment, an untold number of animals—including marine mammals and seabirds—were killed or injured. Observed listed species which were affected by the spill include the western snowy plover, the black abalone, and the humpback whale.[8] Several other federally-listed species also occur in areas that were exposed to the spill, including the California red-legged frog, California least tern, southern sea otter, Steller sea lion, Guadalupe fur seal, blue whale, fin whale, green turtle, hawksbill turtle, leatherback turtle, and loggerhead turtle.[9]

Upon investigation, PHMSA determined that the rupture was a result of "progressive external corrosion," and that the pipeline's cathodic protection system—intended to prevent such corrosion—had failed.[10] Ultimately, PHMSA found pervasive metal loss throughout the entirety of the Onshore Pipelines, and it concluded that cathodic protection is ineffective in buried, insulated pipelines like the Onshore Pipelines.[11]

Following the spill, the Onshore Pipelines were emptied, purged, and idled.[12] Due to the unavailability of the system, the SYU was shut in, and production at the unit was suspended

---

https://noaa.maps.arcgis.com/home/item.html?id=f66c1e33f91d480db7d1b1c1336223c3; and California Department of Fish and Wildlife website at https://apps.wildlife.ca.gov/cnddb subscriptions/downloads.

[4] Expert Report of Igor Mezic, Ph.D., *Andrews v. Plains All American Pipeline, L*.P., United States District Court, Central District of California, Case No. 2:15-cv-04113-PSG-JEM, March 29, 2019 (pp. 16-17).

[5] California Department of Fish and Wildlife *et al*., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 4 (June 2021) [hereinafter "NRDA"] at 18, available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline. Notably, both the Department of Interior, through the FWS, and the National Oceanic and Atmospheric Administration (which oversees NMFS) were among the preparers of the Assessment.

[6] *Id.* at 3-9.

[7] *Id.* at 3.

[8] *Id*. at 37.

[9] *Id*.

[10] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipeline, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, pp. 3, 14 (May 2016) [hereinafter "PHMSA Report"], available at: https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf

[11] *Id.* at 14.

[12] *Id.* at 3, 9.

indefinitely.[13] Because of the pervasive corrosion on the Onshore Pipelines, Sable's predecessor applied to construct an entire new pipeline with a different design and technology.[14] Until recently, the SYU and Onshore Pipelines had not been operated for over ten years.

### B. Sable's Acquisition and Efforts to Restart the Onshore Pipelines

In February 2024, Sable purchased the SYU, the Las Flores Canyon processing facilities, and the Onshore Pipelines. After the purchase, Sable immediately began efforts to restart oil production, including use of the same pipeline system that ruptured in 2015. Sable decided not to replace the original pipelines, but instead to repair the existing pipelines.

Indeed, in its rush to repair the severely corroded pipelines, Sable performed dozens of excavations along the pipeline route without obtaining requisite authorizations from local and state agencies, including the California Coastal Commission (CCC), leading to Notices of Violations, Cease-and-Desist Orders, and even a historic $18,000,000 fine.[15] The CCC found that Sable's work caused "extensive damage to coastal resources," impacted critical habitat for federally-protected endangered species, and occurred during the breeding season for federally protected southern California steelhead and the California red-legged frog.[16] Sable also faces several lawsuits, including felony criminal charges, stemming from its pipeline excavation work.[17]

Meanwhile, pursuant to a Consent Decree entered in *U.S. v. Plains All American Pipeline*, Civil Action No. 2:20-cv-02415 (the "Consent Decree") — which governs the requirements of restarting the Onshore Pipelines and remains binding on both PHMSA and Sable—Sable applied to the Office of the State Fire Marshal (OSFM) for waivers for the "limited effectiveness of cathodic protection" on the Onshore Pipelines. In December 2024, OSFM issued the waivers (the "State Waivers"). The State Waivers became final in February 2025 when,

---

[13] *History*, ExxonMobil Santa Ynez Unit, https://www.syu.exxonmobil.com/history (last visited Oct. 18, 2024).

[14] Environmental Defense Center *et al., Docket No. PHMSA–2026–0464; Pipeline and Hazardous Materials Safety Administration (PHMSA); U.S. Department of Transportation (DOT) Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)* (Apr. 3, 2026), p. 5, available at: https://www.regulations.gov/comment/PHMSA-2026-0464-0058.

[15] Cal. Coastal Comm'n, *Staff Report: Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty* (Apr. 10, 2025) [hereinafter "Coastal Commission Staff Report"], available at: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf

[16] *Id.* at 40, 5.

[17] *See* Complaint, *People ex rel. Cal. Reg'l Water Quality Bd. v. Sable Offshore Corp.*, No. 25CV06285 (Cal. Super. Ct. Oct. 3. 2025), https://www.waterboards.ca.gov/centralcoast/press_room/press_releases/docs/sable-offshore-oil-complaint.pdf; *see also* Felony Complaint, *People v. Sable Offshore Corp.*, No. 25CR07677 (Cal. Super. Ct. Sept. 16, 2025), https://biologicaldiversity.org/programs/environmental_health/pdfs/People-v-Sable_Complaint_2025_09_16.pdf; *see also* Order for Preliminary Injunction, *Sable Offshore Corp. v. California Coastal Commission*, Superior Court for Santa Barbara County, Case No. 25CV00974 (June 10 2025).

pursuant to the PSA, PHMSA did not object to OSFM's State Waivers. In April 2025, the Noticing Parties filed consolidated lawsuits challenging the State Waivers in the Superior Court for the County of Santa Barbara, Case Number 25CV02244, which are ongoing.[18]

### C. PHMSA's Unlawful Federalization of the Onshore Pipelines and the Events Leading Up to the Special Permit

As the Noticing Parties' lawsuits proceeded, Sable requested authorization from OSFM to restart the Onshore Pipelines. The agency refused, citing the fact that additional repairs are needed to ensure the pipelines are safe to operate.[19] However, instead of making those repairs, Sable sent a letter to PHMSA asserting that the Onshore Pipelines were interstate facilities over which OSFM lacked jurisdiction.

In response, on December 17, 2025, PHMSA sent a letter to Sable concurring with Sable's determination and purporting to wrest jurisdiction of the Onshore Pipelines from the State.[20] In a departure from a 2016 Memorandum Of Understanding with OSFM, as well as nearly forty years of its own precedent, PHMSA claimed that the offshore pipeline, the Las Flores Canyon Processing Facilities, and the Onshore Pipelines formed a single, contiguous interstate "pipeline" that extends from federal waters to Kern County.

On December 22, 2025, less than a week after asserting jurisdiction, PHMSA issued a one-page, cursory letter approving a Restart Plan for the Onshore Pipelines purporting to authorize restart of the pipelines (the "Restart Approval"). The next day, PHMSA issued, under the PSA, an Emergency Special Permit (ESP) to Sable. The Noticing Parties filed a Petition for Review in the Ninth Circuit Court of Appeals challenging the ESP and Restart Approval (Case No. 25-8059) which was later consolidated with the State's challenge to PHMSA's assertion of jurisdiction over the Onshore Pipelines and subsequent approvals.

Shortly before the ESP expired in February 2026, Sable applied for the Special Permit at issue. Sable also sent a letter to PHMSA indicating that it would still rely on the ESP to restart and operate the Onshore Pipelines while its Special Permit application was pending, citing a new non-enforcement policy of PHMSA announced in January.[21]

---

[18] In May 2026, Sable and the United States removed the consolidated case to the United States District Court for the Central District of California (Case No. 2:26-cv-05242), where it is currently pending.

[19] OSFM Letter to Sable, *STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA324 AND CA-325A/B* (Oct. 22, 2025), available at: https://s202.q4cdn.com/300304768/files/doc_news/2025/10/OSFM-Letter-to-Sable.pdf

[20] PHMSA Letter to Sable, Determination of Interstate Classification (Dec. 17, 2025), available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000137/sablelasflores_121725.htm

[21] Sable Letter to PHMSA (Feb. 13, 2026), available at: https://www.regulations.gov/document/PHMSA-2026-0464-0001.

### D. The Special Permit Approval and Conditions and Improper Consultation Efforts

On February 24, 2026, PHMSA published a notice to solicit public comment on Sable's request for the Special Permit. Along with a Draft Environmental Assessment for the Special Permit, PHMSA also published a letter which it received from FWS in February 2026, confirming receipt and appearing to concur with PHMSA's February 20, 2026 invocation of emergency ESA consultation procedures, citing Executive Order 14156 (Declaring a National Energy Emergency), pursuant to 50 C.F.R. § 402.05.[22] On February 26, 2026 PHMSA submitted an "informal consultation letter" to FWS concluding that the Special Permit "may affect but is not likely to adversely affect listed species and designated critical habitat."[23] Based on information and belief, FWS has not concurred with that determination. The Noticing Parties filed comments on April 3, 2026, outlining why PHMSA could not rely on the emergency consultation process and was required to engage in standard consultation with the Services.[24]

On June 11, 2026, PHMSA submitted an amended request to FWS specifically limited to the issue of in-line inspections (ILI), seeking concurrence with its conclusion that the Special Permit's required ILI runs may affect but are not likely to adversely affect listed species and their critical habitat.[25] That same day, FWS concurred.[26]

On June 25, 2026, PHMSA issued the Special Permit. Despite PHMSA's previous recognition that the 2015 rupture was the result of progressive external corrosion and that without effective cathodic protection, the Onshore Pipelines were pervasively corroded throughout, the Special Permit purports to satisfy the Consent Decree requirement that Sable obtain a waiver for the limited effectiveness of cathodic protection and to allow Sable to operate the Onshore Pipelines absent an effective cathodic protection system.[27]

To address the Onshore Pipelines' lack of effective cathodic protection, the Special Permit includes a number of conditions that, together, call for frequent inspections for corrosion and repairs of discovered anomalies. This includes ILIs twice a year for the first two years and annually thereafter, as well as four validation digs for each tool run.[28] These inspections and

---

[22] FWS Letter to PHMSA, *Emergency Special Permit Pipeline and Hazardous Materials Safety Administration Project code: 2026-0052879* (Feb. 20, 2026), available at: https://www.regulations.gov/document/PHMSA-2026-0464-0004.
[23] PHMSA, *Finding of No Significant Impact* (June 25, 2026), p. 5, available at: https://www.regulations.gov/document/PHMSA-2026-0464-0078 (hereinafter "FONSI").
[24] Environmental Defense Center *et al., Docket No. PHMSA–2026–0464; Pipeline and Hazardous Materials Safety Administration (PHMSA); U.S. Department of Transportation (DOT) Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable)* (Apr. 3, 2026), available at: https://www.regulations.gov/comment/PHMSA-2026-0464-0058.
[25] FONSI at p. 5.
[26] *Ibid*.
[27] PHMSA Special Permit (June 25, 2026), p. 2, available at: https://www.regulations.gov/document/PHMSA-2026-0464-0076.
[28] PHMSA Draft Environmental Assessment for Special Permit (Feb. 20, 2026), p. 17-18, available at: https://www.regulations.gov/document/PHMSA-2026-0464-0005.

repairs entail frequent excavation of portions of the pipelines for monitoring and repair using heavy machinery to strip the topsoil and vegetation, expose the pipe, clean the exposed pipe, perform any required work on the pipe, and backfill the excavation. As already witnessed, these excavations have affected listed species.[29]

But beyond that, the extreme risk of operating the Onshore Pipelines without effective cathodic protection cannot be understated. According to OSFM, operating without effective cathodic protection increases the risk of a spill by as much as five times.[30] Per a separate analysis prepared for the County, that translates to a possible spill from these pipelines every year and a major rupture every four. [31] Indeed, even with the conditions in the Special Permits, operating the pipelines will likely result in another failure, and they pose a persistent and unresolved threat to the people, property, and environment around them.[32]

On June 25, 2026, PHMSA also issued a Finding of No Significant Impact (FONSI) for the Special Permit. As relevant here, the FONSI itself recognizes the permit's potential effects to listed species:

> **Biological Resources**: Minimal disturbance which is limited to existing ROW. The Action Alternative *could result in ground disturbance which may result in temporary and localized effects*. However, PHMSA has determined these impacts would not be significant to Federal and state listed species or other biological resources, due to the limited scope of anticipated activities, implementation of mitigation measures, and because ground disturbance would occur in the previously disturbed ROW.[33]

The FONSI further states that "Localized excavations and repairs will be addressed through site specific consultation(s) after the exact locations requiring repairs, if any, are identified."[34]

---

[29] CCC, *STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY,* (April 10, 2025) p. 44, available at: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf; *People of the State of CA et al. v. Sable Offshore Corp*. (Case No. 25CV06285), Oct. 3, 2025, pp. 9-10, available at: https://www.waterboards.ca.gov/centralcoast/press_room/press_releases/docs/sable-offshore-oil-complaint.pdf.
[30] Environmental Defense Center *et al., Docket No. PHMSA–2026–0464; Pipeline and Hazardous Materials Safety Administration (PHMSA); U.S. Department of Transportation (DOT) Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable),* p. 19 (Apr. 3, 2026), available at: https://www.regulations.gov/comment/PHMSA-2026-0464-0058.
[31] *Ibid*.
[32] Clayton Bodell, Pipeline Safety Trust Comment on Special Permit Request of Sable Offshore Corp. (Docket No. PHMSA–2026–0464), p. 47 (April 2, 2026), available at: https://www.regulations.gov/comment/PHMSA-2026-0464-006.
[33] FONSI at p. 5.
[34] *Id.*

## III. Legal Background

The ESA, 16 U.S.C. § 1531 *et seq*., is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA v. Hill*"). The statute's fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). To achieve these objectives, the ESA directs FWS and NMFS to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. 16 U.S.C. §§ 1533(a)(1), (c)(1). The ESA provides a variety of protections for species listed as threatened or endangered, to ensure not only the species' continued survival, but their ultimate recovery.

Section 7 of the ESA requires federal agencies to consult with FWS and/or NMFS (depending on the species at issue) to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). FWS has jurisdiction over terrestrial species, seabirds, and some marine mammals including sea otters. NMFS has jurisdiction over most marine species.

The consultation process is designed "to ensure compliance with the [ESA's] substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). Section 7 defines the term "agency action" as "any action authorized, funded, or carried out" by the agency. 16 U.S.C. § 1536(a)(2). The term "action" is further defined by regulation as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" and includes, among other examples, "granting of . . . leases." 50 C.F.R. § 402.02. As the Ninth Circuit has recognized, "the Supreme Court has interpreted the plain meaning of agency action broadly, in conformance with Congress's clear intent." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994); *see also TVA. v. Hill*, 437 U.S. at 173 (referring to Section 7 and concluding "[t]his language admits of no exception."). An agency action exists "whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1026–27 (9th Cir. 2012).

If an action "may affect" a listed species or its critical habitat, consultation is required. 50 C.F.R. §§ 402.14(a), 402.12(k). Some actions may proceed with informal consultation if there is a determination that the action is unlikely to adversely affect the listed species or its critical habitat, and FWS and/or NMFS concurs in writing. 50 C.F.R. § 402.13. A concurrence that the action is not likely to adversely affect a species is only appropriate when "effects on listed species are expected to be discountable, or insignificant, or completely beneficial."[35] However, "[i]f the nature of the effects cannot be determined, benefit of the doubt is given to the species" and a concurrence is inappropriate.[36] If an action that may affect a listed species or its critical

[35] FWS and NMFS, Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act at 3–12 (March 1998).
[36] *Id*.

habitat has the potential of adverse effects, then formal consultation is required.

Formal consultation involves preparation of a biological opinion ("BiOp"). 16 U.S.C. § 1536(b)(3)(A). The BiOp must use the best available scientific information to evaluate the current status of the species and habitats, the effects of the action on species conservation, and cumulative effects. *Id*. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(g)–(h). Through formal consultation, FWS or NMFS prepares a biological opinion as to whether the action will cause jeopardy or destroy or adversely modify critical habitat, and if so, suggests "reasonable and prudent alternatives" to the action. 16 U.S.C. § 1536(b)(3)(A). This analysis is critical because if the wildlife agency makes a jeopardy determination at the end of the consultation process, the action simply cannot go forward as-is. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007). The consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Karuk Tribe*, 681 F.3d at 1020 (*quoting TVA v. Hill*, 437 U.S. at 185).

The ESA regulations provide for alternative formal consultation procedures in very rare and narrowly defined emergencies. The regulations state that "[w]here emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)-(d) of the Act." 50 C.F.R.§ 402.05(a). Such circumstances include "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id*. Moreover, "Formal consultation shall be initiated as soon as practicable after the emergency is under control . . ., [and the agency must] issue a biological opinion including the information and recommendations given during the emergency consultation." 50 C.F.R.§ 402.05(b). In other words, even in the rare occasions where emergency consultation is invoked, FWS and/or NMFS must complete formal consultation resulting in a BiOp once the emergency no longer threatens life, property, or the environment.

## IV. PHMSA and FWS Are Violating the Endangered Species Act.

PHMSA and FWS had a duty to consult under section 7 of the ESA. PHMSA has not, however, complied with the statutory mandates of the law that require an agency to consult *before* taking action. *See Karuk Tribe*, 681 F.3d at 1021-22 (the Forest Service violated the ESA by not consulting with wildlife agencies before approving four notices of intent to conduct mining activities within a national forest); *Environmental Defense Center*, 36 F.4th at 884 (consultation under the ESA was required before the Bureau issued an EA and FONSI approving well stimulation treatments from offshore platforms). To the extent that PHMSA relies on its attempt to improperly invoke emergency consultation, which FWS appears to have concurred with, it must fail. The action is ineligible for emergency consultation, and PHMSA and FWS's decisions to invoke and proceed with it are arbitrary and capricious.

### A. PHMSA and FWS Failed to Fulfill Their ESA Section 7 Consultation Duties Prior to Issuing the Special Permit.

The Special Permit triggers the ESA consultation requirements and cannot be delayed or avoided by improper invocation of emergency procedures.

1. The Special Permit Is an Agency Action that May Affect Numerous Listed Species.

PHMSA had a duty to comply with the ESA's consultation requirements because the Special Permit constitutes a federal agency action that may affect listed species and their critical habitat. *See* 16 U.S.C. § 1536(a)(2).

Approval of the Special Permit is an "agency action" under the ESA because it is "authorized" by the federal government and discretionary. *See* 16 U.S.C. § 1536(a)(2); *Karuk Tribe*, 681 F.3d at 1011. Moreover, the Special Permit may affect species listed as endangered or threatened under the ESA and their critical habitat. Thus, rather than truncating consultation under the guise of a fake emergency to greenlight the operation of these dangerous pipelines, PHMSA was required to engage and complete the full standard Section 7 consultation process.

First, the Special Permit may affect listed species, and PHMSA appears to concede as much. In its FONSI, the agency notes that the action "could result in ground disturbance which may result in temporary and localized effects."[37] While it dismisses such impacts as "insignificant," such recognition is sufficient to trigger the consultation requirement. The relevant inquiry to determine whether consultation is required is not whether impacts are "minimal" or "negligible," rather, consultation is required when an action "may affect" a listed species. 50 C.F.R. § 402.14(a). This includes "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character." 51 Fed. Reg. 19926 (June 3, 1986); *Karuk Tribe*, 681 F.3d at 1027; *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013) ("While the 'disturbance effects' may be discountable or insignificant . . . 'any possible effect' requires the [agency] to obtain the concurrence of the Wildlife Service in order to avoid consultation."). PHMSA's own FONSI identifies such potential effects, triggering the consultation requirement.

Moreover, there are many adverse impacts to these listed species and their critical habitat that come with operation of the Onshore Pipelines pursuant to the permit conditions. As noted above, the Special Permit calls for more frequent inspections for corrosion and repairs of discovered anomalies. This includes ILIs twice a year for the first two years and annually thereafter, as well as four validation digs for each tool run.[38] These inspections and repairs entail frequent excavation of portions of the pipelines for monitoring and repair using heavy machinery to strip the topsoil and vegetation, expose the pipe, clean the exposed pipe, perform any required work on the pipe, and backfill the excavation.

Grading and maintenance activities can remove or significantly alter habitats, facilitate the displacement of native plants with invasive species, result in the direct mortality of listed plants and ground dwelling wildlife, and harass listed wildlife species with noise from

[37] FONSI at p. 5.
[38] PHMSA, *Special Permit* (June 25, 2026), pp. 7-8, available at: https://www.regulations.gov/document/PHMSA-2026-0464-0076.

construction equipment, hydrostatic testing, night-lighting, and increased human presence.[39] For example, the San Joaquin kit fox and giant kangaroo rat are nocturnal species who feed at night, making artificial night lighting and noise pollution particularly harmful.[40] What's more, Sable's repair work has been documented during the nesting season for most bird species, putting southwestern willow flycatcher, California least tern, western snowy plover, least Bell's vireo, and California condor at particular risk.[41] Visual impacts from Sable's grading work have also already been seen.




**Fig. 1a. 2,000-foot long section of pipeline route (red line) in Gaviota State Park on 18 April 2025.**




**Fig. 1b. Same area on 22 May 2025 showing significant vegetation removal and grading along access road.**

**Hunt Comments, p. 19.**

---

[39] Lawrence Hunt, *Comments on Potential Impacts of Restarting and Operating the Las Flores Pipeline System on Listed Plants, Wildlife, and Habitats (Docket No. PHMSA-2026-0464)*, pp. 18-19 (Apr. 3, 2026), available at: https://www.regulations.gov/comment/PHMSA-2026-0464-0063 (hereinafter "Hunt Comment").

[40] *See* Debra M. Shier, et al. *Effects of artificial light at night on the foraging behavior of an endangered nocturnal mamma*l (Nov. 2019), p. 2, available at: https://www.softlights.org/wp-content/uploads/2020/06/Shier-et-al.-2020.-Effects-of-artificial-light-at-night-on-the-foraging-behavior-of-an-endangered-nocturnal-mammal.pdf (noting that artificial light is particularly detrimental to kangaroo rats due to decreased foraging).

[41] CCC, *STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY,* (April 10, 2025) p. 5, available at: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf.

Wildlife and plants located in aquatic and wetland habitats may also be negatively affected since construction work can result in excessive sediment moving into these areas, degrading the water quality.[42] As a result, spawning habitat may degrade, egg masses can be destroyed, fish and amphibians of all life stages could be harmed, and other wildlife that relies on essential wetland habitat may be significantly impacted.[43] Significantly, the effects to listed species "could extend well downstream" from Sable's worksites.[44] These impacts are far from speculative given that Sable's repair work has already affected water quality. [45] In fact, as noted by the CCC, Sable's repair work has already occurred during the time of year in which ground disturbance is most likely to result in erosion, scarring, and discharge of sediment into wetlands and watercourses.[46] Such impacts could directly affect tidewater goby, vernal pool fairy shrimp, arroyo toad, and California red-legged frog.

Second, the extreme risk of operating the Onshore Pipelines without effective cathodic protection all but invites another catastrophic failure and devastating oil spill. The Refugio Oil Spill is evidence of the mortality and harm that another oil spill will cause to species and their habitats.[47] Oil spills at drainages and slopes contributing to waterways may kill listed species as the oil flows directly into their habitats.[48] Such a spill would necessitate extensive cleanup efforts, requiring excavation and grading which can create further habitat loss that may last for years.[49] Spills in coastal drainages in Santa Barbara County may even travel down to the terminal lagoon that serves as nursey habitat for tidewater goby.[50] In fact, a 2020 oil spill in the Cuyama River oiled at least two California red-legged frogs.[51]

Southern sea otters are "among the most vulnerable marine mammals" to oil spills because they rely on dense fur—not blubber—for insulation and spend much of their time at the

---

[42] Hunt Comment at p. 20.
[43] *Id.*
[44] *Id.*
[45] *People of the State of CA et al. v. Sable Offshore Corp.* (Case No. 25CV06285), Oct. 3, 2025, pp. 9-10, available at: https://www.waterboards.ca.gov/centralcoast/press_room/press_releases/docs/sable-offshore-oil-complaint.pdf.
[46] CCC, *STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY,* (April 10, 2025) p. 44, available at: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf.
[47] NRDA.
[48] CCC, *STAFF REPORT: RECOMMENDATIONS AND FINDINGS FOR CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY,* (April 10, 2025) p. 44, available at: https://documents.coastal.ca.gov/reports/2025/4/Th8.1-Th8.3/Th8.1-Th8.3-4-2025-report.pdf.
[49] *Id.*
[50] *Id.*
[51] Oiled Wildlife Care Network, Oil Spill Activation – Cuyama River Incident Webpage, https://owcn.vetmed.ucdavis.edu/oil-spill (last viewed January 15, 2026).

sea surface nearshore, where oil and its most toxic components accumulate.[52] Additionally, the Onshore Pipelines may also impact seabirds in many detrimental ways. Oil spills can impact sea birds during primary oiling leading to hypothermia and death.[53] Secondary impacts occur during release of oil and clean-up activities which result in decreased population size, lower reproductive rates, reduced habitat occupancy, reduced food supply, altered foraging behavior, emigration, and direct/indirect mortality.[54] For example, Western snowy plovers are seriously threatened by oil spills. The Refugio Oil Spill contaminated plovers with tar, and the birds were observed foraging in and around tar on the beach.[55]

The listed plant and wildlife species under the FWS's jurisdiction that the Special Permit "may affect" include: tidewater goby, California red-legged frog, southwestern willow flycatcher, San Joaquin kit fox, blunt-nosed leopard lizard, California least tern, giant kangaroo rat, western snowy plover Pacific DPS, California condor, least Bell's vireo, vernal pool fairy shrimp, arroyo toad, and southern sea otter. In addition, the Special Permit may affect critical habitat of at least three of these species, namely the California red-legged frog, southwestern willow flycatcher, and arroyo toad.[56]

Therefore, consultation pursuant to Section 7(a)(2) of the ESA is required. 16 U.S.C. § 1536(a)(2). This section is the "heart of the ESA." *Karuk Tribe*, 681 F.3d at 1019. It places the "ultimate duty" on the agency to ensure their action does not jeopardize the very existence of listed species. *See Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005) (internal quotations omitted). PHMSA and FWS plainly failed to comply with these requirements by failing to engage in standard consultation.

Moreover, this consultation cannot be deferred. PHMSA's FONSI suggests that it plans to defer certain aspects of consultation to a future date to address "[l]ocalized excavations and repairs . . . through site specific consultation(s)" after any repair locations are identified.[57] Instead, the ESA regulations require an agency to "review its actions at the earliest possible time" to assess impacts. 50 C.F.R. § 402.14(a). PHMSA and FWS were required to complete consultation prior to approving the Special Permit.

---

[52] Roger C. Helm et al., Overview of Effects of Oil Spills on Marine Mammals, in HANDBOOK OF OIL SPILL SCIENCE AND TECHNOLOGY 456 (Merv Fingas ed., 2014), https://doi.org/10.1002/9781118989982.ch18.
[53] G.S. Fraser et al., Estimating the numbers of aquatic birds affected by oil spills: pre-planning, response, and post-incident considerations, 30 ENVIRONMENTAL REVIEWS 323, 335 (2022).
[54] *Id*. at 332–34
[55] University of California Natural Reserve System, Refugio Oil Spill Fouls NRS Reserve (May 27, 2015), https://ucnrs.org/refugio-oil-spill-fouls-nrs-reserve/; *see* California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 4 (June 2021) [hereinafter "NRDA"] at p. 37, available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.
[56] To the extent any of these species are not explicitly included in the February 2026 request for consultation, they are subject to a separate claim that PHMSA failed to conduct any consultation whatsoever in violation of ESA section 7. By this letter, PHMSA is on notice of such violations.
[57] FONSI at 5.

2. PHMSA Improperly Invoked the ESA's Emergency Consultation Procedures, which FWS Appears to Have Concurred With.

PHMSA and FWS cannot cure their failures to properly consult by invoking the ESA's alternative emergency consultation procedures. The FWS's ESA regulations provide that "[w]here emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)-(d) of the Act." 50 C.F.R. § 402.05(a). Such circumstances include "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." *Id.* But even where FWS invokes these emergency procedures, "[f]ormal consultation shall be initiated as soon as practicable after the emergency is under control*." Id.* at § 402.05(b). Then, "[t]he Federal agency shall submit information on the nature of the emergency action(s), the justification for the expedited consultation, and the impacts to endangered or threatened species and their habitats. The Service will evaluate such information and issue a biological opinion including the information and recommendations given during the emergency consultation." *Id.*

The preamble to the Federal Register notice in which this regulation was published reinforces that it was intended solely for situations involving "bona fide" emergencies in which invocation of the standard consultation process is impossible. *See* 51 Fed. Reg. 19,926, 19,938 (June 3, 1986). The Consultation Handbook provides guidance to help agency staff interpret what constitutes an emergency. It states that an emergency includes "activities that must be taken to prevent imminent loss of human life or property" and not predictable events. FWS & NMFS, Endangered Species Consultation Handbook 8–1 (Mar.1998). In other words, it is up to the FWS to determine, in a non-arbitrary manner, whether a true emergency necessitates skipping the ESA's "mandatory, science-based review process" which is designed "to ensure against reckless partisan activities proceeding to the detriment, and potential extinction of, our Nation's threatened and endangered species." *TVA v. Hill*, 437 U.S. at 194.

Here, the only purported "emergency circumstances" PHMSA appears to have invoked are those set out in Executive Order 14156,[58] which borrows talking points from the oil and gas industry aimed at removing regulatory barriers to drilling and production. But nothing in FWS's determination that emergency consultation was appropriate explains what "emergency" specifically exists with respect to restarting the Onshore Pipelines or identifies any sudden or unforeseen new circumstances that would require deviation from existing laws and regulations normal procedures designed to protect species from extinction. Moreover, there is no indication that the emergency is not "under control" or that formal consultation is not "practicable" under the circumstances.

PHMSA and FWS also failed to consider, in the context of using a political Executive Order as a pretext for invoking emergency consultation procedures, that the Onshore Pipelines have no meaningful impact on the nation's energy supply. Evidence shows that restarting the Onshore Pipelines—and by extension, the SYU— would not markedly benefit statewide or national energy markets. The ten-year pause of SYU "had no statistical effect on imports of

---

[58] FONSI at p. 5.

foreign oil."[59] Indeed, "well-established economic models of oil supply and a statistical evaluation of the SYU show that . . . foreign imports are not likely to increase in the absence of SYU production."[60]

The Special Permit cannot feasibly fit within the regulations' limited parameters for when emergency consultation is permissible. Thus, it was improper, arbitrary, and capricious for PHMSA and FWS to expedite consultation and to evade its ESA Section 7 requirements under the guise of an imaginary emergency.

### B. PHMSA Failed to Engage in *Any* ESA Section 7 Consultation with NMFS Prior to Issuing the Special Permit.

Although PHMSA also had a duty to consult with NMFS prior to issuing the Special Permit, PHMSA failed to do so *whatsoever*. Instead, PHMSA simply closed its eyes to the effects which the Onshore Pipelines may have on listed marine species and their critical habitats from the all-too-real possibility of another catastrophic oil spill.

The impacts to listed marine species by virtue of another oil spill from the Onshore Pipelines are already well documented. As relevant here, marine mammals can be impacted by inhalation, direct aspiration, ingestion, and absorption of oil and its toxic components.[61] For example, impacts to black abalone and humpback whales were already observed from the Refugio Oil Spill.[62] However, as noted in the Final Damage Assessment report, Steller sea lion, Guadalupe fur seal, blue whale, fin whale, green sea turtle, hawksbill sea turtle, and leatherback sea turtle also occur in areas which were exposed to the spill and thus may potentially be affected from another spill.[63]

Additionally, impacts from a spill in coastal drainages in Santa Barbara County could extend downstream to include the terminal lagoon that serves as nursery habitat for Southern Steelhead.[64] The Onshore Pipelines also cross coastal drainages along south coast of Santa Barbara County between Arroyo Hondo and Gaviota Creek which serve as critical habitat for the Southern steelhead.[65] For this reason too, the Special Permit may affect both NMFS species and critical habitat.

---

[59] Dr. Paasha Mahdavi, *Economic analysis of market impacts of resuming oil and gas production from the Santa Ynez Unit* (Feb. 2025), p. 3, available at: https://www.environmentaldefensecenter.org/wp-content/uploads/2025/04/Paasha-Mahdavi_Sable-economic-analysis_2025_02_20.pdf.
[60] *Id*. at p. 1.
[61] R. Takeshita et al., The Deepwater Horizon Oil Spill Marine Mammal Injury Assessment, 33 ENDANGERED SPECIES RES. 95 (2017).
[62] California Department of Fish and Wildlife et al., *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment*, p. 4 (June 2021) [hereinafter "NRDA"] at 37, available at: https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.
[63] *Id*.
[64] Hunt Comment at p. 20.
[65] *Id*. at 18.

Beyond oil spills, however, the construction work required by the Special Permit also has the potential to degrade water quality and negatively affect Southern steelhead by virtue of excessive sediment movement, as discussed above.[66] As a result, spawning habitat may degrade, egg masses can be destroyed, and steelhead at all life stages could be harmed.[67]

The listed plant and wildlife species under the NMFS's jurisdiction that the Special Permit "may affect" include: steelhead Southern California DPS, Steller sea lion Western DPS, Guadalupe fur seal, black abalone, white abalone, blue whale, fin whale, humpback whale Mexico DPS, humpback whale Central America DPS, hawksbill sea turtle, loggerhead sea turtle North Pacific DPS, leatherback sea turtle, and green sea turtle East Pacific DPS. In addition, the Special Permit may affect critical habitat of the southern steelhead.

Given the sheer number of marine species and critical habitat potentially impacted by the Onshore Pipelines, PHMSA had a duty consult with NMFS prior to issuing the Special Permit, which it failed to do altogether. In fact, it appears PHMSA did not even seek to obtain from NMFS a list of any species "listed or proposed to be listed [that] may be present in the [action] area" as required by the ESA. 16 U.S.C. § 1536(c)(1).

To the extent PHMSA may assert that it has made a "no effect" determination with regard to marine species, that determination is arbitrary and capricious and in violation of the law. In its FONSI, PHMSA provides:

> The Action Alternative does not involve any offshore activities, underwater noise generation, or potential discharges into the marine environment, therefore, PHMSA has determined the action will have *no effec*t on species or critical habitats under the National Marine Fisheries Service (NMFS) jurisdiction.[68]

However, PHMSA's conclusion is not accompanied by any analysis, reasoning, or support. The determination does not even list specific marine species, and could not purport to have assessed impacts to them. It likewise makes the glaring error of overlooking the potential impacts of oil spills to marine life, as explained above. Accordingly, such determination is arbitrary and capricious and fails to use the best scientific information available, in violation of Section 7 of the ESA. 16 U.S.C. §§ 1536(a)(1)–(2). This statement in the FONSI does not excuse PHMSA from conducting the required consultation.

### C. PHMSA Failed to Comply with ESA Section 7's Substantive and Procedural Mandates.

By failing to engage in Section 7 consultation with the Services, PHMSA also failed to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). PHMSA must analyze these effects on a species-specific level to

---

[66] Id. at p. 20.
[67] *Id*.
[68] FONSI at 5.

capture the full range of jeopardy and adverse modification which will result from the Special Permit's approval and the operation of the Onshore Pipelines.

Moreover, consultation should typically be completed within 90 days, or another mutually agreeable period of time. 16 U.S.C. § 1536(b)(1)(A). PHMSA issued a Federal Register notice on the Special Permit on February 24, 2026.[69] Therefore, there has been ample time for completion of formal consultation and preparation of a BiOp since the Special Permit was not finalized until June 25, 2026— more than 120 days after the PHMSA notice.

PHMSA's failures to ensure against jeopardy and destruction or adverse modification of critical habitat and complete consultation in a timely manner and prior to taking action violated its section 7 ESA substantive and procedural mandates.

### D. PHMSA Failed to Comply with its ESA Section 7(d) Duties with FWS.

Finally, PHMSA has a duty to ensure that it "shall not make any irreversible or irretrievable commitment of resources. . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). PHMSA's issuance of the Special Permit constituted a violation of section 7(d) because it was predetermined, constituting an irreversible and irretrievable commitment of resources which unreasonably constrained the possible range of alternatives.

The predetermined nature of PHMSA's approval goes even further back than the date PHMSA issued its Special Permit under the flawed national security/energy emergency pretext. For example, on July 25, 2025, the U.S. Department of the Interior issued a press release titled "Interior secures win for American Energy Dominance – safely and timely." The press release announced the restart of SYU oil production and anticipated, despite Sable not having secured many legally-required permits and other approvals for the Onshore Pipelines, "all three platforms in the SYU to be online by the end of 2025, bringing a very successful completion to what has been 10 years of no oil production in the Pacific to essentially full production in just a matter of months, which is an excellent testament to President Trump and Secretary Burgum's drive towards Unleashing American Energy."[70] On January 1, 2026, Secretary of Transportation Sean Duffy's social media account announced that "Oil production at the Las Flores Pipeline off the coast of Santa Barbara is MOVING FORWARD."[71] These actions demonstrate that the federal government already made up its mind to allow Sable to operate the SYU and Onshore Pipelines long before PHMSA issued the Special Permit regardless of the impacts to the surrounding environmental and listed species.

---

[69] PHMSA, Pipeline Safety: Request for Special Permit; Sable Offshore Corp. (Sable), 91 Fed. Reg. 8949 (Feb. 24, 2026).
[70] Bureau of Safety and Environmental Enforcement, Interior secures win for American Energy Dominance – safely and timely (July 25, 2025), available at: https://www.bsee.gov/newsroom/latest news/statements-and-releases/press-releases/interior-secures-win-for-american.
[71] X post attributed to Secretary Duffy, available at https://x.com/SecDuffy/status/2006779162556772680 (last visited July 17, 2026).

PHMSA has made an irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures, in violation of its section 7 ESA mandates.

## V. Conclusion

As outlined in this letter, PHMSA's issuance of a Special Permit absent complete standard consultation with the Services was in violation of Section 7of the ESA. We ask that PHMSA immediately suspend the Special Permit until it comes into compliance with the ESA. We are willing to discuss the appropriate remedy with PHMSA and FWS to ensure the protection of the endangered and threatened species at issue, and their critical habitat. Upon the expiration of the sixty-day notice period, the Noticing Parties intend to file a lawsuit against PHMSA and FWS for the above-referenced violations. Please contact us should you wish to discuss this notice letter in further detail.

Sincerely,

*/s/ Linda Krop*
Linda Krop
Maggie Hall
Jeremy Frankel
ENVIRONMENTAL DEFENSE CENTER
*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

*/s/ Talia Nimmer*
Talia Nimmer
Rachel Mathews
Julie Teel-Simmonds
CENTER FOR BIOLOGICAL DIVERSITY
*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

cc:

Eugenio Piñeiro Soler, Director
National Ocean and Atmospheric Administration
1315 East-West Highway
Silver Spring, MD 20910
eugenio.e.pineirosoler@noaa.gov

Matt McGoogan
National Marine Fisheries
California Coastal Offices
501 West Ocean
Boulevard, Suite 4200
Long Beach, CA 90802
matthew.mcgoogan@noaa.gov

Jennifer Quan, Regional Administrator
National Marine Fisheries Service
West Coast Region
7600 Sand Point Way Northeast
Seattle, WA 98115
jennifer.quan@noaa.gov

Adam Gustafson
Adam.gustafon@usdoj.gov
Robert Stander
robert.stander@usdoj.gov
Rebecca Jaffe
rebecca.jaffe@usdoj.gov
Matthew Oakes
matthew.oakes@usdoj.gov
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044

# APPENDIX A:

## List of Threatened and Endangered Species and Designated Critical Habitat that May be Affected by the Special Permit

Threatened and Endangered Species:

- Arroyo toad – endangered, 59 Fed. Reg. 64859 (Dec. 16, 1994)
- Blue whale -- endangered, 35 Fed. Reg. 18,319 (Dec. 2, 1970)
- Black abalone -- endangered, 74 Fed. Reg. 1,937 (Jan. 14, 2009)
- Blunt-nosed leopard lizard – endangered, 32 Fed. Reg. 4001 (March 11, 1967)
- California condor -- endangered, 32 Fed. Reg. 4001 (March 11, 1967)
- California red-legged frog – threatened, 61 Fed. Reg. 25813 (May 23, 1996)
- California least tern -- endangered, 35 Fed. Reg. 8491 (June 2, 1970)
- Fin whale -- endangered, 35 Fed. Reg. 18,319 (Dec. 2, 1970)
- Giant kangaroo rat – endangered, 52 Fed. Reg. 288 (Jan. 5, 1987)
- Green sea turtle East Pacific DPS – threatened, 81 Fed. Reg. 20057 (May 6, 2016)
- Guadalupe fur seal -- threatened, 50 Fed. Reg. 51,252 (Jan. 15, 1986)
- Hawksbill sea turtle – endangered, 35 Fed. Reg. 8491 (June 3, 1970)
- Humpback whale -- endangered, 35 Fed. Reg. 18,319 (Dec. 2, 1970)
- Least Bell's vireo – endangered 51 Fed. Reg. 16474 (May 2, 1986)
- Leatherback sea turtle – endangered, 35 Fed. Reg. 8491 (June 3, 197)
- Loggerhead turtle, North Pacific DPS -- endangered, 76 Fed. Reg. 58,868 (Oct. 24, 2011)
- San Joaquin kit fox – endangered, 32 Fed. Reg. 4001 (March 11, 1967)

- Southwestern willow flycatcher – endangered, 60 Fed. Reg. 10695 (Feb. 27, 1995)
- Southern California steelhead -- endangered, 71 Fed. Reg. 834 (Jan. 5, 2006)
- Southern sea otter -- threatened, 42 Fed. Reg. 2,965 (Jan. 14, 1977)
- Steller sea lion Western DPS – endangered, 62 Fed. Reg. 24345 (June 4, 1997)
- Tidewater goby -- endangered, proposed to be reclassified as threatened, 59 Fed. Reg. 5,494 (Feb. 4, 1994)
- Vernal pool fairy shrimp – threatened, 59 Fed. Reg. 48136 (Sept. 19, 1994)
- Western snowy plover, Pacific DPS -- threatened, 58 Fed. Reg. 12,864 (Mar. 5, 1993)
- White abalone -- endangered, 66 Fed. Reg. 29054 (June 28, 2001)

Designated Critical Habitat:

- Arroyo toad critical habitat, 76 Fed. Reg. 7245 (Feb. 9, 2011)
- California red-legged frog critical habitat, 75 Fed. Reg. 12816 (March 17, 2010)
- Southern California steelhead critical habitat, 71 Fed. Reg. 834 (Jan. 5, 2006)
- Southwestern willow flycatcher critical habitat, 78 Fed. Reg. 344 (Jan. 3, 2013)

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Petition for Review, inclusive of Exhibits A through G, on September 22, 2026, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

I certify that I served the foregoing documents via email to all registered case participants on September 22, 2026, because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

I certify that I served the foregoing documents on September 22, 2026, by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Doug Burgum, Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Office of the Director
U.S. Fish and Wildlife Service
Main Interior
1849 C Street, NW, Room 3331
Washington, DC 20240

Todd Blanche
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

*/s/ Jeremy Frankel*
Jeremy Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Petitioners*
*Environmental Defense Center, Get*
*Oil Out!, Santa Barbara County*
*Action Network, Sierra Club, and*
*Santa Barbara Channelkeeper*