No. 26-4629
Consolidated with Nos. 25-8059, 26-508, 26-6190
Judges Paez, Tallman, and Bennett, Circuit Judges

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, ET AL.,

*Respondents*

# PETITIONER'S OPENING BRIEF

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
*Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA C. MORRISON
*Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
*Attorneys for Petitioner*

November 9, 2026

# TABLE OF CONTENTS


**Page**

Introduction ..... 1

Jurisdictional Statement ..... 3

Statement of the Case ..... 3

A. Pipelines CA-324/325 ..... 3

B. Disputes over restarting the pipelines after Sable's purchase ..... 6

C. Procedural History ..... 9

Issues Presented ..... 9

Summary of Argument ..... 9

Standard of Review ..... 12

Argument ..... 13

I. California Has Standing to Challenge PHMSA's Jurisdictional Determination as a Final Agency Action ..... 13

II. PHMSA's Assertion of Jurisdiction Over Lines CA-324/325 Under Its Continuous Carriage Theory Is Contrary to Law ..... 14

A. The PSA Defines Intrastate Pipelines by Reference to Their Geographic Footprint ..... 15

B. PHMSA's New Jurisdictional Determination Disregards the Material Distinction Between *Interstate Commerce* Under the Commerce Clause and *Interstate Pipelines* Under the PSA ..... 21

C. PHMSA's Interpretation Is Inconsistent with Its Own Regulations and Past Practices ..... 24

III. PHMSA Failed to Correctly Analyze the LFC Facilities and the Importance of the Tasks They Perform ..... 29

**TABLE OF CONTENTS**
**(continued)**

**Page**


A. PHMSA Failed to Consider Industry-Standard Definitions and Its Own Regulations, Which Categorize the Las Flores Canyon Facilities As Production Facilities ..... 30

B. Resort to Dictionary Definitions for “Production, Refining and Manufacturing” Would Also Lead to the Conclusion that the LFC Facilities Interrupt Continuous Carriage ..... 35

C. Even if a Continuous Carriage Interpretation Were Correct, Lines CA-324/325 Would Not Be Interstate Pipelines ..... 37

1. The Emulsion Delivered to the LFC Is Not the Same Liquid Transported Through Lines CA-324/325 ..... 37

2. Even if the Emulsion and Crude Oil Might Be in Continuous Carriage, PHMSA Failed to Complete the Required Analysis ..... 38

3. PHMSA Failed to Consider Evidence in the Record That the LFC Facilities Are Not Pipeline Facilities under the PSA ..... 40

IV. The Jurisdictional Determination Is Arbitrary and Capricious Because it Failed to Conduct the Analysis Required to Justify a Change in Position ..... 41

Conclusion ..... 45

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*
249 U.S. 134 (1919)....................37, 38

*Barton v. Off. of Navajo*
125 F.4th 978 (9th Cir. 2025)....................13, 39, 43

*Commodity Futures Trading Comm'n v. Schor*
478 U.S. 833 (1986)....................24

*Dep't of Com. v. New York*
588 U.S. 752 (2019)....................13

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)....................42

*Flowers Foods, Inc. v. Brock*
608 U.S. 380 (2026)....................*passim*

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*
604 U.S. 542 (2025)....................12

*Goldberg v. Faber Indus., Inc.*
291 F.2d 232 (7th Cir. 1961)....................38

*In re Pac.-Atl. Trading Co.*
64 F.3d 1292 (9th Cir. 1995)....................17

*Kelley v. Rhoads*
188 U.S. 1 (1903)....................34

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024)....................12, 14, 24

*Maryland v. Louisiana*
451 U.S. 725 (1981)....................34

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) .......... 42

*Neumann's Pharmacy, L.L.C. v. DEA*
167 F.4th 320 (5th Cir. 2026) .......... 30

*Park v. Garland*
72 F.4th 965 (9th Cir. 2023) .......... 12

*Roberts v. Levine*
921 F.2d 804 (8th Cir. 1990) .......... 39

*SEC v. Chenery Corp.*
318 U.S. 80 (1943) .......... 12

*Snoqualmie Indian Tribe v. FERC*
545 F.3d 1207 (9th Cir. 2008) .......... 13

*Southern Pacific Pipe Lines v. U.S. Dep't of Transp.*
796 F.2d 539 (D.C. Cir. 1986) .......... 19, 43

*Texaco Inc. & Subsidiaries v. Comm'r*
101 T.C. 571 (1993) .......... 44

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*
578 U.S. 590 (2016) .......... 14

*United States v. Approximately 64,695 Pounds of Shark Fins*
520 F.3d 976 (9th Cir. 2008) .......... 15

*Wyeth v. Levine*
555 U.S. 555 (2009) .......... 14

## TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

5 U.S.C.
§ 702 ........ 13
§ 706(2)(A) ........ 13

49 U.S.C.
§ 60101(a)(5) ........ 16
§ 60101(a)(7) ........ 15, 16
§ 60101(a)(8)(B) ........ 16
§ 60101(a)(8)(B)(i) ........ 18, 26, 27
§ 60101(a)(8)(B)(ii) ........ 18, 19
§ 60101(a)(10) ........ 19, 22, 28
§ 60101(a)(17) ........ 3
§ 60101(a)(22)(B) ........ 36
§ 60101(a)(22)(B)(ii) ........ 31, 32, 36
§ 60101(a)(22)(B)(iii) ........ 36
§ 60104(c) ........ 15, 16, 17, 22
§ 60105(a) ........ 14
§ 60107(8)(B) ........ 16
§ 60107(10) ........ 16
§ 60119(a)(1) ........ 3
§ 60119(a)(3) ........ 12

50 U.S.C. § 4501 *et seq.* ........ 7

California Health and Safety Code §§ 25270-25270.13 ........ 40

Pub. L. 103-272, 108 Stat. 745 (1994) ........ 24

Pub. L. 114-183, 130 Stat 514 (2016) ........ 24

**OTHER AUTHORITIE**

49 C.F.R.
§ 195.2 ........ 4, 31, 33
Part 195, Appendix A ........ 7, 24, 25

## TABLE OF AUTHORITIES
## (continued)

**Page**

50 Fed. Reg. 15,895 (Apr. 23, 1985) ........ 24

50 Fed. Reg. 39,008 (Sep. 26, 1985) ........ 21

51 Fed. Reg. 15,005 (Apr. 22, 1986) ........ 31, 33

Black's Law Dictionary (5th ed. 1979) ........ 35, 36

Webster's New Collegiate Dictionary (1977) ........ 36, 38

## INTRODUCTION

The Las Flores Pipelines (Lines CA-324/325) begin and end in California, never leaving the State. Recognizing this reality, the Pipeline and Hazardous Materials Safety Administration (PHMSA) had classified Lines CA-324/325 as *intra*state pipelines subject to state safety regulation. But in December 2025, PHMSA abruptly reversed this decade-old determination classifying Lines CA-324/325 as *inter*state pipelines subject to federal, and not state, safety regulation. PHMSA attempted to justify this reversal by recharacterizing the relevant "pipeline facility" as including both the onshore processing facility that connects to Line CA-324, as well as the undersea pipeline that connects offshore platforms to that processing facility. According to PHMSA, because the geographic footprint of this entire combined system extends beyond California's borders, Lines CA-324/325 must be interstate pipelines. In this analysis, PHMSA used the correct,—geographic-footprint—rule but incorrectly applied that rule to the facts. California challenged the December 17, 2025 Federalization Order  in *California v. PHMSA*, Case No. 26-508 (*PHMSA I*).

Then, in June 2026, PHMSA made a new jurisdictional determination. Unlike PHMSA's earlier determination, this one does not turn on the pipeline facility's geographic footprint. Instead, it is based on where the substances in the pipeline originated. This reasoning  deviates from years of agency practice and lacks

reasoned elaboration. As illustrated by PHMSA's own published guidance, a pipeline's designation is based on its physical location—not the pre-pipeline origin or post-pipeline destination of the hazardous liquid inside the pipeline.

While agencies are generally permitted to reverse their positions, they must do so in accordance with the law. Here, PHMSA's reversals fail for two reasons:

First, PHMSA's new interpretation of the Pipeline Safety Act (PSA) is contrary to the statute's text, structure, purpose, and history, all of which support a geographic footprint rule. PHMSA rests its erroneous interpretation on judicial decisions interpreting and applying the Constitution's Commerce Clause and other statutes. But Congress enacted unique definitions of the terms into the text of the PSA that PHMSA's interpretation ignores.

Second, PHMSA's decision is arbitrary, capricious, and lacks support. The evidence PHMSA considered—and the evidence PHMSA ignored—demonstrates that Lines CA-324/325 are intrastate pipelines under any reasonable interpretation of the PSA and implementing regulations.

Either of these errors suffices to sustain California's challenge to PHMSA's jurisdictional determination under the Administrative Procedure Act. If PHMSA's flawed determination is allowed to stand, it will create an unstable and unpredictable system where states cannot discern where their jurisdiction begins and ends. It may, as a result, convert the vast majority of pipelines presently

designated as intrastate into interstate pipelines, stripping states of their long-recognized regulatory authority.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 49 U.S.C. § 60119(a)(1). *See also* 49 U.S.C. § 60101(a)(17). This petition was timely filed on July 20, 2026, within 89 days of the June 25, 2026, Special Permit and Jurisdictional Determination.

## STATEMENT OF THE CASE

This is the second case addressing PHMSA's determination that Lines CA-324/325 are interstate. Because the Court is familiar with the background from California's opening brief in *PHMSA I*, California Br. (No. 26-508, Dkt. 23.1) at 4-19, this brief focuses on aspects that were either not discussed in prior briefing or merit additional discussion in light of PHMSA's June 25 jurisdictional determination (Jurisdictional Determination), 1-CalER2-2-21.

### A. Pipelines CA-324/325

Lines CA-324/325 are three pipeline segments that connect the Las Flores Canyon processing facilities (the LFC Facilities) in Santa Barbara County to Pentland Station in Kern County, California. The first segment, CA-324, runs along the California coast from the LFC Facilities to the Gaviota pump station. The second, CA-325A runs from the Gaviota pump station through Gaviota State Park to the Sisquoc pump station, where it meets the (presently inactive) Phillips 66

Sisquoc pipeline. The third and final segment, CA-325B, continues from Sisquoc to Pentland Station. 1-CalER-2-8, 65-68.

Presently, Lines CA-324/325 transport crude oil distilled from the output of three offshore platforms known as the Santa Ynez Unit (SYU), located in federal waters off the coast of California. 1-CalER2-65. Three undersea pipelines connect the SYU to shore. Two undersea pipelines carry (i) gas, and (ii) an emulsion containing water, crude oil, gas, other hydrocarbons, and sulfur[1] from the SYU to the LFC Facilities, where the emulsion is separated into its component parts. 1-CalER2-7 (Jurisdictional Determination), 48-49 (quoting Sable's state court complaint). The third returns water stripped from the emulsion back to the offshore platforms for reinjection into the undersea reservoir. 1-CalER2-293.

At the LFC Facilities, the emulsion undergoes a multi-step process including "stabilization" and "separation," without which the petroleum would not be marketable. *See* 49 C.F.R. § 195.2. The emulsion first arrives at the "LFC Oil & Water Treating Facilities." 1-CalER2-293. Those facilities "treat the oil, gas, water and other by-products to acceptable product quality specifications prior to shipment by pipeline or truck to their destinations." 1-CalER2-290. The oil treating plant then "dehydrates, stabilizes, and sweetens the crude oil[.]"[2] *Id*. Next, water

[1] This pipeline is known as the "Offshore Emulsion Pipeline."
[2] Sweetening, in the context of crude oil, refers to reducing the sulfur content.

separated from the emulsion is "filtered, degassed, and biologically treated with anaerobic bacteria to reduce dissolved oil and grease so that it is suitable for ocean disposal." 1-CalER2-290. Lastly, the facilities remove and compress gas. 1-CalER2-293. Once the emulsion has been treated at the LFC Oil & Water Treating Facilities, the resulting sales-quality crude oil is delivered to the LFC Transportation Terminal for shipment through Lines CA-324/325. *See* 1-CalER2-290. Gas is transported by pipeline to nearby facilities; propane and butane are transported by truck; and sales-quality crude oil is transported through Lines CA-324/325 to Pentland Station in Kern County. 1-CalER2-48-49, 290, 293.

In 2015, CA-324 ruptured due to corrosion, causing the Refugio Oil Spill. 1-CalER2-69, 45-46, 185. The pipelines' owner at the time, Plains All American Pipeline L.P., entered into a court-issued consent decree with federal and state agencies, including PHMSA. 1-CalER2-189-90. The Consent Decree recognized Lines CA-324/325 as intrastate pipelines and required that California's pipeline safety regulator, the Office of the State Fire Marshal (OSFM), approve a restart plan.[3] 1-CalER2-233, 260, 276-81.

[3] This brief does not discuss arguments concerning the Consent Decree. In California's view, this issue has been adequately addressed in the briefs in the preceding case and in California's Response to 28j Letter, filed September 4, 2026.

### B. Disputes over restarting the pipelines after Sable's purchase

Sable Offshore Corporation (Sable) acquired Lines CA-324/325 while they were inactive. 1-CalER2-137. Rather than replace Lines CA-324/325 or modify them to enable an effective anti-corrosion system, Sable proposed an alternative maintenance plan that requires ongoing testing and remediation of the pipelines. 1-CalER2-151-52, 166-67. Sable then sought approval of "state waivers" from OSFM to operate Lines CA-324/325 without a working anti-corrosion system. *Id.* OSFM approved the State Waivers, and PHMSA concurred in OSFM's decision. *Id.*, *see also* 1-CalER2-147-50. The State Waivers were the first of two steps required to restart operations. 1-CalER2-260, 276-81.

But in the fall of 2025, while its review of the restart plan was ongoing, OSFM informed Sable that it had not met the State Waivers' required terms because Sable had failed to remediate certain portions of Lines CA-324/325 with elevated levels of corrosion. 1-CalER2-290145-56. OSFM identified the steps Sable needed to take for its restart plan to be approved. *Id.*

Rather than attempting to remediate the corrosion, Sable contacted PHMSA to request that the federal government displace OSFM as the safety regulator for Lines CA-324/325. 1-CalER2-290 137-40. In December 2025, PHMSA obliged, issuing (1) a Federalization Order asserting federal jurisdiction over Lines CA-324/325, (2) the Restart Plan approval, and (3) an Emergency Special Permit

(ESP).[4] 1-CalER2-108-14. PHMSA concluded that the Offshore Emulsion Pipeline, the LFC Facilities, and Lines CA-324/325 were, together, "a single pipeline system." 1-CalER2-112. At the time, PHMSA explained that this pipeline facility "transports crude oil from the [Outer Continental Shelf] to an onshore processing facility at Las Flores Canyon and continues transportation of crude oil from Las Flores Canyon to Pentland, California." 1-CalER2-113. Based on this *single facility* interpretation, PHMSA concluded that the facility crosses a state line—the line between California state waters and the OCS (*i.e.*, federal waters)—and therefore was an interstate pipeline. 1-CalER2-1123-14 (citing 49 C.F.R. Part 195, Appendix A, Example 7). But the December 2025 Federalization Order did not enable lawful restart of Lines CA-324/325. At that time, Sable was prohibited from restarting Lines CA-324/325 without OSFM's approval by both the court-issued Consent Decree and a preliminary injunction imposed by the Santa Barbara County Superior Court.

Sable then requested that Secretary of Energy Chris Wright invoke the Defense Production Act, 50 U.S.C. § 4501 *et seq.*, to command it to restart production. *See* 50 Op. O.L.C ___ (March 3, 2026), 2026 WL 712392, at 2 (citing

---

[4] Sable never operated Lines CA-324/325 under the ESP, as it expired prior to the restart. *See* Sable Feb 13 Ltr at 1.

letter by Sable's counsel[5]). Secretary Wright granted that request, issuing an order on March 13, 2026, which PHMSA and Sable interpret as directing Sable to restart Lines CA-324/325. 1-CalER2-24.[6] Shortly thereafter, Sable restarted the pipelines. Beginning with its restart and continuing until the issuance of the Special Permit, Sable operated Lines CA-324/325 while out of compliance with federal pipeline safety regulations, and without either state or federal permission to operate the pipelines out of compliance with those safety regulations.

On June 25—12 days before the hearing in *PHMSA I*—PHMSA issued a special permit (the Special Permit) to Sable. 1-CalER2-22. Included in the permit is a document identified as the Jurisdictional Determination, which, according to PHMSA, supersedes the Federalization Order. 1-CalER2-19-20. The Jurisdictional Determination provides a different rationale for federal jurisdiction than the Federalization Order. It turns not on the geographic footprint of the relevant pipeline facility, but on whether the crude oil in the pipelines makes an interstate journey—regardless of whether the interstate portion of the journey involves the pipeline at issue. 1-CalER2-19. To support this conclusion, the Jurisdictional

[5] Although the U.S. has repeatedly cited to this letter, *see, e.g.*, Opp'n to Motion for Preliminary Injunction, *California v. Wright*, C.D. Cal., No. 2:26-cv-03396, Dkt. 23-1 at 11 n.6, 26 n.1 (filed May 11, 2026), it appears that neither the U.S. nor Sable has disclosed it in any public filing or administrative record.

[6] California is separately challenging the legality of the Wright Order in *California v. Wright*, Case No. 26-5409.

Determination discusses appellate court precedents arising under the Commerce Clause and other statutes unrelated to pipelines. 1-CalER2-16-19; *see infra* p. 24. The Jurisdictional Determination concludes that Lines CA-324/325 are interstate pipelines because they carry crude oil that was originally extracted in federal waters.

### C. Procedural History

California initially challenged PHMSA's December 2025 Federalization Order in *California v. PHMSA*, Case No. 26-508 (*PHMSA I*). That matter is submitted. California petitioned for review of the Special Permit on July 20, 2026. After a status conference, this Court bifurcated the challenge to the Jurisdictional Determination to be briefed and decided first, to be followed, if necessary, by all other grounds challenging the Special Permit.

## ISSUES PRESENTED

1. Are Lines CA-324/325 intrastate pipelines under the PSA, and therefore not subject to PHMSA's jurisdiction?

2. Was PHMSA's June 2026 Jurisdictional Determination arbitrary, capricious, or contrary to law?

## SUMMARY OF ARGUMENT

In PHMSA's December 2025 Federalization Order, PHMSA redefined the relevant "pipeline facility" to include the Offshore Emulsion Pipeline, the onshore LFC Facilities, and the onshore pipelines known as Lines CA-324/325. PHMSA

then concluded that the re-defined facility extends beyond California's waters, and therefore was an interstate pipeline. 1-CalER2-113. But in the subsequent June 2026 Jurisdictional Determination—the order challenged here—PHMSA adopted a different position: because the crude oil transported in Lines CA-324/325 is "in commerce" from federal waters to Pentland Station, Lines CA-324/325 are interstate pipelines. *See* 1-CalER2-12. PHMSA's new position fails because (a) its new legal interpretation of the PSA is incorrect, and (b) PHMSA failed to conduct the required analysis to support its decision, as required by the APA.

First, PHMSA's new interpretation of the PSA, announced in the June 2026 Jurisdictional Determination, disregards its long-standing interpretation of the PSA. Under PHMSA's prior interpretation, the interstate or intrastate status of a hazardous liquid pipeline turns on the pipeline's geographic footprint. This prior interpretation gives meaning to the unique definitions of interstate hazardous liquid pipelines in the PSA, which differ from definitions in other statutes and interpretations of the Commerce Clause. The geographic footprint interpretation also comports with PHMSA's long-standing regulations, guidance, and practice. PHMSA's abrupt reversal, if accepted, would undermine the purpose of the intrastate pipeline provisions in the PSA, which Congress included to preserve a meaningful role for states. It would also introduce tremendous uncertainty as to the classification  of other pipelines in California and states beyond.

Second, PHMSA's reversal fails to comply with the APA. PHMSA failed to explain how both its new interpretation and its application of that decision comport with PHMSA's own regulations, or how its conclusions are compatible with the undisputed facts concerning the LFC Facilities. Even applying PHMSA's new interpretation of the PSA, PHMSA fails to support its decision that Lines CA-324/325 are interstate. PHMSA claims that the same liquid transported from the offshore platforms travels through Lines CA-324/325, but ignores the fact that the emulsion that enters the LFC Facilities is a fundamentally different product than the marketable crude oil that is transported through Lines CA-324/325. At the LFC Facilities, the emulsion is separated into component parts, with most components going elsewhere. Only a minority of what enters the LFC Facilities in the Offshore Emulsion Pipeline is transformed into the sales-quality crude oil shipped through Lines CA-324/325. This transformation of the liquid represents a break in "continuous carriage," indicating that PHMSA's own theory of a single "interstate journey" is unsupported by the facts. An analysis of record documents and other information made publicly available by federal agencies is more than enough to conclude that Lines CA-324/325 are intrastate pipelines.

Finally, PHMSA shifted its interpretation of the PSA without acknowledging the change or providing the legally-required explanation. PHMSA also failed to

explain how both its new interpretation and its application of that decision comport with PHMSA's own regulations. They do not.

## STANDARD OF REVIEW

Judicial review of agency actions under the PSA, 49 U.S.C. § 60119(a)(3), are reviewed under the standards set forth in the APA. "Under the *Chenery* doctrine, reviewing courts . . . generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Park v. Garland*, 72 F.4th 965, 977 (9th Cir. 2023) (cleaned up). This includes the agency's interpretation of statutes. Courts do not affirm agency actions based on alternate interpretations that did not form the basis for agency action in the first place. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590-91 (2025) (discussing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).[7] If the agency's interpretation of its own jurisdictional statute is incorrect, the agency action should be vacated. *Id.* at 591.

---

[7] Sable contended that, as to the agency's interpretation of a statute, *Chenery* is incompatible with *Loper Bright*. Sable Supp. Br. (No. 26-508, Dkt. 111.1) at 11. But the Supreme Court has unanimously maintained the application of *Chenery* to the agency's interpretation of a statute. *Wages & White Lion*, 604 U.S. at 591 ("[T]he FDA has not identified any prior case in which we have held that the application of an erroneous understanding of the governing law was harmless because a subsequent agency decision shows that the agency would have reached the same result if it had applied the correct understanding of the law.").

The agency's interpretation or application of a statute, including its statutory mandate, is a question of law reviewed de novo. *See Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1212 (9th Cir. 2008).

The agency's decisionmaking must not be "arbitrary, capricious, an abuse of discretion." 5 U.S.C. § 706(2)(A). To survive a challenge, the agency must articulate "a satisfactory explanation" connecting the facts to its decision. *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (citation omitted). "[A] decision is arbitrary and capricious when it . . . entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency[.]'" *Barton v. Off. of Navajo*, 125 F.4th 978, 982 (9th Cir. 2025).

## ARGUMENT

### I. CALIFORNIA HAS STANDING TO CHALLENGE PHMSA'S JURISDICTIONAL DETERMINATION AS A FINAL AGENCY ACTION

The APA grants a right of judicial review of final agency action. 5 U.S.C. § 702. The Jurisdictional Determination is a final agency action in that, according to PHMSA, it "confirms and supersedes" the prior final agency action, i.e., the Federalization Order. *See* 1-CalER2-3. The Jurisdiction Determination therefore

marks the conclusion of PHMSA's decisionmaking process. *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597-98 (2016).[8]

California has standing to challenge the Jurisdictional Determination because it displaces OSFM as the pipeline safety regulator for Lines CA-324/325. 1-CalER2-114 (notifying OSFM that it is displaced as safety regulator).

## II. PHMSA'S ASSERTION OF JURISDICTION OVER LINES CA-324/325 UNDER ITS CONTINUOUS CARRIAGE THEORY IS CONTRARY TO LAW

This Court interprets statutes de novo. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024), *see also Wyeth v. Levine*, 555 U.S. 555, 577 (2009) ("agencies have no special authority to pronounce on pre-emption absent delegation by Congress . . . ."). In designating Lines CA-324/325 as an interstate pipeline facility under the PSA, PHMSA exceeded its jurisdiction, unlawfully displacing OSFM as the pipelines' safety regulator. *See* 49 U.S.C. § 60105(a) ("[T]he Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility . . . to the extent that the safety standards and practices are regulated by a State authority . . . .").

As California explained in its earlier briefs, the text, structure, purpose, and history of the PSA establishes that the statute characterizes a pipeline as intrastate

---

[8] Alternatively, if the Jurisdictional Determination is not itself a final agency action, it is a necessary component of the Special Permit, which is a final agency action. 1-CalER2-23.

or interstate based on its geographic footprint: A pipeline that is located entirely within a single state is an intrastate pipeline. California Br. (No. 26-508, Dkt. 23.1) at 25, 31-32. PHMSA's new Jurisdictional Determination flips this concept on its head by now relying on an erroneous continuous carriage rule that looks to the entire journey—including outside the pipeline in question—of any of the material carried by the pipeline.[9]

### A. The PSA Defines Intrastate Pipelines by Reference to Their Geographic Footprint

"In determining the meaning of a statute, we first look to the language of the statute itself." *See United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008). The PSA provides for state safety regulation of "intrastate pipeline facilities," under certain conditions, while preempting such regulation of "interstate pipeline facilities." 49 U.S.C. § 60104(c). An "interstate hazardous liquid pipeline facility" is one "used to transport hazardous liquid" (including oil) "in interstate or foreign commerce." 49 U.S.C. § 60101(a)(7). The PSA contains a unique definition of "interstate or foreign commerce" when

[9] PHMSA does not use the term "continuous carriage" in the Jurisdictional Determination, but relies extensively on *Flowers Foods, Inc. v. Brock*, 608 U.S. 380 (2026), which is a case analyzing continuous carriage. 1-CalER2-19 (discussing *Flowers Foods*). Simplified, a liquid is in continuous carriage when that liquid, in materially the same form, from the beginning to the end of its journey.

"related to hazardous liquid"[10] as being "commerce between . . . a place in a State and a place outside that State" or "through a place outside the State," *id.* § 60107(8)(B). All other hazardous liquid pipeline facilities are "intrastate." *Id.* § 60107(10).

The central inquiry in this case arises from the combination of two definitions in subdivisions (a)(7) and (a)(8)(B). Together, these subdivisions read:

> "[I]nterstate hazardous liquid pipeline facility" means a hazardous liquid pipeline facility used to transport hazardous liquid in [commerce between--(i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State].

49 U.S.C. § 60101(a)(7), (8)(B).

This means the *pipeline facility* itself is used to transport between places in two states or the *pipeline facility* itself travels through another state. California Br. (No. 26-508, Dkt. 23.1) at 25, 31-32 n.9. More simply, an interstate pipeline facility itself is used to move something across a state line. Thus, States may regulate pipeline safety, subject to the conditions in 49 U.S.C. § 60104(c), where the pipeline's footprint remains inside one State.

This makes perfect sense. After all, the object of safety regulation here is the "facility," including "a pipeline." 49 U.S.C. § 60101(a)(5). If the entirety of the

[10] For a discussion of the comparison with the gas provisions of the PSA—and why the comparison supports California's position—*see* California Br. (No. 26-508, Dkt. 23.1) at 31-34.

facility is in one State, that State may impose more stringent safety regulations. *Id.* § 60104(c). If part of the facility is located in another State, however, only a federal entity can ensure that the entire facility is regulated consistently. Congress' clear geographic footprint rule sensibly avoids a scenario in which two States could attempt to impose different, and even conflicting, safety requirements on the same facility, simply because parts of it fall within each State's boundaries. Conversely, under PHMSA's new, atextual interpretation, a pipeline could be categorized as interstate even if located entirely within one state so long as some of the liquid it carries is transported across a state line before it enters, or after it leaves, the pipeline.

Faced with two interpretations of a statute, one that gives meaning to all provisions in a statute, and another that renders a provision surplusage, this Court should select the interpretation that gives meaning to all provisions. *In re Pac.-Atl. Trading Co.*, 64 F.3d 1292, 1303 (9th Cir. 1995) ("A statute should be read to give meaning to all of its parts."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (no provision in a statute "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence" (cleaned up)). California's interpretation passes this test; PHMSA's does not.

Under the geographic footprint rule, all parts of subsections (a)(7), (a)(8), and (a)(10) have meaning. Consider the examples on the following map, prepared by counsel:

*Figure 1: Examples of Geographic Footprint*




In Figure 1, following a geographic footprint rule, the straight line from A to B, from California to Nevada, is interstate. *See* 49 U.S.C. § 60101(a)(8)(B)(i). The curved line from C to D, from California to California through Nevada, is interstate. *See id.* § § 60101(a)(8)(B)(ii). And the straight line from E to F, from

California to California, only within California, is *intra*state. *See id.* § 60101(a)(10). The three lines illustrate that each of the three provisions in the statute have unique meaning.

By contrast, under PHMSA's continuous carriage rule, the only inquiry is whether some or all of the hazardous liquid that a pipeline carries—not the pipeline itself—*ever* crosses a state line. Once some or all of the liquid crosses a state line once, even if that occurs before or after the travel through the pipeline in question, the inquiry is over, and the pipeline, regardless of whether it is physically located in only one state, is interstate. This renders subpart (ii) of the definition of "interstate or foreign commerce" meaningless. *See* 49 U.S.C. § 60101(a)(8)(B)(ii). Any liquid that crossed the first state line would fall under the definition in subpart (i), so there would be no need for subpart (ii) addressing crossing back into the origin state. Rendering an entire provision meaningless is contrary to accepted principles of statutory interpretation.

Considering the broader goals of Congress, the D.C. Circuit reached a similar conclusion in *Southern Pacific Pipe Lines v. U.S. Dep't of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986). As explained in California's briefing in *PHMSA I*, the D.C. Circuit correctly assessed that Congress intended to preserve a meaningful role for states in pipeline safety regulation. California Reply Br. (No. 26-508, Dkt. 93.1) at 11 n.8, 13-14. When Congress opts not to preempt state regulation, it does so to

preserve state police powers. And PHMSA failed to explain why Congress would have intended the authority to protect residents from safety threats posed by in-state facilities to turn on where particular materials ultimately originate or end up. The court rejected Southern Pacific's proposed interpretation because it would have shrunk the category of intrastate pipelines to few, if any, pipelines. *Id.* The same logic applies to PHMSA's new approach, which would transform pipelines located entirely within a state from intrastate to interstate so long as there is some liquid that originated outside of the state in the pipeline.

The implications of this are substantial for California, but more dramatic for states that produce no or very little oil.[11] Under PHMSA's approach, states without oil wells or refineries could not regulate pipelines located entirely within the state's boundaries because those pipelines necessarily carry oil originated in other states.

PHMSA's rule would also be challenging to administer because pipelines carry oil from different sources. For example, Lines CA-324/325 terminate at Pentland Station, far from any refinery. Further delivery of crude oil requires travel through another pipeline to reach refineries. That other pipeline might also carry crude oil produced onshore in California. Under PHMSA's definition, a pipeline

[11] It appears this number changes from year to year. In 2022, 18 states had no oil production, and another 8 states produced under 1 million barrels each. *See* U.S. Energy Information Administration, Oil and Petroleum Products Explained: *Where Our Oil Comes From*, https://www.eia.gov/energyexplained/oil-and-petroleum-products/where-our-oil-comes-from.php.

from Pentland to a refinery might switch between interstate and intrastate status depending on whether Sable's system is operating or idled for maintenance. This would needlessly introduce uncertainty into an otherwise clear and administrable system of interstate and intrastate designations.

PHMSA's predecessor, the Research and Special Projects Administration (RSPA), agreed, attesting "that a particular pipeline facility does not change its character depending on the character of the shipment at a particular time." 50 Fed. Reg. 39,008, 39,011. That view is incompatible with PHMSA's current approach to classify Lines CA-324/325.

### B. PHMSA's New Jurisdictional Determination Disregards the Material Distinction Between *Interstate Commerce* Under the Commerce Clause and *Interstate Pipelines* Under the PSA

PHMSA's interpretation not only reaches the incorrect conclusion, but erroneously conflates the concepts of *interstate commerce* under the Commerce Clause and *interstate pipelines* under the PSA. PHMSA concludes that Lines CA-324/325 are interstate because "the crude oil remains in interstate commerce at least until it reaches Pentland Station." 1-CalER2-18. PHMSA refers to this as the "essential character" of the commerce, not the nature of the facility itself. *Id*. In support, PHMSA relies on *Flowers Foods v. Brock*, 608 U.S. 380 (2026), a case

premised on the journey that foods traveled from production to market, not the geographic footprint of any facility.[12] 1-CalER2-11-12, 19.

PHMSA correctly notes that the PSA contains two different uses of the term "interstate," but fails to address the distinction between the two uses. First, the PSA governs all hazardous liquid pipelines "*in or affecting* interstate or foreign commerce." 1-CalER2-13 (emphasis original). Congress uses this phrase—*in or affecting*—to reach the full extent of the Commerce Clause. *Id*. (citing *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115-16 (2001)). As a result, all hazardous liquid pipelines that have any impact on interstate commerce—regardless of their geographic footprint—must comply with "minimum standards" prescribed under the PSA. *See* 49 U.S.C. § 60104(c). And pipelines with no effects on interstate commerce are simply uncovered by the statute.

As to the pipelines it does cover (including all pipelines that affect interstate commerce), the PSA distinguishes between interstate and intrastate *pipelines*, and expressly provides that state regulators may impose and administer additional, more stringent safety standards for intrastate pipelines. 49 U.S.C. §§ 60101(a)(10), 60104(c).

[12] If there was any ambiguity in PHMSA's Jurisdictional Determination, PHMSA erased that ambiguity in its Supplemental Brief. PHMSA Supp. Br. (No. 26-508, Dkt. 109.1) at 4 ("*Flowers Foods* provides the governing rule.")

PHMSA's Jurisdictional Determination ignores the importance of this distinction: Congress understood that interstate and intrastate pipelines are two subsets of pipelines *in or affecting* interstate commerce. But PHMSA's Jurisdictional Determination repeatedly relies on cases that define interstate commerce by reference to the Congress' power to regulate interstate commerce and the negative implication of that power as a restraint on states (*i.e.*, the dormant Commerce Clause). 1-CalER2-12-13, 17-18 (citing, *e.g.*, *Illinois Cent. R. Co. v. De Fuentes*, 236 U.S. 157, 163 (1915) (addressing "an unlawful attempt to regulate interstate commerce") and *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 376 (1922) (addressing implications of Commerce Clause for local taxation)). While these cases may be relevant to the reach of PHMSA's minimum safety standards—which apply to *both* interstate and intrastate pipelines—they are not relevant to the reach of PHMSA's exclusive jurisdiction.

PHMSA also relies on cases interpreting other statutes, most notably the Federal Arbitration Act. 1-CalER2-10, 19 (discussing *Flowers Foods*, 608 U.S. at 387). But PHMSA's reliance on other statutes fails because these statutes contain different definitions and address different industries. *See* California Br. (No. 26-508, Dkt. 23.1) at 31-31 n.9, California Supp. Br. (No. 26-508, Dkt. 105.1) at 2-5. Cases interpreting the FAA rely on precedents interpreting the Commerce Clause as of the enactment of the FAA in 1925. *See, e.g.*, *Flowers Foods*, 608 U.S. at 388.

PHMSA has not stated and California has not discerned any reason why the understanding of the Commerce Clause as of 1925 would inform the meaning of the PSA, enacted in 1979. Absent good reason, this Court should disregard PHMSA's reliance on cases interpreting different statutes.

### C. PHMSA's Interpretation Is Inconsistent with Its Own Regulations and Past Practices

Agency actions are also evidence of the PSA's meaning because Congress re-enacted and amended the PSA several times. In those amendments, Congress never amended the statute to reject the use of geographic footprint for interstate vs. intrastate pipeline determinations. *See, e.g.*, Pub. L. 114-183, 130 Stat 514 (2016), Pub. L. 103-272, 108 Stat. 745 (1994). These statutory amendments post-date the promulgation of regulations and guidance in the 1980s. *See* 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985) (discussing guidance codified at 49 C.F.R. Part 195, Appendix A). "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (cleaned up); *see Loper Bright*, 603 U.S. at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) ("interpretations issued contemporaneously with the statute at issue, and which

have remained consistent over time, may be especially useful in determining the statute's meaning.").

The regulations and guidance promulgated by PHMSA's predecessor, RSPA, confirm the geographic footprint rule is the correct understanding of the PSA. PHMSA's Jurisdictional Determination comes close to acknowledging this, describing the U.S. Department of Transportation as having made changes to its regulations to clarify that pipelines were interstate only if they (a) were common carriers regulated by the Federal Energy Regulatory Commission (FERC), or (b) originated outside of the state (in this case, originating in federal waters). 1-CalER2-5-6. RSPA and later PHMSA instructed states to follow the diagrams in Appendix A to 49 C.F.R. Part 195, which now contains 10 "examples" shown on 12 maps. Neither the regulations nor the maps support the continuous carriage rule that PHMSA now advances. Instead, they are consistent with the geographic footprint rule, with an exception for pipelines within a state that are both (a) connected to a pipeline that connects to another state, and (b) subject to a FERC tariff (*i.e.*, a federally-approved rate schedule for interstate transportation).

First, consider PHMSA's Example 2 below. The pipeline from C to D crosses a state line and is interstate regardless of the absence of a FERC tariff. This is consistent with a geographic footprint interpretation.




*C to D: Texas to Oklahoma: interstate. 49 U.S.C. § 60101(a)(8)(B)(i).*

Next, consider Example 7 below, on which PHMSA relied for its initial Federalization Order. 1-CalER2-113 n.7. Example 7 shows a pipeline from the Gulf of Mexico to Texas. This demonstrates that a pipeline from federal waters to a state is treated the same as a pipeline from one state to another state. This would be analogous to Sable's Offshore Emulsion Pipeline, which connects the offshore platforms comprising the SYU to the onshore LFC Facilities.




*A to B: OCS to Texas: interstate. 49 U.S.C. § 60101(a)(8)(B)(i).*

Next, consider Example 4B below, which shows a pipeline from A to B in Texas, but connects to another pipeline (from B to D) that reaches Oklahoma. This example shows that the pipeline from A to B is an intrastate pipeline, even though it is connected to a pipeline that crosses state lines.




*A to B: Texas to Texas, connected to another pipeline B to D (Texas to Oklahoma), but no FERC tariff: intrastate. 49 U.S.C. § 60101(a)(10).*

For purposes of jurisdiction, Lines CA-324/325 are indistinguishable from the pipeline connecting A to B in Example 4B. Lines CA-324/325 are located entirely within California, and they are not subject to a FERC tariff. To be sure, the

Offshore Emulsion Pipeline that connects the offshore platforms to the onshore LFC Facilities is analogous to Example 7, and, for jurisdictional purposes, is also equivalent to the pipeline from B to D in Example 4B. But the mere fact that both the Offshore Emulsion Pipeline and Line CA-324 connect to opposite ends of the LFC Facilities does not convert Lines CA-324/325 into interstate pipelines. Indeed, by publishing Example 4B, PHMSA and its predecessor confirmed the opposite—that a pipeline confined to a single state does not become interstate by virtue of its connection to a separate interstate pipeline. PHMSA's newfound adoption of a continuous carriage approach is inconsistent with its own policy, and therefore, it is contrary to law.

## III. PHMSA Failed to Correctly Analyze the LFC Facilities and the Importance of the Tasks They Perform

PHMSA's conclusions, both in the December 2025 Federalization Order and the June 2026 Jurisdictional Determination, require concluding that the LFC Facilities do not function as a break in transportation. But, of course, the LFC Facilities do exactly that, transforming an unmarketable emulsion into sales-quality crude. Under a geographic footprint rule, the LFC Facilities mark the end of one pipeline facility and the beginning of another. Under a continuous carriage rule, the LFC Facilities transform the hazardous liquid from one substance into another.

### A. PHMSA Failed to Consider Industry-Standard Definitions and Its Own Regulations, Which Categorize the Las Flores Canyon Facilities As Production Facilities

Federal agencies are required to follow their own regulations. *See Neumann's Pharmacy, L.L.C. v. DEA*, 167 F.4th 320, 327 (5th Cir. 2026). Courts "will not hesitate to overturn agency action . . . if the agency fails to comply with its own regulations." *Id*. at 327-28 (cleaned up). Accordingly, the agency's action supporting its decision must be consistent with those regulations.

PHMSA offers no rational connection between its conclusion that the LFC Facilities merely facilitate transportation in interstate commerce, and the record, which demonstrates that the LFC Facilities are a "production facility." PHMSA does not dispute that the emulsion that enters the LFC Facilities is not the same liquid that leaves the LFC. 1-CalER2-7 ("the offshore facilities produce crude oil as part of an emulsion that also contains water and other impurities."). More,

> At the LFC Facility, the crude oil is metered and heated to reduce its viscosity for subsequent movement through the [Santa Ynez Pipeline System (SYPS)]. A "free water knock out" . . . process is also performed to remove water and other corrosive constituents. The crude oil is then sweetened by removing hydrogen sulfide and stabilized to reduce vapor pressure to levels suitable for subsequent storage and movement by pipeline.

*Id*. (footnotes omited). In other words, an emulsion of oil, water and impurities enters the LFC, and "heat[ed], dewater[ed], sweeten[ed], and stabiliz[ed]" crude oil exits the LFC and enters Lines CA-324/325. *Id.* While PHMSA characterizes these

processes at the LFC as "*only* . . . transportation-related processing," 1-CalER2-19 (emphasis added), these processes constitute crude oil *production* under PHMSA's regulations. *See* 49 C.F.R. § 195.2 (defining a "production facility" as "equipment used in the production, extraction, recovery, lifting, *stabilization, separation or treating* of petroleum." (emphasis added)). When PHMSA's predecessor promulgated this regulation, it explained that status as a production facility is based on function, not location. 51 Fed. Reg. 15,005, 15,006 (Apr. 22., 1986) ("Facilities are designated as production facilities according to their usage, not the location of wells from which hydrocarbons are being produced.") Indeed, PHMSA's regulations recognize that production includes "preparing [petroleum] for transportation by pipeline." *Id*. (promulgating 49 C.F.R. § 195.2). Otherwise, even a refinery could be characterized as a "transportation-related" facility, by producing a more valuable, pure, and less viscous liquid, even though refining is explicitly excluded from the PSA. *See* 49 U.S.C. § 60101(a)(22)(B)(ii). Because the LFC Facilities are production facilities, they cannot be part of an "interstate hazardous liquid pipeline facility." Instead, the LFC Facilities operate to separate Lines CA-324/325 from the Offshore Emulsion Pipeline.

Rather than utilize the definitions in its own regulations and apply them to the evidence in the record, PHMSA instead resorts to inapplicable dictionary definitions, such as that: "[p]roduction was commonly understood as the '[p]rocess

or act of producing' and '[t]hat which is produced or made; i.e. goods'"; or that "[p]roduct was commonly understood as 'something produced.'" 1-CalER2-15-16. In so doing, PHMSA concludes that the exception for "onshore production, refining, or manufacturing facilities" set forth in 49 U.S.C. § 60101(a)(22)(B)(ii) only applies to facilities that make "petroleum products." 1-CalER2-16. That conclusion is contrary to and ignores the definition in PHMSA's own regulations, which states that a production facility is a facility that, among other things, treats "petroleum," and which makes no mention of "petroleum products."

To support its Jurisdictional Determination on this point, PHMSA cites its own assertions in two Interpretation Responses—#PI-17-0003 and #PI-96-015—and its own agency adjudication. 1-CalER2-18-19. These are not decisions by neutral tribunals, nor are they regulations subject to judicial review. But even on their own terms, PHMSA's authorities do not support its position.

First, PHMSA cites the two interpretation responses to conclude that the exception for production facilities "does not apply to any facilities that are used directly in the transportation of hazardous liquids by pipeline." 1-CalER2-16-17. But neither of these letters answers the central question of whether the LFC Facilities are production facilities.

The first letter, #PI-17-0003, concerns a storage facility that supports operation facilities. While the LFC Facilities may include some storage facilities,

the crude oil only arrives at the storage facilities after it undergoes processing at the LFC Oil & Water Treating Facilities.

The second letter, #PI-96-015, concerns a facility that blends natural gas liquids with separated oil. The letter explains that "blending is not one of the operations that characterizes a facility as a production facility under [49 C.F.R. § 195.2]." Unlike the facility at issue in #PI-96-015, the operations at the LFC Facilities do include "the operations that characterizes a facility as a production facility," which include production, extraction, stabilization, or treatment. The parenthetical reference in the definition, which is also mentioned in #PI-96-015, does not change the conclusion that the LFC Facilities are a production facility. Instead, the reference is only meant to clarify that a production facility includes facilities that extract petroleum from the ground as well as facilities that "prepar[e] the petroleum for transportation by pipeline (stabilization, separation, treating, storage, measurement)." *See* 51 Fed. Reg. 15,005, 15,006 (Apr. 22., 1986) ("Facilities are designated as production facilities according to their usage . . . .").

PHMSA also relies on *ONEOK NGL Pipeline, L.P.*, 2016 WL 8315623 (PHMSA Oct. 12, 2016). But just like the interpretation letters, *ONEOK* is inapplicable. Unlike here, where "production facility" is defined in the regulations, in *ONEOK*, PHMSA accepted dictionary definitions to determine what a "refinery" is. Ultimately, the PHMSA adjudicator concluded that the facility in question,

which conducted natural gas liquids fractionation, was not a "refinery" because fractionation was not part of refining. *Id.* at *11. Here, on the other hand, the regulatory definition of "production facility" includes stabilizing and treating of crude oil, which is exactly what the LFC Facilities do.

PHMSA's other authorities cited to support its determination that the LFC Facilities do not "interrupt[] the flow of interstate commerce," 1-CalER2-11, are likewise inapposite. *Flowers Foods* and other cases arise from the Federal Arbitration Act, not the PSA, despite different text and history. *See* California Supp. Br. (No. 26-508, Dkt. 105.1) at 2-19. Other cases, including *Kelley v. Rhoads*, 188 U.S. 1 (1903), seek to analogize the PSA with the dormant Commerce Clause, without explanation of why the dormant Commerce Clause informs the interpretation of the PSA. *See supra* Part II.B, *see also* California's Supp. Reply Br. (No. 26-508, Dkt. 115.1)) at 13-15 (discussing *Maryland v. Louisiana*, 451 U.S. 725 (1981)).

PHMSA's Jurisdictional Determination failed to consider an important aspect of the problem—whether the LFC Facilities are production facilities excluded from regulation under the PSA, notwithstanding that the "heating, dewatering, sweetening, and stabilizing" that takes place there may also facilitate transportation. Accordingly, PHMSA's determination that the 34-acre LFC

Facilities simply perform "transportation-related processing" is arbitrary and capricious.

### B. Resort to Dictionary Definitions for "Production, Refining and Manufacturing" Would Also Lead to the Conclusion that the LFC Facilities Interrupt Continuous Carriage

PHMSA concedes, as it must, that "production, refining, [and] manufacturing facilities," and "in-plant piping" in those facilities, are excepted from the definition of a pipeline facility. 1-CalER2-15-16. But in defining those terms, PHMSA applies a mix-and-match approach, first using dictionary definitions, then using industry expectations, and concluding by finding an atextual exclusion for "transportation-related processing." 1-CalER2-19. That exclusion does not exist, and the application of the definitions cited by PHMSA shows how this exclusion is inconsistent with the PSA.

PHMSA begins with excerpts from the contemporaneous definitions of "production" and "manufacture" in the Fifth Edition of Black's Law Dictionary. 1-CalER2-15. These definitions indicate that production and manufacturing are overlapping categories. Black's definition of "production" ends with the phrase "manufactures of every kind." Production, Black's Law Dictionary 1089 (5th ed. 1979). Black's definition of "manufacture" includes the comment that goods that "have acquired changed conditions or new and specific combinations, whether . . . from chemical processes devised and directed by human skill, or by the

employment of machinery, are commonly designated as 'manufactured.'" Manufacture, Black's Law Dictionary 869 (5th ed. 1979). This describes what occurs in the LFC Facilities, where chemical processes including free water knock-out, stabilization, and sweetening (*i.e.*, removal of sulfur) change the composition of the liquid.

The same is true for the term "refining." There, PHMSA draws on the contemporary Webster's New Collegiate Dictionary,[13] which includes "to reduce to a pure state." 1-CalER2-15 (citing Refine, Webster's New Collegiate Dictionary (1977)). This is also a task that the LFC Facilities perform, removing sulfur, propane, butane, and other components from the emulsion. 1-CalER2-48-49.

If PHMSA stopped at the dictionary definitions, those definitions would lead to the conclusion that the LFC Facilities, and the piping within the facilities, fall within the exceptions in 49 U.S.C. § 60101(a)(22)(B)(ii) and (iii) for "production, refining, or manufacturing facilities," and related "in-plant piping."

To avoid this conclusion, PHMSA contends that the LFC Facilities *only* perform "transportation-related processing," suggesting an exception to "production, refining, or manufacturing." 1-CalER2-19. But this "exception to the exception" makes no sense. In 49 U.S.C. § 60101(a)(22)(B), the terms "production, refining, [and] manufacturing" are identified as exceptions to transportation. Of

[13] Black's Fifth Edition does not define refine or refining.

course there are facilities that perform production, refining, and manufacturing that are *related to* transportation—this is why Congress had to include the exception.

### C. Even if a Continuous Carriage Interpretation Were Correct, Lines CA-324/325 Would Not Be Interstate Pipelines

#### 1. The Emulsion Delivered to the LFC Is Not the Same Liquid Transported Through Lines CA-324/325

Even if PHMSA were correct on several points—including that the correct rule is continuous carriage, and the LFC Facilities are not production facilities—what occurs at the LFC Facilities is not merely "incidental to pipeline transportation" to ensure "safe or convenient transit" of crude oil by pipeline. *See* 1-CalER2-18. Applying PHMSA's continuous carriage argument—which necessitates looking at the substance being moved rather than the facilities doing the moving—the change that occurs to a substance need not be substantial, but material, to interrupt continuous carriage. *See Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 151 (1919) (shipment of rough lumber from forest to mill within a state was not interstate commerce, even though the milling was followed by shipment of nearly all of the final product to points outside the state, because "when the rough material left the woods it was not intended that it should be transported out of the state . . . until it had been subjected to a manufacturing process that materially changed its character, utility, and value."). But PHMSA

offers only conclusory statements about what happens to the emulsion at the LFC Facilities. 1-CalER2-7-8, 17.

Like the mill in *Arkadelphia*, the LFC Facilities carry out a complex set of processes to the input they receive, transforming an unmarketable emulsion consisting mostly of water into marketable crude. *See supra* pp. 4-5 (describing processes performed at LFC Facilities). The emulsion that arrives at the LFC Facilities contains a variety of substances at inconsistent concentrations. *See, e.g.*, *See* 1-CalER2-290, 293, *see also* Motion for Judicial Notice, Exhibit A. The substance that leaves is marketable crude. 1-CalER2-115. By fundamentally changing the substance, the LFC Facilities "break the continuity of the transportation" in interstate commerce. *See Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 234 (7th Cir. 1961).

### 2. Even if the Emulsion and Crude Oil Might Be in Continuous Carriage, PHMSA Failed to Complete the Required Analysis

PHMSA's Jurisdictional Determination does not address whether the emulsion that arrives at the LFC Facilities meets the dictionary definition of "petroleum," or whether that definition only fits the product after processing. *See* 1-CalER2-15-16 (citing Petroleum, Webster's New Collegiate Dictionary (1977) (defining "petroleum" as "a complex mixture of hydrocarbons with *small amounts of other substances*") (emphasis added)). Because PHMSA's conclusion relies on

an assumption that petroleum is in continuous carriage, *see* 1-CalER2-4, 12, 16, this constitutes a "fail[ure] to consider an important aspect of the problem," *Barton*, 125 F.4th at 982.

PHMSA acknowledges that water, "corrosive constituents," and hydrogen sulfide are removed at the LFC Facilities. But it does not categorize the constituent elements in the emulsion by volume or weight. *See, e.g.*, 1-CalER2-7. PHMSA offers no evidence that there are only "small amounts of other substances." The record suggests otherwise. 1-CalER2-290, 293. The emulsion contains more water than crude oil. *See* Motion for Judicial Notice, Exhibit A. Because the emulsion is predominantly water, by PHMSA's own definition, the emulsion that arrives at the LFC Facilities cannot be defined as "petroleum" until after processing at the LFC Facilities. *See Roberts v. Levine*, 921 F.2d 804, 815-16 (8th Cir. 1990) (raw soybeans are not sold until their "character, utility, and value" are changed at the processing plant; the plant thus interrupted transportation in interstate commerce). At the very least, PHMSA failed to adequately analyze the composition of the emulsion flowing into the LFC Facilities and explain how that mixture met its definition of petroleum.

### 3. PHMSA Failed to Consider Evidence in the Record That the LFC Facilities Are Not Pipeline Facilities under the PSA

PHMSA fails to address evidence in the record—including evidence constituting admissions by PHMSA and/or Sable—that the LFC Facilities are not pipeline facilities under the PSA First, PHMSA failed to consider admissions by Sable that the LFC Facilities are not "incidental to transportation." For instance, although PHMSA found that the two 11.3 million gallon storage tanks "qualify as PHMSA-regulated breakout tanks," 1-CalER2-19, Sable previously admitted that the storage tanks in fact are not "breakout tanks." 1-CalFER-4. Moreover, Sable's Spill Prevention, Control, and Countermeasure (SPCC) Plan identifies the LFC Facilities as a "*non-transportation-related* onshore facilit[y]." 1-CalPSE-96 (submitted with California's Opening Brief in Case No. 26-508).

Second, according to PHMSA and Sable, neither PHMSA nor OSFM regulates the LFC Facilities. According to Sable's state court pleadings, the County of Santa Barbara regulates the LFC Facilities pursuant to the California Aboveground Petroleum Storage Act (APSA), sections 25270 to 25270.13 of the California Health and Safety Code. *See* 1-CalER2-99, 101 (¶¶ 13, 16 & 24). There is no evidence in the record that PHMSA has ever asserted regulatory jurisdiction over the LFC Facilities. And there is no evidence in the record that Sable has ever asserted that PHMSA is the rightful regulator of the LFC Facilities. In state court,

Sable is seeking declaratory relief from the court confirming Santa Barbara's exclusive jurisdiction over the LFC Facilities. *See* 1-CalER2-106 (Prayer for Relief, at ¶ 2.b).

Rather than confront the record evidence that the LFC Facilities are not pipeline facilities, PHMSA argues that Lines CA-324/325 are part of the "Santa Ynez Pipeline System," or "SYPS," a construct invented by Sable that amalgamates Lines CA-324/325 with the Offshore Emulsion Pipeline, the LFC Facilities, and Pentland Station. *See* 1-CalER2-7-8, 17-21. Prior to Sable's invention of a so-called "SYPS," never had these disparate facilities been treated as one contiguous "interstate hazardous liquid pipeline facility."

Nowhere in its jurisdictional analysis does PHMSA confront the fact that it lacks jurisdiction over an essential component of what it describes as an "interstate hazardous liquid pipeline facility." *See* 1-CalER2-3. Because PHMSA lacks jurisdiction over the LFC Facilities, then it definitionally is not a "hazardous liquid pipeline facility" and interrupts continuous carriage.

## IV. THE JURISDICTIONAL DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILED TO CONDUCT THE ANALYSIS REQUIRED TO JUSTIFY A CHANGE IN POSITION

PHMSA failed to provide a reasoned explanation for its determination that it has jurisdiction to issue the Special Permit. PHMSA's continuous carriage approach is a new one, not previously applied to Lines CA-324/325. When an

agency changes its interpretation, it must say so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* . . . ."). An agency that changes course "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

PHMSA's Jurisdictional Determination does not acknowledge that continuous carriage of a hazardous liquid was not, and has never been, the agency's jurisdictional analysis under the PSA. The Jurisdictional Determination explains that in May 2016, PHMSA changed the classification of Lines CA-324/325 from interstate to intrastate because of the cancellation of FERC tariffs. 1-CalER2-8. PHMSA seeks to now re-assert jurisdiction. But PHMSA cannot rely on a FERC tariff to support its whiplash determination that Lines CA-324/325 are, once again, interstate. *See* 1-CalER2-19. And neither the PSA nor PHMSA's regulations have ever considered owner intent or continuous carriage as relevant inquiries to a jurisdictional determination. PHMSA's failure to acknowledge or explain this fundamental policy change is arbitrary and capricious.

PHMSA's newfound explanation for its jurisdiction does not contain a viable limiting principle. The D.C. Circuit rightly rejected such an expansive view of PHMSA's jurisdiction when it held that the PSA "has always recognized a major

role for the states." *Southern Pacific*, 796 F.2d at 542. PHMSA appears to not have even considered this. In doing so, PHMSA "fail[ed] to consider . . . important aspect[s] of the problem," *Barton*, 125 F.4th at 982, namely, California's strong interest in regulating pipeline safety within its borders. Instead, PHMSA adopts Sable's framing, first that Lines CA-324/325 are part of a single pipeline facility,[14] and later to a continuous carriage rule.

Seeking to compensate for this omission, PHMSA's Supplemental Brief indicates the agency's view that a crude oil pipeline from an in-state well to an in-state refinery, or from an in-state refinery to an in-state end user, would be an *intra*state pipeline. This analysis requires a conclusion that the LFC Facilities are not a break in pipeline transportation. 1-CalER2-17-19. PHMSA then seeks to draw a line based on its view that the LFC Facilities change the liquid in a way that makes it easier to transport. 1-CalER2-19. On this basis, PHMSA rejects the idea that the LFC Facilities interrupt continuous carriage. This distinction is contrary to statutory text and unsupported by evidence.

There is no legal basis for PHMSA's line-drawing because the LFC Facilities are a production facility. *See supra* Part III.A. And in ignoring evidence that the

[14] PHMSA even changes the name it uses for Lines CA-324/325 from "Las Flores Pipeline" in the December 2025 Federalization Order, 1-CalER2-112, to adopting Sable's term "Santa Ynez Pipeline System," in the Jurisdictional Determination, 1-CalER2-3.

LFC Facilities are a production facility, PHMSA fails to acknowledge two essential facts. First, though PHMSA claims that the LFC Facilities make crude oil more efficient to transport, PHMSA ignores that a conventional refinery does the same thing. Refined products—such as gasoline and diesel fuel—are less viscous than crude oil, requiring less energy to transport. *See, e.g.*, *Texaco Inc. & Subsidiaries v. Comm'r*, 101 T.C. 571, 572-76, 581 (1993) (explaining relative viscosity of water and liquid fuels).

Second, the LFC Facilities do not simply "thin" the liquid for easier transport—they convert a crude oil emulsion into an entirely different substance. The Facilities receive an emulsion of water, oil, gas, other hydrocarbons, and sulfur from Sable's offshore platforms. 1-CalER2-7. The emulsion that arrives at the LFC Facilities is not a marketable product—it is an emulsion that contains predominantly water. *See* Motion for Judicial Notice, Exh. A (showing that platforms extracted more water than oil).[15] The LFC Facilities remove the water, other hydrocarbons, and sulfur, extracting sales-quality crude oil from the emulsion. 1-CalER2-48-49, 290, 293. The product that leaves the LFC Facilities is chemically distinct from what entered and economically marketable as a

[15] PHMSA offers no evidence that any buyer would be interested in purchasing this emulsion, especially given the month-to-month variation in the composition. *See id.* (showing variation in water content in the 60% to 70% range for most of 2026).

standardized commodity. PHMSA's failure to analyze any aspect of this transformation other than the allegation that it assists in transportation is a failure to comply with the APA.

## CONCLUSION

The Court should vacate PHMSA's Jurisdictional Determination.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Michael S. Dorsi*

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
*Senior Assistant Attorney General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
MYUNG J. PARK
VANESSA C. MORRISON
*Supervising Deputy Attorneys General*
MICHAEL DORSI
MATTHEW BULLOCK
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
*Deputy Attorneys General*

## STATEMENT OF RELATED CASES

The following related cases are pending:

*California v. Pipeline and Hazardous Materials Safety Administration, et al.*, No. 26-508

*Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.* No. 25-8059

*Environmental Defense Center, et al. v. Pipeline and Hazardous Materials Safety Administration, et al.* No. 26-6190

## CERTIFICATE OF COMPLIANCE

I am the attorney for Petitioner California in this case, Case No. 26-4629, and the consolidated cases, Case Nos. 25-8059, 26-508, and 26-6190. This brief contains 9,272 words, including 77 words manually counted in the visual images that are intended to be read by the Court, and excluding the items exempted by Federal Rule of Appellate Procedure 32(f). The brief's style and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this brief complies with the length limit designated by court order dated October 6, 2026.

Dated: November 9, 2026

Respectfully submitted,

*s/ Michael S. Dorsi*

MICHAEL S. DORSI
*Deputy Attorney General*